IN THE ~~CIRCUIT~~ COURT FOR DAVIDSON COUNTY TENNESSEE
CHANCERY,

Deryl L Baker

Sheri L Baker( aka Sheri Jones)

        Plaintiff's,

V.

CASE NO. 12- 1502 ~~CT~~

JP MORGAN CHASE BANK NA
Successor By Merger To Chase
Manhatten Mortgage Corp.and
Successsor By Merger to

CHASE HOME FINANCE LLC

Shellie Wallace : individually

WILSON & ASSOCIATES LLC

MORTGAGE ELECTRONIC REGISTRATION
SYSTEM Inc, and MERSCORP
Collectively as MERS

        Defendants,

**COMPLAINT FOR:**

1. VIOLATION OF 18 USC § 1962 1964
KNOWN AS "RACKEETERING INFLUENCED AND
CORRUPT ORGANIZATION ACT (RICO)

2. VIOLATION OF "FAIR DEBT COLLECTION
   PRACTICE ACT"

3. FRAUD

4. VIOLATION OF THE TENNESSEE CONSUMER
   PROTECTION ACT.

5. CONVAYENCE IN FRAUD

6. BREACH OF CONTRACT

7. TENNESSEE RICO ACT

------------------------------------------------------------------------------------

Plaintiff's Deryl L. Baker and Sheri L Baker, (collectively,) The plaintiff's comes Pro-se, Brings this action
to hold JP Morgan Chase Bank NA Racketeering Enterprise, Chase Home Finance LLC racketeering
Enterprise, Shellie Wallace, Wilson & Associates Racketeering Enterprise, MERS Racketeering enterprise,
Accountable for their rampant violations of Plaintiffs Rights, Tennessee law, Federal Law and associated
unfair and deceptive conduct amidst the foreclosure crisis that has gripped Tennessee and the nation since
2007, Plaintiff makes claims for Treble and punitive damages, costs and attorneys fees, under 18 U.S.C. §
1962 18 USC 1964 otherwise known as the "racketeer influenced and corrupt organizations Act " herein
after (RICO), Violation of Plaintiff's Cvil Rights, Fraud, violation of Tennessee Consumer Protection Act,

1

EXHIBIT

Fair Debt Collection Practice Act , And state basis for the Court to Enjoin violations of, TCA 39-12- 206, Tennessee RICO Act, And for other Relief, and Demand Trail by Jury.

## SUMMARY OF ALLEGATIONS

1. This is a action on behalf of the Plaintiffs, in the State of Tennessee who, during the period from, 1998 through the present were (a) in mortgage foreclosure actions prosecuted by Wilson & Associates on behalf of JP Morgan chase Bank, and (b) adversely affected by the W&A firm's systematic abusive foreclosure practices, including:

a) Preparation, execution and notarization of fraudulent court documents and property records used, *inter alia*, to initiate and prosecute foreclosure actions in the name of JPMC who has no standing, because JPMC conveyed all rights Title, and Interest to Ginnie Mae.

2.   Integral to their fraudulent scheme to inflate or fabricate foreclosure-related
Fees charged to Plaintiffs, threatened with loss of their homes. Defendants systematically bring foreclosure actions in the name of entities that do not possess (a) legal ownership of homeowners' mortgages or notes and (b) legal standing to sue homeowners obligated under those instruments. With speed and profit as their paramount objectives, Defendants file foreclosure lawsuits against Plaintiffs without undertaking even rudimentary investigation of basic facts concerning mortgage ownership and legal standing. Thus violating FHA Statue and codes, concerning Foreclose proceedings, had the shady law firm W&A took time to investigate its client JPMC, the firm would have discovered what the plaintiff discovered, which is JPMC is not the owner of Plaintiffs Note/security.

3.     To create an illusion of mortgage ownership and standing, Defendants systematically create and use (a) falsified mortgage corporate assignments From MERS.
Integral to their fraudulent scheme to inflate or fabricate foreclosure-related records filed with county agencies, and (b) complaints, certifications, verifications, affidavits, motions, and other legal documents filed in Davidson County Registry of Deeds state courts, which contain untrue statements of material fact purportedly based "on personal knowledge" of employees (robo-signers) of the Shady W&A firm, JPMC enterprise, related entities and servicer clients,

4. This is significant because Tennessee is a Non-judicial state that the Defendants take advantage of, the

2

fraudulent affidavits used to create the illusion of ownership of Plaintiffs Property is recorded in the Davidson County Registry of Deeds.

5.  Plaintiffs do allege that Defendants are liable for the *fraudulent practices* they systematically employed in prosecuting foreclosure actions and in thereby obtaining millions of dollars in inflated or fabricated fees from Tennessean homeowners. Including Plaintiff

6.      Defendants' false and misleading statements concerning mortgage ownership and legal standing operate as a fraud on the judicial system. They also (a) burden Plaintiffs with unnecessary attorneys' fees and other inessential expenses that undermine their ability to remain in their homes, and (b) contrive for Defendants illegitimate opportunities to foist inflated or fabricated foreclosure fees upon delinquent borrowers desperate to save their property.

Fraudulent foreclosure-related fees obtained by Defendants from financially distressed homeowners.

## I. THE PARTIES
## A. PLAINTIFFS

7. Plaintiff's Deryl L. Baker one of the people, a Natural, private common Man, and child of god, within the Tennessee and Sheri L. Baker, who Refinanced the home together on October 24, 2008, have since married and resides at 165 Timber Ridge Dr. Nashville TN, Deryl L. Baker acquired Rights Title and Interest by way of Quitclaim Deed executed and recorded in Davidson County, Under Tennessee law, it is possible for one spouse's separate property, or the appreciation of that separate property, to become marital property. The income from and appreciation of separate property during the marriage may be classified as marital property if the non-owning spouse proves that both spouses substantially contributed to its preservation and appreciation, thus commingling of assets or transmutation.

Plaintiff's are innocent victims of a systematic pattern of "Predatory Lending, Securitization scheme" Orchestrated by Defendant JP Morgan Chase Bank NA. Herein JPMC

3

8. MORTGAGE ELECTRONIC REGISTRATION SYSTEM, INC (hereinafter "MERS") is a Delaware Corporation which was created for the purpose of defrauding homeowners (as to identity of the holders of promissory notes and mortgages), Courts (as to the real parties in interest in mortgage foreclosures), and local municipalities (in avoiding recording fee's on mortgage assignments in the sum of billions of dollars nationwide) which conspired with the JPMC to avoid Registry of Deeds.

9. JP MORGAN CHASE BANK NA, (herein after JPMC), and CHASE HOME FINANCE LLC (hereinafter CHF)is and was at all times engaged in a regular and systematic course of conduct in Davidson County, and throughout the state of Tennessee, conduct included but is not limited to false claims of the acquisition of Mortgage loans relating to real property; the institution of fraudulent threats of foreclosure and fraudulent foreclosure proceedings based on false and fraudulent misrepresentation; the fraudulent collection, through one or more agents including but not limited to Defendants Chase Home finance LLC, Wilson & Associates, of monies allegedly owed on unsecured illegally obtained promissory notes use for collateral, for the Federal Reserve Bank to obtain funds from the Taxpayers. and the perpetration of fraud upon the courts of the united states, including registry of Deeds of Davidson county, through false, fraudulent prosecution of non-judicial foreclosure actions which conduct, Loan modification Scams, theft by deception, in the aggregate and in the manner executed, constituted a pattern of criminal activity.

10. SHELLIE WALACE for the past Decade has joined with defendant Chase Home finance LLC and JPMC, and other conspirators in the fraudulent scheme to Fabricate Affidavits, to appear as though she has been appointed successor Trustee, in order to steal property from hard working taxpaying homeowners. Taking advantage of the non-judicial foreclosure proceedings. Sabotaging the integrity of the Davidson county Land records, Shellie Wallace and her employer Wilson and associates, the
Davidson County Registry of Deeds is a crime scene, through false fraudulent prosecution of non-judicial foreclosure actions, which conduct, in the aggregate and in the manner executed, constitutes a pattern of criminal activity.

**The Law Firm:**

11. In or about the last decade, the Defendant law Firm Wilson & associates Joined Defendant JPMC, and

CHF, other conspirators in the fraudulent scheme and enterprise herein complained. The employees of the Defendant firm, including licensed attorneys, have become skilled in fabricating documents, filing fraudulent substitute of Trustee affidavits, acting as a Trustee for entities that has no "standing". Sabotaging judicial process to the detriment of borrowers, and over the years routinely relied upon MERS to accomplish illegal acts.

Wilson & associates PLCC, is a law firm with its principle place of business in Little Rock AR, with an office in Brentwood TN. The firm is one of the regional foreclosure mills, and a corporate counsel for JPMC. In the aggregated and in the manner executed, constitutes a pattern of criminal activity.

Note: Non-party Primary Residential Mortgage(Herein after PRM) who was the original Broker/pretender Lender in Plaintiff Transaction.


## II JURISDICTION AND VENUE

12. The court has original and subject matter jurisdiction over the plaintiff's statutory, equitable, and common law violations, When a court of chancery takes jurisdiction of a case under its inherent jurisdiction it may decide all issues involved in the matter in order to prevent a multiplicity of actions. *Industrial Dev. Bd. v. Hancock*, 901 S.W.2D 382 (Tenn. Ct. App. 1995).

13. Venue is proper in this Court, as the plaintiff's property is located in Davidson County Tennessee. Defendants have conducted business, illegally in this county and throughout the one hundred and twenty (120) Counties in Tennessee and throughout the United States.


## FACTUAL ALLEGATIONS


## SECURITIZATION AND STANDING

14. To the judges throughout the state of Tennessee, The foreclosure Defendant JPMC, CHF appears to be a Bank in this transaction, this falsity is due to the Name (JP Morgan Chase Bank NA) they are not Banks or Lenders to Plaintiffs alleged Loan. They are not Benificiaries under the Loan. They do not possess any legal binding documentation to show Standing. All documentation they possess is tainted with Fraud,

5

misrepresentation, robo-signing, illegal notarization.

This Honorable court is urged in the strongest possible way to apply a "PRESUMPTION OF FALSITY" when reviewing any documentary evidence filed in this court by one or more Defendants, especially JPMC. Such a presumption is not just warranted it is indeed compelled by the extent to which the Defendants and those with which they are associated have long acted in a malicious and wanton manner evincing complete contempt for judicial process and the rights of persons having interest contrary to their own.

15. At the time plaintiff signed promissory Note, she was unknowingly converting her property into an asset of a MBS. Miss Baker (aka miss Jones) was never informed of the nature of the scheme. She was deliberately induced into signing a Negotiable instrument which was never intented as such, but intented as collateral for the "Real" Lender, the US Treasury (the taxpayer)

16. Mortgage-backed securities (MBS) are pools of mortgages used as collateral for the issuance of securities in the secondary market. MBS are commonly referred to as "pass-through" certificates because the principal and interest of the underlying loans is "passed through" to investors. The interest rate of the security is lower than the interest rate of the underlying loan

To allow for payment of servicing and guaranty fees. Ginnie Mae MBS are fully modified pass-through securities guaranteed by the full faith and credit of the United States government. Regardless of whether the mortgage payment is made, investors in Ginnie Mae MBS will receive full and timely payment of principal as well as interest. Ginnie Mae MBS are created when eligible mortgage loans (those insured or guaranteed by FHA, Like the Plaintiffs the VA, RHS or PIH) are pooled by approved issuers and securitized. Ginnie Mae MBS investors receive a pro rata share of the resulting cash flows (again, net of servicing and guaranty fees).

17. Defendant JPMC Enterprises and CHF are approved issuers of the Ginnie Mae Mortgage Backed Security Program. (herein after GMMBSP).

(JPMC Approved issuer No. 3975).

(CHF issuer No. 1638).

all approved issuers must have a Document custodian. JPMC document custodian is (JP Morgan Chase Bank. ID No. 000131.) All ginnie Mae approved issuers are governed under the Ginnie Mae 5500.3 (Referred herein as the "Guide") http: www.ginniemae.gov guide guidtoc.asp?subTitle

NOTE: The information obtained in paragraph 25, highlighted in Bold is information obtained from the Ginnie Mae website.
Paragraph 31 is an excert from the "Guide" this is important because it talks about the risk involved with MBS, and the Defendant was well aware of those risk, as it played loosely with Plaintiffs Mortgage, in such a way, it no longer has STANDING. As evidence will show.

Case 3:12-cv-01222   Document 1-1   Filed 11/26/12   Page 6 of 207 PageID #: 11

18. Pursuant to Chapter 5-2 of the "guide", the Defendant JPMC Enterprises was well aware of the Risk involved in Securitizing Plaintiff's Note/Security.

## a) 5-2: RISKS AND LIABILITIES

This chapter describes the risks and liabilities that an Issuer assumes, regardless of pool or loan package type. Additional risks and liabilities, if any, associated with a particular pool or loan package type can be found in Chapters 24 through 32 and 35.

This chapter is intended to provide a general outline of the most common types of risks and liabilities that a Ginnie Mae Issuer may encounter; it may not, however, identify every item of Issuer risk or liability that may arise.

An Issuer of Ginnie Mae MBS has obligations that may n t be customary for a mortgage servicer in the private sector. Each Issuer must be aware of these obligations and make suitable financial arrangements to ensure that it has the capacity to cover them.

If Ginnie Mae declares the Issuer in default under the applicable Guaranty Agreement, Ginnie Mae has the right, without further cause, to declare a default on all of the Issuer's pools and loan packages and all of the pools and loan packages of any affiliate of the Issuer that has executed a Cross-Default Agreement.

19. Plaintiff contacted The Office of Mortgage Backed Securities at Ginnie Mae seeking information pertaining to the FHA Loan in this instant matter.

20. The defendant JPMC Racketeering Enterprises elected to Securitize Plaintiff's Note/Security in the Ginnie Mae 1 Single –Family (level Payment) Mortgage Backed Securities.

Pool No. 688110XSF

Issued Date: 12/1/2008

Cusip No : 36296DN38

Transfer Agent: The Bank of New York.

Depositor: The Federal Reserve Bank of New York.

Starting pool amount: $ 200,019,917.00.

Pool interest rate: 5.500 %.

21. There are special requirements for this program outlined in Chapter 24 of the "guide", also outlined in Chapter 13-4 & 6 as follows:

7

NOTE: Paragraph 4 & 6 are excerts from the "guide" which governs the issuers and participants of the GMMBSP
This is significant, because paragraph 6 outlines the interim assignments necessary to make the assignment valid against lien holders.

(4) For each pooled mortgage or Participation, an original note or other evidence of indebtedness endorsed in blank and without recourse by the pooling Issuer.

(6) If the Issuer did not originate the loan, **interim assignments necessary to show a complete chain of title from the originating mortgagee to the Issuer. If the loan is registered with MERS, the Issuer must provide a complete chain of interim assignments from the origination of the loan to its assignment to MERS.** If the loan was originated with MERS as the original mortgagee (MOM), an interim assignment is not required. If state law requires recordation, the interim assignments must be recorded (or must have been transmitted by the Issuer for recordation) in order to make the assignment valid against all lien holders.

22. There is no interim assignment from PRMI to the Issuer JP Morgan chase Bank as required by the "Guide" PRM had no legal authority to endorse Note/security, attached exhibit (D) to JPMC, Enterprises Pursuant to TCA 45-13-105:" any Broker who for compensation, originates a residential mortgage loan, for another person, but uses mortgage brokers own name, **must assign Loan to person who provided funding of the loan.** Regardless of whether the acts are done directly, through contact by telephone, by electronic means, by mail or in person with the borrower. This is significant because this is the only assignment that connects JPMC to plaintiffs Mortgage loan, therefore if the assignment is unlawful on state and federal level JPMC has no standing, because it wasn't the funder or creditor.

23. The Defendant JPMC Enterprise is the issuer in this transaction see exhibit (C), The "Prospectus". During a Conversation with John Frank in human resources at the Headquarters of non-party Primary residential Mortgage, located in Salt Lake City, Mr. frank admitted to the fact that PRM dropped the ball PRM did not register the Assignment of Deed.( Exhibit E. faxed to the plaintiffs by john frank) assigning the Deed of Trust to Chase Manhatten Mortgage. But not recorded, shall be null and void pursuant to TCA 66-26-103

The Note/Security (exhibit(D) was illegally endorsed to JPMC. By PRMI, and from JPMC, endorsed in Blank. The Plaintiff Loan is register with MERS-MIN #100146401928001422,
The Proper Assignment is displayed below:

8

NOTE: 1. The information in the diagram below, Pertaining to the warehouse lender was obtained through conversation with John Frank, Head of Human recourses for Primary Residential Mortgage Headquarters in Salt Lake city UT, Mr. Frank told Mr. Baker That the Loan was funded by a warehouse Lender, in laymen terms it was table funded, meaning an entity funded the Loan at closing, until JPMC receives Payment from the Window of the Federal Reserve Bank Of New York, for the collateral securities. Then JPMC pays the warehouse Lender with Taxpayers Money. 2. The Diagram below shows the interim assignments required by ginnie Mae of the Issuer (JPMC) to validate the assignment against lien holders This is significant as to STANDING.





HOW DEFENDANTS COMMIT FRAUD UPON HOMEOWNERS/ VETERANS

Assignment of Deed/Not Recorded

PRIMARY RESIDENTIAL

JP MORGAN Document

MERS is the Enity
Created by the Banksters
to be a Front to Cover up the
Fraud, by Recording JPMC as
the Creditor/Investor

FEDERAL RESERVE BANK

24. Non-defendant PRMI was instructed by Defendant JPMC Enterprise to construct the Loan transaction Illegally according to John Frank, Breaking The chain of Title. Separating the Note/security from the Deed of Trust, JPMC could never be the owner of the plaintiffs Mortgage, Note/security, There is no Valid interim Assignment or endorsement to JPMC, Therefore JPMC has ⟷ **NO STANDING ANY TIME**, JPMC Racketeering Enterprise Obtained plaintiffs Note/security through unfair and deceptive practices, for the purpose of Securitization, violating State Law, Federal Regulations and guidelines under the Ginnie Mae Mortgage back Security Program. Example:

10

NOTE: The Guaranty Agreement is very significant, this agreement clearly shows that the defendant JPMC conveyed all rights title

NO<br/>
STANDING<br/>
ANY<br/>
TIME

and interest to ginnie mae. Article III 3.01. Therefore having ◄——► Below is an exert from Agreement:.

# a) APPENDIX III-15 GUARANTY AGREEMENT GINNIE MAE I SINGLE-FAMILY (LEVEL PAYMENT) MORTGAGE-BACKED SECURITIES

**THE GUARANTY AGREEMENT** ("Agreement") is composed of (i) the terms and conditions contained herein; (ii) a duly executed Schedule of Subscribers and Ginnie Mae Guaranty Agreement (the "Schedule") incorporating this entire document by reference; and (iii) a Schedule of Pooled Mortgages. This Agreement is made by and between the Government National Mortgage Association, a corporate body organized and existing under the laws of the United States within the Department of Housing and Urban Development (**"Ginnie Mae"**) and the financial entity identified in the Schedule and approved by Ginnie Mae to issue the securities provided for in this Agreement (**"Issuer"**);

25. The Defendant JPMC conveys all rights, title, and interest to ginnie Mae on 12/01/2008 in Article 3 of the "agreement" as follows:

ARTICLE III. MORTGAGES

Section 3.01    **The Issuer does hereby transfer, assign, set over, and otherwise convey** to Ginnie Mae all the **right, title,** and **interest** of the **Issuer** in and to the Mortgages identified and described in the Schedule of Pooled Mortgages for the subject pool. Such transfer and assignment shall be effective as of the date and time of delivery (release) of the Securities by Ginnie Mae or its agent, and shall include all interest, principal and other payments made on or with respect to, or related in any way to, such Mortgages. This includes, but is not limited to, payments due on the Mortgages after the Issue Date of the Securities and all unscheduled recoveries of principal received on the Mortgages after the close of business on the day on which the original principal balance of the pool was determined.

11

Note: JP Morgan Chase has No collateral securing the Mortgage. See page 7 paragraph 9. of the Deed of Trust as follows: Upon Payment of all sums secured by this Security Instrument. Lender shall release this Security Instrument without charge to the borrower. JPMC Payed all sums Secured by the Deed of Trust to the Lender,

26. The Defendant JPMC re-purchased the Loan at Par value on 12/14/2009, Plaintiffs was never 90 continuous days delinquent exhibit (G), plaintiffs payment history, in fact plaintiffs was never 60 days late prior to the re-purchase date.

27. The Defendant JPMC did not comply with the terms of the "Agreement" , by not notifying Ginnie Mae of the Plaintiff defective Mortgage, Pursuant to section 3.05 & 3.06 JPMC warrants the delivery as follows:

a) Section 3.05  The Issuer hereby covenants and warrants that it has delivered or will deliver and deposit with an eligible custodian institution appropriate documents evidencing and relating to the pooled Mortgages within the time frame required by the Guide. Such documents and such custodial requirements shall be those set forth in a custodial agreement in the form prescribed by Ginnie Mae. Such custodial agreement has been provided to Ginnie Mae, and its terms and conditions as they relate to Ginnie Mae and the Issuer are incorporated into and made a part of this Agreement by reference. The Schedule identifies the institution selected by the Issuer to serve as custodian for the documents relating to the Mortgage pool that is the subject of this Agreement.

b) Section 3.06  The Issuer hereby covenants and warrants that it shall replace any Defective Mortgage, within four (4) months after the Effective Date. If, after that time, any Defective Mortgages exist, then: (a) if such Defective Mortgages can be corrected or cured such that they no longer would be defective, the Issuer shall effect such correction or cure; or (b) if such Defective Mortgages cannot be so corrected or cured, the Issuer shall notify Ginnie Mae immediately, and if Ginnie Mae approves, the Issuer shall repurchase the Mortgages at one hundred percent (100%) of the outstanding balance ("Par"). Such correction or repurchase shall occur either 30 days from discovery or the final certification due date, as set forth in the Guide, whichever is earlier. Any delinquency or any default by the borrower occurring before or after the Effective Date in the payment of any Mortgage shall not be deemed a defect for purposes of this section.

12

28.    The Defendant JPMC knew the Mortgage was defective from its inception, due to no interim Assignment to MERS Pursuant to section 13.06, JPMC Racketeering Enterprise failed to Notify Ginnie Mae, the effective date was 12/01/2008.    The Defendant JPMC warranted a defective mortgage, systematically defrauding the Plaintiff, ginnie Mae, and the United States Government.   Violating the "Agreement"


29.  JPMC Enterprise is well known in the industry for selling defective securities, the FHA filed a lawsuit against JPMC. Between September 7, 2005 and September 2007, fannie mae and Freddie mac purchased over $33 billion in residential mortgage backed securities, issued in connection with 103 securitizations sponsored by JP Morgan, these securities were sold pursuant to registration statements, including **prospectuses** that formed part of those registration statements, which contained materially **false** or **misleading** statements and **omissions**. . Defendant JPMC falsely represented that the underlying mortgage loans complied with certain underwriting guidelines and standards.   To read the entire complaint: http://www.fhfa.gov/webfiles/22597/FHFA%20v%20JP%20Morgan.pdf

This is significant to plaintiff's Claim, because these are identical tactics JPMC enterprise use on Plaintiffs Mortgage Loan, The Plaintiffs Loan did not comply with the guidelines, Prospectus, State, and federal

NO<br/>
STANDING<br/>
ANY<br/>
TIME

laws. Thus has ◄─────► .


30.    JPMC engage in plethora of "prohibited activities" and sold the investors certificates with phantom mortgage backed assets, JPMC was, in effect the banking back-office for Madoff Ponzi scheme, shuffling piles of money from one account to another at madoff's request," said steve Berman of Hagens berman, in a prepared statement. " Had JP Morgan done even a perfunctory job of due diligence and fulfilled its duty to report madoff's illegalities, it would have saved investors millions of dollars.


31.  Defendant JPMC Business model is "Originate To Distribute" acquire FHA, VA, subprime loans by any means necessary, regardless of the validity or the ability for the borrower to pay back, just so long as they can bundle them together to create a 200 million dollar bogus pool, in which they receive .50 % of the 6% charged to borrower. Then selling the pool as a pass-through MBS to investors at 5.500 % collecting .44 basic points and paying Ginnie Mae 0.06% for guaranty fee. They just net about 900,000 for servicing fee.  Passed all interest principle, taxes to the investor, never having to ever put the Loan on their Books. How clever is that scheme. Then after selling the plaintiff mortgage, continued to violate state laws,

13

"Agreements", to send the borrower through forbearance plan scams in order to swindle more monies for late fees, attorney fees, recording fraudulent document fees, publishing notices fees.

32. Part of the reason this fraudulent scheme has gone largely unnoticed for such an extended period of time is that its sophistication is beyond the imagination of the average persons, and it's Congress approved. These corrupt influences have spread throughout the financial services, lending and banking industries into the national economy and beyond, threatening the economic stability of the United States.

33. This is particularly true because the Defendants' contempt for due process is compounded by their specific intention to obviate the requirement that documents prepared for legal use be truthful, authentic, and legitimate.

34. In order to collect on the mortgage loan and divest Americans of their homes, JPMC, Servicers, issuers, have had to mislead the courts as to their standing in foreclosure. They have had to create, forge and fabricate phony documents in order to obtain an order of sale in Foreclosure, in non-judicial states they have filed fake and forged affidavits with the county clerks office giving the false impression that they had legal standing to sell homes. When in fact the Real party of interest is the Certificate holders, and the Federal Reserve Bank by way of the US Treasury

35. Because of the fraud committed in these illegal foreclosure sales, by Banksters like JP Morgan Chase Bank NA, and regional foreclosure mills like Wilson & associates, and individual shady lawyers, like Shellie Wallace, hundred of thousands of homeowners have gone from sleeping in a warm bed to being out in the streets.

## STATEMENT OF RELEVANT TENNESSEE LAW AND THE
## UNIFORM COMMERCIAL CODE

36. The Defendant JPMC & PRM Endorsed The Promissory Note, "Pay to the Order" (exhibit) (D). Pursuant to TCA 47-9-102. (65) *"Promissory note" means an instrument that evidences a promise to pay a*

14

*monetary obligation, **does not evidence an order to pay**, and does not contain an acknowledgment by a bank that the bank has received for deposit a sum of money or funds.*

37.     The Defendant JPMC racketeering Enterprise is Not in possession of the original negotiable instrument with any legally binding original endorsement.

38.   The Note will never be enforceable, as made obvious by official comments to the UCC § 355.3-203, that read as follows: " X signs a document conveying all of X's right, title, and interest in the instrument to Y. Although the document may be effective to give Y a claim to ownership of the instrument, Y is not a person entitled to enforce the instrument until Y obtains possession of the instrument. No transfer of the instrument occurs under Section 3-203(a) until it is delivered to Y."

39.     Based on the record in the plaintiff's loan, the Note and the mortgage were bifurcated at interception and were and remain unenforceable as a secured transaction under the Uniform commercial code.

40.     upon information and belief, the Note was "securitized" and was paid off in excess of the principle balance and is no longer enforceable as a secured negotiable Instrument.

41.   The JPMC racketeering Enterprise does not hold, bear or own the original Note, is not a Mortgagee and has no legally enforceable interest in the loan or Standing.

42.     if an enforceable transaction can be proven, the plaintiffs were deceived into such transaction without notice that they were encumbering the property as "security" under the regulations of the Ginnie Mae Mortgage Backed Security Program.

43.     Pursuant to TCA 45-13-105 the "bogus" assignment of the Promissory Note is invalid, because the broker/pretender lender (PRM) never assigned the Loan to the funder.

## NATIONAL HISTORIC BACKGROUND AND SIGNIFICANCE

44.   In the United States, home purchases are typically financed by mortgages or loans that are secured by a mortgage (in judicial foreclosure states) or deed of trust ( in non-judicial foreclosure states) and a note which, when executed on behalf of the same entity and held by the same entity as a "note and deed of trust", entitle the holder of the note and deed of trust to foreclose on the property of the borrower if the

Case 3:12-cv-01222   Document 1-1   Filed 11/26/12   Page 15 of 207 PageID #: 20

borrower is in default without legal excuse or recourse.

45.    According to CNNmoney.com, beginning in 2008, U.S. foreclosure filings spiked by more than 81% in one year, a record in the United States. Foreclosures were up 225% compared with 2006 figures. A reported excess of ten (10) million foreclosures have occurred in the U.S. since 2008.    The peak in foreclosures is not predicted to occur until the end of 2011.

46.    In 2008, the Plaintiff entered into a mortgage with deed of trust and a notes that was intentionally separated after the execution of the mortgage, the note was warehoused and alleged to have been sold to an investor , and the note was in whole or in part allegedly conveyed to that investor by means of deposit in the GMMBSP as a mortgage backed security pool ("MBS."). In essence, prior to the contract being signed by the borrower, the note was funded by a party other than the originator or servicer of the loan. The MBS was literally created and funded prior to the borrower ever taking out a loan. Therefore, the MBS underwriter/originator or servicer had to go create loans after the fact which loosely matched the description of the prospectus used to entice investors into the MBS. Most times, the ratings Agency, such as Moody's would give the MBS its AAA rating even though the loans had yet to be created or originated.

47.    Most importantly, for purposes of the nationwide foreclosure frenzy, the investors, do not attempt to call defaults upon the borrowers nor do the investors threatened to or foreclose. The entity filing foreclosure has absolutely NO financial stake in the mortgage loan.    If they did, the MBS would lose its REMIC pass through tax status. Most importantly the foreclosing entities have NO agreement with the Trust or Servicer to act on their behalf. In fact, the Servicing Agreements forbid the Trustees or Servicers from filing actions on the investors behalf.

48.    Nationwide, the mortgages and Deed of Trusts, name a party as the "lender" who did not fund the mortgage and had no intention of funding the mortgage; yet, that "lender" who had no beneficial interest named MERS as the beneficiary and MERS had no beneficial interest nor did MERS represent any party to the deed of trust who had a beneficial interest. Each mortgage and deed of trust was, therefore, void upon execution because the statements contained therein were untrue and the failure to disclose these facts to the borrower acted to the borrower's detriment and there was no meeting of the minds, no consideration and an utter failure to create a security instrument.

49.    Nationwide, borrowers execute the note and then separately execute the mortgage or deed of trust naming MERS as the beneficiary and/or nominee of the beneficiary/lender.    At inception, the note was separated from the mortgage or deed of trust.

50.    This concept was unheard of in state property law in every state and territory of the union until these

16

Defendants created these fictional documents and these fictional beneficial interests, and fictional lenders.

51.    After the execution of the documents, with the note being allegedly transferred to investors whose money had funded the loans taken out by the Plaintiffs/borrowers, the failed mortgage or deed of trust was kept with MERS listed as the beneficiary, but the notes were transferred to parties outside the MERS system in violation of the rules and policies adopted by MERS.

52.    It is predicted that in at least seventy percent (70%) of the nationwide mortgages and Deeds of Trust registered to MER in America, the "lender" that MERS claims to be a "nominee" for is no longer in business and/or has been liquidated in bankruptcy. MERS, at the moment of the note's transfer to another party, or the "lender's" demise, MERS could not possibly have an agency/beneficiary/nominee status with the "lender." There is no further authority to substitute a mortgagee or trustee or transfer any other interest in the mortgage or deed of trust to any party. No party that has initiated foreclosure or intends to initiate foreclosure on any MERS mortgage has any authority to and holds, at most, an unsecured note in favor of the real parties in interest of the note, the investor/owners;(Federal Reserve Bank) if and only if they can prove they have an agency relationship with the owners and if they can show that they owners have not already been made whole by a derivative contract.

53.    Simultaneously with or immediately after the loans were taken out by borrowers nationwide, the obligations reflected by the notes were satisfied by monies provided by the (Federal Reserve Bank) investors who then obtained ownership of and right to payments under the terms of the note. These investors are the only parties to whom any obligation arose after the loan was securitized, and are the only proper parties, but these parties have no recorded interest in the mortgage or deed of trust, which was never delivered to the Trustee for the mortgage backed security pool and, therefore, the note itself, is at best unsecured rights to payment.

54.    The note, that had been executed with the mortgages or deed of trust were separated from the mortgages and deed of trust in that the note became part of a pool of mortgages; thereby losing its individual identity as a note between a lender and a borrower. The note instead merged with other unknown notes as a total obligation due to the investor or investors.   The note is no longer a negotiable instrument, but collateral for a Federally regulated Security under the confines of the GMMBSP.

55.    MERS was created by its owners to work with investment banks and "lenders" as co-conspirators in relation to the MERS system with the specific intent that MERS would be named the beneficiary and/or as the nominee of the lender on the mortgages and deeds of trust which borrowers nationwide were induced into signing.

17

56.    However, MERS was not the "nominee" for the lenders, but was the agent for the servicers. The true lenders were US Treasury investors who had provided the funds for the loans through mortgage backed security pools which were held as trusts. This fact was known to MERS and the purported lender and the subsequent assignee of any and all rights purported to have been assigned by MERS at the time the note and mortgage or deed of trust was signed by borrowers at the time of each and every such later purported assignment by MERS of any interest in the note and deed of trust.

57.    The foreclosures filed in the past, present and in the future bearing a recorded mortgage or deed of trust in MERS name have been and continue to be initiated nationwide by parties who have no right to declare default, have failed to provide an accounting of the amounts due and owing to the true beneficiary, who are the only parties with the right to declare such default.

58.    The Servicers, such as JPMC Enterprise, did not fund the loans of the nation's borrowers with any of its own assets and is not owed any of the funds to be repaid by the nations' borrowers. The Servicers and MERS do not stand to suffer any loss should they be enjoined from foreclosing on real estate nationwide and have no right to foreclose on behalf of unknown investors because of a lack of agency, lack of authority and lack of knowledge of whether the note has been discharged.

59.    All Defendants knew that prior to the time that the loan was taken out by the nation's borrowers, a loan which named MERS on the mortgage was securitized or intended to be securitized prior to the preparation of the note and mortgage reflecting the loan. Defendants also knew that the scheme employed by all Defendants involved in the origination, aggregation and securitization of mortgage-backed loans originated from 2003 through 2009 and secured by real property in the United States included financial incentives which were designed to result in the loans being written on terms which were likely or certain to result in foreclosure, and that the scheme described herein included financial incentives designed to motivate appraisers, mortgage brokers, lenders, aggregator banks and securitizing banks to steer borrowers into loans they could not afford and could not repay so that the loans would go into default and the Defendants involved in servicing, aggregating and securitizing those loans could make yet more profits from default, foreclosure and selling the properties after foreclosure.

60.    The financial incentives mentioned in the previous paragraph included without limitation the hiring of appraisers who had financial incentive to appraise properties at a value that would justify the loan requested, the payment to mortgage brokers of higher fees for sub-prime and sub-sub-prime loans than for prime loans and the use of novel and unprecedented underwriting criteria such as stated income and 100% or more financing of the purchase price, and the purchase of loans from lenders by aggregators and servicers of loans at more than face value if the loans were sub-prime or sub-sub-prime and if such loans also included an adjustable interest rate and/or a pre- payment penalty. In the case of many of the nation's

18

borrowers the loans were advanced based upon the value of the house itself and not the income of the borrower. Also, in this case, the equity in the house itself was used to secure more loans based upon the value of the home when that value was exaggerated by the market manipulated by the Defendants and which is clearly not in the interest of the borrowers for an initial purchase or refinancing of property.

61.     The Defendants who originated, serviced, aggregated and/or securitized the loans knew or should have known at the time of those actions by Defendants that the financial incentives described in the previous paragraph herein were not disclosed to the investor or to the nation's borrowers, and that the Defendants who originated, serviced, aggregated and/or securitized the Plaintiff's loan also purchased credit default swaps which were essentially bets that the Plaintiff's loan would fail, resulting in multiple payments to those Defendants of the face amount of the loan, and knew or should have known that fact was also concealed from the investors and Plaintiffs who were instead intentionally misled by Defendants to believe that the Plaintiffs qualified for the loans under residential loan underwriting standards used in the industry.

62.     All Defendants who originated, serviced, aggregated and/or securitized the Plaintiff's loan knew or should have known at the time of those actions by Defendants that the more likely or certain the loans were to fail, the more likely that failure was to cause the entire mortgage-backed security pool, to fail, and the more profitable those events would be to Defendants.

63.     The investors and the borrowers were entitled to information regarding all of the profits, payments, kick-backs, fees and insurance and credit default swaps related to the transactions which included the identity of the investors providing the funds loaned to the borrowers, and the concealment of those facts by all the Defendants who originated, serviced, aggregated and/or securitized the loans was an intentional misrepresentation and/or intentional material omission of fact by those Defendants for the purpose of using the borrowers' signature on a note and deed of trust to defraud the investors and the borrowers. These Defendants, upon information and belief, falsely told the FDIC or the federal government or the federal reserve that the Defendants were in dire need of trillions of dollars in federal funds due to "toxic assets" being allegedly on the books of Defendants and those "toxic assets" included the loan to the borrowers for which they were not qualified, but were encouraged and induced by the Defendants to enter into the loan and to default on the loan in order for the Defendants to foreclose.

64.     All Defendants participated in a conspiracy to cause borrowers to enter into instruments that would result in the foreclosure on their home and the loss of their investment and to initiate and complete foreclosure on the borrower's house without the lawful right to do so or to commence and advance foreclosure against the borrowers with knowledge that the borrowers had been deceived by having not been informed that the loan they took out was intended to result in foreclosure and consequently more profits to

the Defendants. As a proximate and direct result, soon to be named Defendant servicers, such as JPMC, have been unjustly enriched by the payments of the Plaintiffs on the note and by the profits earned by Defendants from the declarations of default, the commencement and advancement of foreclosure on the borrower's property and will be unjustly enriched if allowed to keep the property of the Plaintiff.

65.     The lenders and investors in mortgage-backed securities, including some of the Defendants, have obtained bailout money from the United States Treasury and the Federal Reserve in the amount of trillions of dollars for the stated purpose of compensating the lenders and investors for losses sustained due to the alleged default on residential mortgage loans including those of Plaintiffs.

66.     The Pretender lenders, servicers and investors in mortgage backed securities, have used those funds to repay investors who funded loans and/or to settle the lawsuits of those investors against the securitizing banks for fraud, with such use of those funds having extinguished the obligations reflected by the note that was executed by the borrowers and thus have no right to collect on the note, and had no right to initiate the foreclosure on Plaintiffs home bearing a mortgage or deed of trust in the name of MERS.

67.     The Plaintiff have a deed of trust that states that the beneficiary and/or beneficiary as the nominee of the lender is MERS. and have been declared in default by JPMC Enterprise who is not entitled to declare the default. Even though the Borrowers/Plaintiffs did pay the payments agreed in the "Note," and, in fact, invested their savings in the home based upon the representations of the Defendants, the Defendants have foreclosed and intend to foreclose and take the Plaintiff's property without stating who holds the note and to whom payment is due on the note and what amount is due on the note.

68.     Defendants' use of MERS created the method to defraud the Home Purchaser, because MERS was not the holder of the Note and MERS was not a transferee in possession entitled to the rights of a holder or had authority under State law to act for the holder. Neither does MERS have the authority to appoint a successor "nominee.".

69.     The entities that have foreclosed or will attempt to give notice that they will foreclose on the home of the Plaintiffs are not MERS and are not the parties that funded the loan of the borrowers.

70.     The Plaintiffs executed a note and Deed of Trust on their property under circumstances that were predatory lending and all the defendants herein are now in a position to have taken advantage of the predatory lending or are now in a position of taking advantage of the predatory lending and, thus, all are liable for the predatory lending.

71.     Defendants knew that the business practices in which they were engaged would result in driving the market for housing into unnaturally high demand which would cause the prices on home to escalate beyond their normal and reasonable value and further knew that lending money to persons who were not qualified in such large numbers would cause the market to eventually crash. The Defendants believed this to the extent that the Defendants purchased credit default swaps, in essence, side bets that bet that the Plaintiffs and other loans given in the same time frame and under the same circumstances would fail.

72. The Note/Security has Been stripped of all its Equitable assets and transferred to the Federal Reserve Bank of New York by way of Fed wire Book-entry as collateral for JPMC borrowing of Taxpayers Money. The Issuer, transfers the stripped Note to the Document custodian by way of delivery and the Document custodian is actually the same entity, JPMC. This scheme is designed to commit fraud upon the homeowners of America, and veterans of the armed forces. JPMC bundles thousands of VA, and FHA, subprime predatory lending alleged Loans, and transfer them to the Federal Reserve Bank by way of Fed wire Book -entry. By using their own entity to store the stripped Notes, because the Loans are backed by the full faith of the Taxpayer, it's a win- win situation. When homeowners struggle to make payments on the inflated mortgage, the pretender lenders JPMC Enterprise reap profits on the over-appraised mortgage loan values. Conversely, when homeowners fall behind, the purchasing pretender lender JPMC, sell the properties through foreclosure auction, and then collect the full principal and arrears on the over-valued mortgages through the FHA insurance fund. the FHA guarantee unfortunately provides a disincentive for pretender lenders to negotiate a resolution: even in cases where homeowners were clearly defrauded, pretender lender JPMC push for a foreclosure sale rather than an equitable resolution, in order to claim their full FHA payment. Like the refinance schemes, fraudulent FHA transactions are disproportionately targeted at homebuyers of color. Recent public and private initiatives to expand homeownership by non-white families are being seriously undermined by this and similar patterns of apparent racial targeting and discrimination.

NOTE: excerpts from the OIG: Properties located in judicial foreclosure states and jurisdictions accounted for $547 million in claims (26 percent of the total loans with claims). Properties located in nonjudicial foreclosure states and jurisdictions accounted for more than $1.55 billion in claims (74 percent of the total loans with claims). These amounts include all categories of **FHA claims.**
s October 1, 2008, through September 30, 2010 ₆ 31 U.S.C. § 3729 et. seq. ₇ Comprised of representatives of the State attorneys general, DOJ, and HUD.

73.     The nominal "lender,"(PRMI) on the original Promissory Note/Security was not the lender. The originators of the loan immediately and simultaneously securitized the Note/ Security. The beneficial interest in the Note/security was never in the nominal lender (PRMI). The Defendants were never intended to be the lender nor did it represent the true lender of the funds for the mortgage. The Servicer/issuer, JPMC, has declared the default, but is not in privities with the lender. The true owner or beneficiary of the

21

mortgage loan, The Federal Reserve Bank of NEW York, fiscal agent for the US Treasury (the taxpayer) or The Certificate Holders has not declared a default and usually no longer have an interest in the Stripped Note. JPMC Racketeering enterprise, Conveyed all Rights, Title, interest To Ginnie Mae. Therefore have

**NO STANDING ANY TIME**
←——→

74. The obligations reflected by the Note/Security have been satisfied in whole, because the Federal Reserve Bank, Fiscal agents for the US treasury paid in advance the funds to JPMC, who furnished the funding to the wharehouse Lender, thus satisfying the obligation of the Note. Defendants JPMC Racketeering Enterprises, Wilson & associates Racketeering, Enterprises Shellie Wallace, have and will cloud the title and illegally collect payments and attempt to foreclose upon the property of the Plaintiffs when they do not have "Standing", lawful rights to foreclose.

## THE FORBEARANCE PLAN, LOAN MODIFICATION SCAM CONDUCTED BY CHF, LLC

75. The plaintiffs filed a complaint with her United States Senator Bob Corker, on or about august 29th 2010.

76. On September 7, 2010 The Honorable Bob corker received a letter from Comptroller of Currency, Administrator of National Banks, Acknowledging a case has been opened on behalf of his constituent. Case# 01273643 Letter attached as exhibit M

77. The plaintiffs received a Letter from the Honorable Bob Corker, dated September 13, 2010 Acknowledging the response from his request made to the Comptroller of Currency. Letter attached as exhibit N.

78. Prior to Plaintiffs filing complaint to the Senator, Chase refuse to Modify plaintiffs alleged Loan. It fact it set a sale date for October 6, 2010. Trustee sale Notice attached exhibit O.

79. On October 28, after pressure from the Senators office and the OCC, JP Morgan Chase Enterprise Canceled Sale. And Executed a Fraudulent Loan Modification Agreement, naming Chase Home Finance

22

LLC, as the Lender, trying to ratify a Note/security that JPMC conveyed all rights title and interest to Ginnie Mae, attempting to re-attached the Note/Security.

80. The Loan Modification (Exhibit B) Executed on October 28, 2010 is fraudulent. for these reason's:
A). JPMC nor CHF, was not a Creditor (Lender) in plaintiffs Transaction, MERS Named JPMC as a Servicer/ Investor to Plaintiff's alleged Loan. See Exhibit (P) MERS service Identification system there's a fundamental Difference between a Servicer/Investor and a Creditor/Lender. JPMC was a Issuer as indicated in Exhibit C, and also a Servicer to the Certificate Holders (Investors).

B). "MERS" acting solely as a nominee for Lender, The Lender was a table funded warehouse vehicle. Used to Temporally fund a Loan until JPMC runs the plaintiff signature through the channels to acquire Taxpayers Money to pay the warehouse lender. MERS is a Fake Entity created by the Banksters to defraud the counties in Tennessee of land recording Fees. And to confuse investors, and borrowers as to whom the real parties in interest are. Once a loan is registered with MERS it is systematically Shuffled and lost. To Hide the Securitization process.

C). ON Page 1 of the loan Modification, Chase amends and supplement the Note/Security
This is Fraud, Chase Has No "Standing" to amend a Note/Security, because it gave up all its Rights, Title, and Interest to Ginnie Mae.

D). The Signatures on page 6 of the Loan Modification is signed by the same person for Two separate entities
, and this person doesn't have Authority to act for the Principle. This is Misrepresentation at its finest. The robo-signer is not authorized by US Treasury to execute this document.

81. The Plaintiffs had to sign loan Modification to save there home from being stolen, by Defendant JPMC Racketeering enterprise. Plaintiffs later learned that Chase had No authority to execute a Loan Modification.

82. Defendants JPMC Morgan Chase Bank NA. and Chase Home Finance LLC are in the business of servicing mortgage Loans on behalf of investors, for a fee, including "pooled " Mortgage backed security investments. This Complaint seeks to remedy Chase's unlawful acts in servicing mortgage loans after unlawfully repurchasing from the Pool, with no legal binding Authority to do so, because it conveyed all Title Rights and interest to Ginnie Mae. Unlawful Acts summarized as follows:

23

a) Repeatedly failing to grant, implement, or consider in good faith or in a timely manner, plaintiff request for modification, including misrepresenting the requirements for achieving permanent loan modifications and the status of loan modification applications:

b) Requesting and accepting interim debtor payments as a "condition" for promised permanent loan modification, under temporary modifications or trail period plans, without any reasonable basis to believe that the loans would be permanently modified, and without taking diligent or reasonable steps to implement loan modifications or even to consider the borrowers' applications as promised: doing so with no legal or equitable interest in Mortgage loan.

c) Systematically and continually erecting artificial obstacles in the loan modification process (such as repeatedly "losing" plaintiff documents: rotating personnel assigned to plaintiff files: altering modification requirements: delaying the modification approval process and then rejecting applications on grounds that submitted documents were stale or outdated: and engaging in similar "red tape" with the intent of obstructing, delaying, or preventing permanent loan modifications:

d) Instructing loan modification applicants to stop making their existing mortgage payments purportedly as a prerequisite to qualifying for a loan modification, thereby subjecting such applicants to additional financial jeopardy including foreclosure, risk of foreclosure, late payments fees ore penalties, and negative references on credit reports:

e) Including plaintiff to participate in temporary modifications, or forbearance agreements, then diverting payments to a "suspense account" which is not applied to the plaintiff principle or interest, then reporting plaintiff as delinquent to credit reporting agencies, thus destroying plaintiff credit and leaving plaintiff at the mercy of defendants loan modification hoax.

83.     Defendant Chase practice of cruelly stringing along Plaintiffs, while ultimately failing to provide them with permanent loan modifications, has been aptly characterized as a scheme of **"Extend & Pretend"** This is not a product of mere negligence but rather is an intentional scheme with the foreseeable and known effect of harming consumers.

84.   By failing to timely convert forbearance into permanent modifications or process loan modification applications in good faith, defendants are forcing Plaintiffs into a state of anxiety and uncertainty,

24

wondering if their homes can be saved, and inducing them to pay forbearance plan indefinitely. These "extend & pretend" practices are deceptive and unlawful.

85. Plaintiff got information from Chase website, about the Obama plan
And contacted Chase in March of 2009. Plaintiff was current with her mortgage since 2006, when she purchased the home. And was only looking to lower her interest rate, and payments.

86. March 20th 2009 plaintiff filled out homeowners assistance package: mailed to: CHASE PO BOX 299009, LOUSVILLE, TX 75029.

87. March 31st contacted chase to check status if paperwork had been received
I spoke with Rochelle at 800-446-8939, who said nothing was received and there was another program and she transferred me to sharlonda, who says to call back in 2 weeks.

88. April 15, called Chase, spoke with Deana who informed me that my package was received and that it would be another 30-45 days

89. May 29th called spoke with Edoria who was a screener, so I was transferred to chris, who gave me the # 550-550-5705. Ext 3 chris also told me I didn't qualify for a modification because I wasn't delinquent. Then I wanted to know where all my documentation was, and he didn't know.

90. July 9th called Chase and talk to tom, who gave me the fax # 614-422-7259, and stated that I wont qualify, and that I should miss 2 payments so I could qualify for a permanent Modification, after I complete a forbearance plan. Plaintiff missed August and September of 2009 payments.

91. September 10th Plaintiff call chase and talked to Valencia at 877-419-6493, she said they had no information on me, she transferred me to Steve, who took my information, then the phone went dead, called back and talked to Jeff who said I qualified for Forbearance plan for October, November December of 2009, and
January of 2010. After the third payment is made I will receive documents for a **permanent modification.**

92. Plaintiff signed forbearance plan on September 18, 2009 payments were adjusted from 1,500 a month to 950.00 a month, first payment is to be made on October 1st 2009.

93. Nov 3rd 2009 plaintiff received a acceleration to foreclose from Chase, plaintiff called chase and was told to ignore the letter, and as long as I payed the forbearance plan I would be o-k. Plaintiff continued to

25

receive threatening foreclosure from defendant chase for the entire time she was on the forbearance plan even though she complied with the terms of the forbearance agreement.

94. January plaintiff made last payment in compliance with the agreement, and called chase in hopes to receive paperwork for permanent Modification, but that didn't happen. Plaintiff was told to continue forbearance plan payments. I asked why is it taking so long, and he replied there processing the paperwork. The defendants JPMC Breached the Forbearance contract. Exhibit (H), by telling plaintiff to continue making forbearance payments, and defendant excepting payments after the period expired on the contract. see Exhibit G

95. Sometime in February, 2010 plaintiff called chase and spoke with Mr. vanderwalle, he said that a permanent modification plan will be in effect sometime in April, 2010

96. March 9th 2010 plaintiff heard about a program that can contact your Lender to work out an affordable payment plan. (NACA) Neighborhood assistant corporation of America, they were in Nashville, and plaintiff attended there seminar, spoke with a Naca counselor who informed that Chase was one of the Lenders contracted to participate in there program, but they had no representative there to represent the people,

97. March 10th 2010 Naca started negotiation process with Chase,

98. March 18th 2010 received some Modification paperwork from chase, call them and they would not speak to me, they referred me back to NACA, I called naca and talked to Heidi that same day, and she told me to fax the Modification to her, after she reviewed the Modification, she told me not to sign it, and that chase could do much better than that, they barely change my rate at all, and my payments were 20.00 different from my original payment.

99. April 17th 2010 A representative from JMS services came to my Home, after business hrs, about 7:30 pm to pick up Loan Modifications papers, which I thought was kind of out of the ordinary, I explained to him I didn't sign the paperwork, and that I was represented by NACA, he gave me a letter from Chase, that said to call them, I faxed the letter to NACA

100. April 26th 2010 called Dave lomas Vp of Chase to see if he could help, he never called back.

101. May 3rd 2010 contacted NACA, who informed me that they spoke with chase explaining that I didn't reject the offer, but was wondering why I didn't qualify for a FHA Hamp being that my Loan was FHA insured. Chase refuses to cooperate with NACA, even though they're under contract to do so.

26

102. June 21ˢᵗ 2010 Chase still haven't responded to NACA about the FHA Hamp request. Spoke with Taylor at 614-248-1837, who directed me to call Darlene at 877-717-5040. Spoke with Daniel who asked me to call Michelle merino at, 866-234-1234 ext 322, who's the underwriter, ended up talking to prisha who said I

Was turned down for the FHA HAMP on the 1ˢᵗ of June, and that I couldn't re-apply for another year.

103. JULY 8ᵀᴴ 2010 by this time plaintiff is upset, and confused as to why Chase refused to do anything that it said it would do, plaintiff's wrote chase a letter stating that she just want to get on with her life, and didn't need a modification,

And if they could send her a Contract, and she would pay her regular payments, and that she was tired of the Games, and run around by Defendant Chase Home finance LLC.

104. July 11ᵗʰ 2010 plaintiff Received letter from chase dated July 8ᵗʰ. Act now to avoid foreclosure pay 9,000 dollars by July 31ˢᵗ or you could lose your home.

105. August – Letter from Defendant Wilson & associates dated August 2ⁿᵈ 2010; Stated plaintiff home is about to be foreclosed on.

106. August 4ᵗʰ ²⁰¹⁰ Contacted chase, spoke with Christina we discussed my situation and went over my Debts, and asked for me to send in my current pay stubs to be reviewed to hold off on the foreclosure proceedings.

107. August 5ᵗʰ 2010, plaintiff Called chase to make sure they received my information, spoke with Julie who says that the underwriter has that information, and that I was in active foreclosure status.

108. August 17ᵗʰ 2010 plaintiff Called chase again and spoke with Wendy to see if the underwriter has my file, she said that they received my current paystubs and to call back in a week.

109. August 23ʳᵈ 2010 plaintiff Talked to Stephanie she says that I'm in need of more paperwork to be fill out because the info I provided is expired. Wow unbelievable and overwhelmed

110. August 24ᵗʰ 2010 plaintiff faxed all information to chase fulfillment center and ask for help as I didn't want to lose my Home, and that my financial status hasn't changed.

111. August 28th 2010 plaintiffs received another letter from Defendant Wilson & associates Notice of Trustee sale on October 6th 2010 at the Bridgestone arena.

Defendant Chase initiated foreclosure proceedings while plaintiff was still paying forbearance plan payment, with no intention of executing a permanent Modification. Defendant chase refuse to Negotiate with Naca even though they were under contract.

112. NACA has a contract with Chase that it refuses to adhere to. NACA has legally binding agreements will all the major lenders and major investors including Fannie Mae and Freddie Mac. Chase is the only lender or investor that has refused to adhere to the contract. The contract provides homeowners with affordable solutions. The solution for borrowers with stable income is to restructure the mortgage by permanently reducing the interest rate to 4%, 3% and as low as 2% and if necessary reducing the outstanding principal as well. For borrowers who are unemployed or under-employed the solution is a forbearance agreement where there is a minimal payment for a period of time while the borrower is seeking stable income. If a lender cannot provide these solutions they need to provide NACA the opportunity to appeal the decision. Chase does not provide homeowners with the solutions mentioned above.

113. It is unacceptable and illegal that Chase continues to breach its legal duties as laid out in the contract it has with NACA. Chase has shown no respect for homeowners, the NACA process (and all of its success), and the legal duties Chase is obligated to under this contract. As such, NACA has initiated a lawsuit against Chase for breach of contract.

114. Defendant Chase reported plaintiff to credit reporting agencies for being over 90 days late on her payments because she was making the reduced monthly payment per chase's instructions. As a result of Chase deceptive credit reporting, plaintiff credit score has been sabotaged.

115. Chase's conduct in dealing with plaintiff in her serious financial straits has been marked by extreme misconduct and Bad faith. For Example:

(a) Intentionally sabotaging Deal with NACA Defendant Chase made it clear that it wasn't going to give plaintiff a Modification until April. Once NACA got involved and contacted chase on my behalf, Chase immediately mailed plaintiff a bogus Agreement in March that did not lower the interest rate. JPMC sidetrack the negotiations it was obligated under NACA, plaintiff qualified for a 2 % reduction on interest rate. Defendant chase went so far as to send a JMS servicer to Plaintiff home after hours to retrieve the bogus Modification, this is unethical deceptive practice.

28

(b) Delays Causing "Stale" Documents. Chase has required "updated" pay stubs and other documents numerous times from plaintiff because its own dalays and malfeasance caused previously submitted documents to become "stale".

The short expiration dates of these documents are arbitrarily set by Chase in a manner intended to ensure that Chase keeps borrowers in a series of Forbearance plans, so homeowner can get behind on payments, and then Chase scheme is to deny mostly all modifications, and Demand delinquent balance in one lump sum, or lose your home, some homeowners have cashed in there 401k, due to this Scam conducted by Defendant Chase. The forbearance plan agreement is designed to enrich Chase, and sabotage the borrower.

(c) Failure to communicate. Plaintiff was told at one time that Michelle merino at 877-717-5040 was the underwriter handling her account. Plaintiff could never reach this person, made multiple phone calls and was unable to reach her.

Chase rotates the assignments of loss mitigation specialist monthly to disrupt continuity and create a state of administrative chaos, thereby assuring that few modifications packages are ever complete.

116. Chase representatives told plaintiff numerous times over the phone that if she complied with her forbearance agreements she would be placed on permanent Modification in a timely manner.

Plaintiff complied with all of the paperwork requirements requested of her by Chase (multiple times) satisfied all required loan modification criteria, and mad all payments called for under her agreements, and continued to pay after the 4 months of forbearance payments.

117. Chase continues to blame the "high volume of applications" when explaining its supposed inability to track paperwork, or process applications, yet never fails to receive payments. Since refinancing with JPMC racketeering enterprise, plaintiff's principle went from 204,000.000 to 224,000.00

## TESTIMONY OF FORMER CHASE EMPLOYEES.

118. Numerous of chase employees and whistleblowers have come forward to confirm defendants' illegal and deceptive practices. Cindy Walker, Debra Stillwell

Erika Peneloza, and Janet Moynihan are all former employees of chase who have attested to Chase's pattern of deceit and fraud. Among other revelations, these four

29

Have testified that they were trained and instructed by Chase managers to deceive Chase borrowers into falsely believing that their loan modification applications were being "processed " when, in fact they were not.

119. They were also instructed to lie to borrowers, telling them that their paperwork had not been received when; in fact the paperwork was in defendants possession. These whistleblowers also describe in a bevy of artificial obstacles that chase created to ensure that most borrowers' attempts to obtain loan modifications would be futile, while at the same time disguising the futility of their efforts so that the borrowers would continue to make payments. Further details in the attached declarations.

120. Attached as Exhibit I, and incorporated herein, is a true correct copy of the Declaration of former Chase employee Cindy Walker.

121. Attached as Exhibit J and incorporated herein, is a true correct copy of the Declaration of former Chase employee Debra Stillwell.

122. Attached as Exhibit K, and incorporated herein, is a true and correct copy of the Declaration of former chase employee Erika Panelize.

123. Attached as Exhibit L, and incorporated herein, is a true and correct copy of the Declaration of former Chase employee Janet Moynihan.

## MERS AND JPMC EXECUTION OF FRAUDULENT INSTRUMENTS, FALSE CLAIMS
## PARTNERS IN CRIME

124. The Defendant JPMC Enterprise filed a Johnny come lately, FRAUDULENT CORPORATE ASSIGNMENT OF DEED OF TRUST, conveying the Deed to JPMC on **11/16/11**. Record # 20111116-0089631. Attached as Exhibit Q. This is a perfect example of the fraud, false statements, misrepresentation, that pollutes the integrity of our land records. JPMC retained NTC, National Title Clearance, a Document Prep company out of palm harbor, FL, who prepare Fraudulent Documents for Large Banksters like Defendant JPMC to appear as though they have standing, but the problem with the late clean up assignments, with this Mortgage is that IT WAS ASSIGNED 3 years after the Transaction, MERS as the principle is claiming "Nominee " for **PRMI** and its assigns, successors, PRMI Doesn't have any legal

30

binding assignments on Record, the only assignment by PRM is Null and void. Because it was never Recorded.

The assignee executed the Instrument as the Assignor, thus assigning the instrument to themselves.

125. United States Bankruptcy Judge Robert Grossman has ruled that MERS's business practices are unlawful. He explicitly acknowledged that this ruling sets a precedent that has far-reaching implications for half of the mortgages in this country (Case No. 810-77338-reg.).

While there has been no significant decision relating to Mers in Tennessee. However See

STATE OF TENNESSEE, ex reel BARRETT BATES, REALTOR, V. MERS, CHASE (NCCHCVRE10-10)

The State of Tennessee alleges, as do the Plaintiffs the following:

126. Defendant JPMC contractual and agency relationship with MERS also require that additional documents be truthfully recorded if the status of the loans and/or documents changed to a non-MERS member. Specifically, MERS policies and promises with their members oblige them to record and pay for recordation of documents reflecting the establishment and/or transfer of secured interest in real property, or beneficial interest in the underlying promissory notes, when a non-mers members acquire an interest in any debt evidenced by a security instrument. Defendant failed to record or cause to be recorded any such documents of a non-MERS member interest in the applicable loans and security with the specific intent of avoiding payments to the counties, and confusing Plaintiffs, and homeowners throughout the state as to who the actual beneficial owner of Plaintiffs mortgage really is. Defendants utilized this scheme in the creation of securitized Mortgage pools, and Trust where no such trust, or entity is a MERS member.

Note: MERS recorded JPMC as the Investor and servicer for Plaintiffs Mortgage, Exhibit O. MERS assignment. This is significant because JPMC conveyed all Rights title and interest to Ginnie Mae. and Ginnie Mae is a non-member of MERS.

127. MERS is named in Plaintiffs, and excess of a million recorded documents in the state. Defendants recorded or cause to be recorded deeds of trust and "Corporate Assignments, other documents which identified MERS as the "nominee" of the Lender's successors and assigns" which MERS never was, and as holding "legal title" when MERS did not, thereby falsely naming, appointing and/or characterizing MERS in any of those capacities in documents recorded throughout the state over the past 10 years.

128. Defendant JPMC have used these characterizations for MERS despite the fact MERS never had and has no employees, and instead purported to act since MERS' inception, through alleged authorized certifying officers and signatories who were never authorized by any official act or corporate resolution of MERS or to act in any means MER'S representative capacity whatsoever. Further such alleged signatories

31

or certifying officers were not and are not authorized by any applicable law to take any action on behalf of MERS with regard to any documents recorded in the state bearing MERS' name or on MER'S behalf. Kimberly Neal a robo-signer who signed as a Mers vice President on a Corporate Assignment pertaining to Plaintiffs Mortgage is Not a vice President of MERS. And has no authority to sign on its behalf.

129. Additionally, these documents affected the interest in property and were, therefore, to be recorded pursuant to Tenn. code Ann. 66-5-106, and should be recorded truthfully so as to maintain the veracity an sanctity of the land records, allowing reliance on the TRUTH of any document filed therein.

130. The recording of Deeds of Trust and other security instruments and/or assignment, by defendants was done for the purpose of protection of such security interest from the competing claims of subsequent bonfire purchasers.

131. Based on the false representations, the recorded documents pertaining to Plaintiffs Mortgage do not reflect the true beneficial ownership of the loan in question.

132. MERS and JPMC allowed non-MERS employees to identify themselves as officers or vice presidents of MERS, because it creates the illusion of a recorded chain of title whereby the actual creditors and/or loan beneficial remain hidden from public record. Because Promissory notes were frequently assigned, the falsely recorded documents decrease the number of recording fees paid by Defendants.

133. When ownership of any loan was transferred to a non-MERS member (ginnie Mae MBS), MERS and any of its members (JPMC) had no further rights, interest or authority to act relative to Deeds of trust and mortgages. As such, the applicable property records do not provide a clear and verifiable chain of title on any property interest bearing MERS name. The recorded instruments failed to show that MERS or any of its members had no rights, interest or authority to act relative to such deeds of trust, assignments of security interest, lien releases and other documents.

134. When a Note/security associated with a deed of trust on property was transferred to a non-MERS member, the rules and policies of MERS required the assignment of the loan to the non-MERS member be executed by MERS and recorded in the county where the real property is located. The loan would thereafter be deactivated from MERS system.

135. MERS maintains a list of all MERS members, and no MBS pool, or Ginnie Mae, SPV, REMIC) Which owned loans secured by MERS deeds of trust on property in the state was or is a MERS member.

136. Despite knowing that the Note/security had been assigned outside the MERS system, (GSE,

32

GINNIE MAE). Defendants intentionally recorded documents, which they knew were false and fraudulent because the documents purported to reflect a continuing relationship to those loans.

137. JPMC conduct enabled them to hide their activities with respect to: 1) Lack of any loan origination underwriting standards pertaining to Plaintiff loan. 2) Lack of any underwriting standards for the securitizing of Plaintiffs Note/security into a mortgage Pool. 3) Hide/clouded their failure to comply with any IRS REMIC rules regarding transfer of Plaintiffs loan to ginnie Mae

138. Create the appearance of an arm length transaction.

139. The designation of MERS as a beneficiary or nominee of the lender on a deed of trust was intentional and knowing false designation by MERS in numerous ways, namely: 1) neither MERS nor the "lender" so designated was a true Lender: 2) MERS was not the nominee of the true Lender of the funds for which the promissory Note/security was executed. 3) The name MERS does not appear on Plaintiff promissory Note/security, or any note Secured by property in this entire State. Defendants have foreclosed on Plaintiffs knowingly using false documents.

140. MERS and JPMC transfer property by "electronic handshake(s)" which should have been recorded by the counties' registers of deeds for the purpose of providing an accessible public record that reflects the actual transfers of interest in Plaintiffs property available to the public and, particularly, by other interested secured creditors and judgment holders where the property is situated.

141. JPMC knew or should have known that the MERS scheme is a sham: was indented wrongfully to frustrate the Plaintiffs rights to know the identity of the holder of the Note/security that was not secured by the deed of trust.

142. MERS claims that use of its scheme has "saved" at least 2.4 billion dollars in recording costs for its members. And billions in profits for wrongful foreclosures.

143. MERS is perpetrating foreclosure fraud all across the nation. Its business model makes it impossible to legally foreclose on any mortgaged property registered within its system -- which includes half of the outstanding mortgages in the US. MERS was a fraud from day one, whose purpose was to evade property-recording fees and to subvert five centuries of property law. Its chickens have come home to roost.

33

144.     Here's MERS's business model in brief. Real estate property sales and mortgages are supposed to be recorded in local recording offices, with fees paid. With the rise of securitization, each mortgage might be sold a dozen times before it came to rest as the collateral behind a mortgage backed security (MBS), and each of those sales would need to be recorded. MERS was created to bypass public recording; it would be listed in the county records as the "mortgagee of record" and the "nominee" of the holder of mortgage. Members of MERS could then transfer the mortgage from one to another without all the trouble of changing the local records, simply by (voluntarily) recording transactions on MERS's registry.

145.     A mortgage has two parts, the "note" and the "security" (not to be confused with the MBS) or "deed of trust" that is usually just called the "mortgage". The idea behind MERS was that the "note" would be transferred from seller to purchaser, but the "mortgage" would be held by MERS. In fact, MERS recommended that the "note" be held by the mortgage servicer to facilitate foreclosures, but in practice it seems that the notes were often lost or destroyed (which is why all those Burger King Kids were hired to Robo-sign "lost note affidavits").

146.     At each transfer, the note and mortgage are supposed to be "assigned" to the new owner; MERS claimed that because it was the "mortgagee of record" and the "nominee" of both parties to every transaction, there was no need to assign the "mortgage" until foreclosure. And it argued that since the old adage is that the "mortgage follows the note" and that both parties intended to assign the notes (even if they did not get around to doing it), then the Bankruptcy Court should rule that the assignments did take place in some sort of "virtual reality" so that there is a clear chain of title that allows the servicers to foreclose.

147.     The Judge rejected every aspect of MERS's argument. The Court rejected the claim that MERS could be both holder of the mortgage as well as nominee of the "true" owner. It also found that "mortgagee of record" is a vague term that does not give one legal standing as mortgagee. Hence, at best, MERS is only a nominee. It rejected MERS's claim that as nominee it can assign notes or mortgages -- a nominee has limited rights and those most certainly do not include the right to transfer ownership unless there is specific written instruction to do so. In scarcely veiled anger, the Judge wrote:

34

148. "According to MERS, the principal/agent relationship among itself and its members is created by the MERS rules of membership and terms and conditions, as well as the Mortgage itself. However, none of the documents expressly creates an agency relationship or even mentions the word "agency." MERS would have this Court cobble together the documents and draw inferences from the words contained in those documents."

149. Judge Grossman rejected MERS's arguments, saying that mere membership in MERS does not provide "agency" rights to MERS, and agreeing with the Supreme Court of Kansas that ruled "The parties appear to have defined the word [nominee] in much the same way that the blind men of Indian legend described an elephant -- their description depended on which part they were touching at any given time."

150. He went on to disparage MERS's claim that since in legal theory the "mortgage follows the note", the Court should overlook the fact that MERS separated them. He stopped just short of saying that by separating them; MERS has **irretrievably destroyed the clear chain of title**, although he hinted that a future ruling could come to that conclusion:

151. There have been numerous court rulings against MERS -- including decisions made by state supreme courts. What is significant about the US Bankruptcy Court of New York's ruling is that the judge specifically set out to examine the legality of MERS's business model. As the judge argued in the decision, "The Court believes this analysis is necessary for the precedential effect it will have on other cases pending before this Court". In the scathing opinion, Judge Grossman variously labeled MERS's positions as "stunningly inconsistent" with the facts, "absurd, at best", and "not supported by the law". The ruling is a complete repudiation of every argument MERS has made about the legality of its procedures.

152. The Corporate Assignment of Deed of Trust is Void pursuant to TCA-66-3-101 in more ways than one. The affidavit is Fraudulent upon its face. It was signed by a Robo--Signer Kimberly Neal as VP for MERS, Mers is located in Michigan, and Delaware, It was notarized at the Chase foreclosure mill#1 in Franklin County Ohio by a Chase rep. Benito Caldwell, did they fly Kimberly Neal in? Or is Kimberly Neal an employee of Chase who forged the name of a VP, that doesn't exist. The Notary acknowledgement is invalid, because it doesn't comply with Ohio or Tennessee Law. A certificate of authenticity must accompany a Notary who acknowledges an affidavit to be recorded out of State from secretary of state

35

where the notary is registered.

153. Although the greatest risk of fraud from the fraudulently produced assignments is imposed on the Plaintiff, this scheme poses a great risk in the exposure of the Title Companies that guaranteed the clear and correct transfer of ownership. Some title companies have refused to insure Banksters like JP morgan Example: excerpt from huffington post.:

http://www.huffingtonpost.com/2010/10/03/title-insurer-stops- writi_n_ 748238.html

*USA Today*:

Old Republic National Title Insurance, among the nation's largest title insurance companies, will no longer write new policies for homes foreclosed upon by J.P. Morgan Chase and Ally Financial's GMAC Mortgage unit —- a sign that concerns about faulty foreclosure paperwork could now endanger new sales of foreclosed homes.

154.  The Defendants have a pattern of criminal behavior, excerpt from United States Attorney Bill Nettles. Example:

# PRESS NOTICE
## BILL NETTLES
## UNITED STATES ATTORNEY
## DISTRICT OF SOUTH CAROLINA
1441 Main Street, Suite 500 * Columbia, SC 29201 * (803) 929-3000

March 9, 2012
FOR IMMEDIATE RELEASE CONTACT PERSON:
Fran Trapp
(803) 929-3000 Fran.Trapp@usdoj.gov

$95 MILLION SETTLEMENT WITH THE NATION'S FIVE LARGEST MORTGAGE SERVICERS PARTIALLY RESOLVES SOUTH CAROLINA FALSE CLAIMS ACT LAWSUIT COLUMBIA, South Carolina —-

A $95 million settlement with the nation's four largest mortgage servicers was announced today by United States Attorney Bill Nettles. Bank of America Corporation, **J.P. Morgan Chase** & Co., Wells Fargo &

36

Company, and Citigroup Inc. agreed to the settlement to address allegations that the defendants participated in a nationwide practice of failing to obtain required **mortgage assignments which resulted in servicing misconduct, and using false assignments to submit Federal Housing Administration mortgage insurance claims, all in violation of the federal False Claims Act, 31 U.S.C. § 3729.** This is the largest False Claims Act settlement ever obtained by the District of South Carolina. The settlement was reached as part of the $25 billion dollar global resolution between the same defendants, the United States of America the

state attorneys general, and others. The United States and the state attorneys general filed today in the U.S. District Court in the District of Columbia proposed consent judgments with Bank of America Corporation, J.P. Morgan Chase & Co., Wells Fargo & Company, Citigroup Inc. and Ally Financial Inc., to resolve violations of state and federal law. Included in the proposed settlement agreements, is the partial settlement for four of the defendants of allegations that the United States Attorney's Office for the District of South Carolina began investigating in the Spring of 2010. In particular, the government investigated allegations that the defendants participated in a **pervasive nationwide scheme involving the wholesale fabrication of mortgage assignments and other servicing abuses.**

The False Claims Act allows the government to bring civil actions against entities that knowingly use or cause the use of false documents to obtain money from the government or to conceal an obligation to pay money to the government. The lawsuit in this case was initially filed by Lynn Szymoniak under the qui tam or whistleblower provision of the False Claims Act.    This provision entitles a private person to bring a lawsuit on behalf of the United States, where the private person has information that the named defendant has knowingly violated the False Claims Act. Under the False Claims Act, the private person, also known as a "whistleblower," is entitled to a share of the government's recovery. In this matter, the whistleblower will receive $18 million from the proceeds of the settlement.

"Whistleblowers play an important role in protecting taxpayer funds from fraud and abuse," said U.S. Attorney Nettles. "Settlements like this one help maintain the integrity of the federal mortgage servicing process."

**"By this agreement we are making an important first step to hold mortgage servicers accountable for fraudulent and abusive practices not only in South Carolina but nationwide.** I am proud of the tireless work of this office to investigate this case across the country," said U.S. Attorney Nettles.

"We see this historic settlement as one of national importance as our success in this case marks a precedent setting application of the False Claims Act to complex financial fraud," said U.S. Attorney Nettles. "It also demonstrates the role that whistleblowers can play in working with the government to return dollars to the federal treasury and to expose wrongdoing."

"We are very pleased by this settlement but at the same time our investigation is ongoing as we continue to ascertain the full magnitude of wrong doing and to seek redress for the United States Government," said U.S. Attorney Nettles.

This settlement was the result of a coordinated effort by Assistant United States Attorneys Fran Trapp and Jennifer Aldrich of the U.S. Attorney's Office for the District of South Carolina along with the Commercial Litigation Branch of the Justice Department's Civil Division, the U.S. Attorney's Office for the Western District of North Carolina and the Offices of Inspector General and legal counsel departments for HUD, the Treasury and the Federal Reserve in investigating the allegations.

NOTE: this is significate, due to the fact that the plaintiffs Loan was FH \ insured and the Defendant JPMC executed a fabricated assignment, thereby inflicting the same unlawful tactics that the United States government accuse JPMC of. This is not merely a coincidence, This is JPMC business Model, Doesn't matter if it's the US government or the Pope himself.

## DEFENDANTS FRAUDULENT USE OF INTERSTATE WIRE FACILITIES AND US MAIL

## JP MORGAN CHASE, THE FRANKLIN COUNTY OHIO, FORECLOSURE MILL#1

## WILSON & ASSOCIATES REGIONAL FORECLOSURE MILL#2

155.   The Defendants JPMC Racketeering enterprise, CHF enterprise, Wilson & Associates Racketeering enterprise, and the lead attorney Shellie Wallace have attempted to execute a fraudulent foreclosure action against the plaintiff, and have been successful in defrauding thousands of Homeowners with intentions, to acquire monies from the sale of the property while engaging in fabricating Substitute of Trustee affidavits, Trustees Deeds, and any other affidavit that's needed to show an illusion of ownership. Or what some would call ownership of Record. . Below are examples of the fraudulent fabricated affidavits prepared, executed by the Defendants? CHF, JPMC W&A, Shellie Wallace

a) Example 1):

 On 8/31/10 Chase Home finance, LLC pretending to be the Lender, after JPMC Bank conveyed all rights, title and interest over to ginnie Mae, executed an Appointment of Successor Trustee. Recorded in land records # 201009130072591. Exhibit R. This document appears to be misrepresented, as to the authority to "Appoint", the authority to sign, and the authenticity of the Notaries signature. Pursuant to TCA 35-5-101

the beneficiary has to appoint, or whatever terms are in the Deed of Trust, the deed of trust states that the Lender can appoint a Successor Trustee. CHF was never a Lender in plaintiff's transaction; in fact CHF wasn't even mentioned until after closing, as a Servicer for JPMC. Exhibit S Notice of New creditor, The Pretender lender on the Note/security is PRMI, CHF is a sub-servicer for JPMC, with the authority to collect payments for investors, Not pretend to be a lender and "appoint" the shady law firm W&A, Shellie Wallace as Successor Trustee to steal property from homeowners. The signature of Susan massie as Vice president of CHF, raises suspicious questions as to who Susan massie really is, upon further investigation, it was learned that Susan massie is not a Vice president of CHF, (she's not even on the employee Directory List). But a customer service Representative, better known as a robo-signer, who is bestowed a deveis task to sign thousands of documents a day without ever knowing the content of the affidavit. The Notaries signature Melissa hammock, is not authentic, exhibit S. Melissa hammock application for Notary from the secretary of State of Ohio. The signature on the application (Below leftt) doesn't match the signature on the Successor Trustee affidavit. (Below right)

Ohio and Tennessee law requires Notaries who notarize affidavits in the state for the purpose of out of state, must be an attachment to the acknowledgement from the secretary of the state of the Notary authenticating the signature. JPMC Racketeering enterprise never abides by the state, federal, Law. This is a systematic pattern developed by the JPMC racketeering enterprise foreclosure Mill and W&A racketeering enterprise, this is not an isolated incident,

b) Example 2.)

Appointment of Successor Trustee, # 20100915-0073270 Executed by Defendants CHF on 9/3/2010 Prepared by Defendant W&A, Recorded in Davidson county. Signed by non other than Melissa Hammock

Case 3:12-cv-01222   Document 1-1   Filed 11/26/12   Page 39 of 207 PageID #: 44

as vice President. Exhibit 1).

Chase Home Finance, L.L.C.

By: _____

Melissa Hammock          Vice President

Melissa hammock, moved up the corporate ladder quick, she went from a customer service Notary to vice president in a Month. The Notary on this fraudulent document is Nicole Kinsley also an employee of CHF. And CHF has no authority to Appoint.

c) Example 3.)

Appointment of Successor trustee, # 20100818-0065124 executed by Defendants CHF on 8/6/2010 prepared by Defendant W&A, Recorded in Davidson /county signed by non other than Mellissa Hammock (robo-signer) as Assistant Secretary. Exhibit 2.

Chase Home Finance, L.L.C.

By: _____

Melissa Hammock

Title: Assistant Secretary _____

She must of gotten demoted from vice president to Assistant secretary, wow Melissa hammock is a busy little beaver, three titles in a two month period. d) Example 4.)

d) Example 4.)

40

Appointment of Successor Trustee # 20090413-0033312 executed by Defendant CHF on 4/3/2009, prepared by Defendant W&A, naming Shellie Wallace as successor Trustee, signed by the Notorious robo-signer Beth Cottrell As Assistant Secretary. Recorded in Davidson County

Chase Home Finance servicing agent for JPMC Specialty Mortgage LLC

By: _____
Beth Cottrell

Exhibit 3,

f) Example 6)

Appointment of successor Trustee # 201000726-0058084 executed by the defendant CHF on 7/14/2010 prepared by Defendant W&A, naming Shellie Wallace as successor trustee signed by the Notorious robo-signer Beth Cottrell as Assistant secretary Exhibit 4.

Chase Home Finance LLC

By: _____

Title: _____Beth Cottrell_____Assistant Secretary___

g) Example 7.)

Appointment of Successor Trustee # 20090320-0025465 executed by the Defendant CHF on 3/13/2009 prepared by the Defendant W&A, signed by Notorious robo-signer Whitney cook as Assistant Secretary exhibit 5

41

By: _____

Title: _____

Whitney K. Cook

Assistant Secretary

h) Example 8).

Appointment of successor Trustee #201000818-0065144 executed by the Defendant CHF on 8/3/2010 prepared by W&A, appointing Shellie Wallace as successor Trustee, signed by notorious robo-signer Whitney cook as Vice president. Exhibit 6

Chase Home Finance LLC

By: _____

Whitney K. Cook        Vice President

i) Example 9.)

Appointment of successor trustee executed by CHF as servicing agent for Deutsche Bank National Trust Company, as Trustee for sound view Home loan trust 2005-4. Deutsche Bank is located in Germany, CHF is agent for an entity in Germany, that has no standing, because it violated the pooling and servicing agreement by not transferring the res (Note) to the REMEC. Signed by a notorious robo-signer Stacy spoon as Vice president. Exhibit 7

42

By: _____
Stacy E. Spohn
Title: _____
VICE PRESIDENT

156. The Davidson County registry of Deeds is a crime scene, filled with these fabricated affidavits that are used in a non-Judicial foreclosure process, that JPMC racketeering enterprise and W&A Racketeering enterprise has been taking advantage of for well over a decade as records indicate. They have no intentions on stopping any time soon as records indicate there are thousands of these documents filed throughout the State, and country Example:

Below is article from a blog, a concerned journalist from the state of Ohio wrote a letter to the attorney general of Ohio, exhibit U

http://www.foreclosurehamlet.org/profiles/blogs/dear-ohio-attorney-general

NOTE: THIS IS SIGNIFICAT AS IT RELATES TO THE PLAINTIFFS CLAIM THAT JPMC RACKETEERING ENTERPRISE IS A FAR REACHING SHEME, DESIGN TO STEAL PROPERTY FROM HOMEOWNERS.

157. The Defendants JPMC, W&A, Shellie Wallace, CHF have been committing fraud Against homeowners like the Plaintiffs for well over a decade as records indicate, they have a systematic pattern, that's well designed by committing **mail fraud** and **wire fraud** every time they submit a fraudulent document in the registry of Deeds. Either by US Mail or Wire. The attorneys of the law Firm, commits forgery to get the job done, for example at the W&A racketeering enterprise foreclosure mill #2, there seem to be two Shellie Wallace signature on record. Exhibit 9.(public record) Trustee Deed#1 & Trustee Deed #2) Example:

43

_Shellie Wallace_
Shellie Wallace
Successor Trustee

2. _Shellie Wallace_
Shellie Wallace
Successor Trustee

One of these documents was forged by an attorney at the W&A racketeering foreclosure mill # 2 Deanna dorrough, Angela Boyd, Christopher palmer, are attorney's who signs bogus fabricated affidavits. Some of the Affidavits have forged Notaries, who scribble circles as signatures of a Notary, when in fact there employees of JPMC racketeering enterprise, upon further investigation the Notaries state application signature doesn't match the affidavit signature Example:

Title: _Beta Cottrell_

## ACKNOWLEDGMENT

STATE OF _____ **Ohio** _____

COUNTY OF _____ **Franklin** _____

    Before me, the undersigned notary public of the state and county aforesaid, personally appeared _____ **Beth Cottrell** _____, with whom I am personally acquainted (or proved to me on the basis of satisfactory evidence), and who, upon oath, acknowledged such person to be the president (or other such officer authorized to execute the instrument) of Chase Home Finance LLC, the within-named bargainor, a corporation, and that such officer executed the foregoing instrument for the purposes therein contained by personally signing the name of the corporation.

    Witness my hand and seal at office in ........ **Ohio** this _14_ day of _April, 2010_.

LATRESA D. PAYNE
NOTARY PUBLIC
STATE OF OHIO
Recorded In
Franklin County
My Comm. Exp. 9/16/12

Notary Public: _____

My Commission Expires: _____

DA06T_countfarms_100408_1248

44

Latresa Payne allegedly signed this Appointment of successor Trustee, claiming the notorious robo-signer Beth Cottrell whom personally appeared before her. The signature is forged, Latresa Payne Signature on record with the Secretary of the state of Ohio looks like this:



Notary Commission Clerk
Ohio Secretary of State
Tel: 614-644-4559
www.sos.state.oh.us

SOS Form 2007 (rev. 01-07)

## NOTARY PUBLIC
### (Non-Attorney Only)
Application for the Appointment of

Name: LatreSA Payne

* FORMER NAME: _____
  *if different on previous commission
Residence Address:

6444 Kelsey Court
City: Canal Winchester 43110
County: FRANKLIN

Written Signature (do not print):

X Latresa Payne

Expiration of present (or former) Commission:

Date: _____, 20_____
County: _____

OFFICE USE ONLY
Commission Date SEP 17 2002
Commencing _____

Case 3:12-cv-01222   Document 1-1   Filed 11/26/12   Page 45 of 207 PageID #: 50



Not like this:

. NOTE: ALL affidavits incorporated in this complaint is public records from the Davidson County Registry of Deeds This is significant in Plaintiffs argument that there is a pattern of criminal misconduct amongst the defendants W&A, and JPMC as evidence will confirm. The Davidson county Registry of Deeds is a Crime Scene, polluted with defendants fraudulent documents used to steal real property from plaintiffs and homeowners throughout the State and Country.

158. Plaintiffs are a victim of this ongoing fraudulent scheme conducted by the Defendants JPMC, W&A, and Shellie Wallace. Davidson county Registry of Deeds is a Crime scene, which has well over hundreds of thousands of these fraudulent documents used to fabricate ownership, and to appear, as the Defendants are a party in interest when in fact they are not. THE DEFENDANT JPMC appears to be a domestic corporate terrorist enterprise that conducts illegal malicious, criminal tactics throughout the country Example:

159. The Commonwealth of Massachusetts Southern Essex District Registry of Deeds has called for an Audit, by **John O'Brian**, Register, on Three major Banks, Wells Fargo, Bank of America, and the Defendant JPMorgan Chase, here are the results of that audit: to view the entire audit: http://www.salemdeeds.com/pdf/Audit.pdf  Example : excerpt from audit:

JPMORGAN CHASE BANK, N.A.:

| Description | Quantity | Percentage |
|---|---|---|
| **Assignments of Mortgage Examined** | **147** | **100%** |
| Principal Amount of Mortgages | $31,089,916 | |
| Average Amount of Each Mortgage Examined | $259.083 | |
| Valid Assignments of Mortgage | 44 | 29.93% |
| Missing Assignments of Mortgage | 107 | 72.79% |
| Questionable Assignments of Mortgage | 16 | 10.88% |
| **Invalid Assignments of Mortgage** | **87** | **59.18%** |
| Facts Not Sufficient to Establish Intent | 29 | 19.73% |
| **Robo-Signed Assignments of Mortgage** | **58** | **39.46%** |
| Fraudulent Assignment of Mortgage | 54 | 38.72% |

46

Example : excerpt from press release
Read entire press release:
http://www.salemdeeds.com/pdf/PressRelease1-18-12.pdf

**O'Brien calls for criminal action against the Big Banks Says they acted like "criminal enterprise"**

*Saying that the time has come for a full-scale criminal investigation, Southern Essex District Register of Deeds John O'Brien today has sent some 31,897 of what he says are fraudulent documents that have been recorded in the Salem Registry to Massachusetts Attorney General Martha Coakley, U.S. Attorney General Eric Holder and U.S. Attorney Carmen Ortiz. O'Brien said that he is asking these officials to impanel a Grand Jury to look into the evidence that he has presented. "I am confident that these documents will show a pattern of fraud, uttering and forgery. Known robo or surrogate signers, whose signatures were supposedly witnessed by notary publics, sign these documents. In addition, these documents may contain fraudulent information in the body of the documents. I believe that a criminal investigation is the next step to hold the perpetrators responsible." O'Brien praised Attorney General Coakley for her aggressive pursuit of wrongdoing in her civil action but noted that other states such as California, Nevada, Illinois and Michigan have launched criminal investigations, and O'Brien is hopeful that Massachusetts will do the same. O'Brien strongly suggests that the Grand Jury should subpoena both the past and present Chief Executive Officers (CEOs) of the Mortgage Electronic Recording Systems, Inc. ("MERS"), Bank of America, JP Morgan Chase, Citibank, Wells Fargo, Countrywide, Washington Mutual among others. In addition, he is asking that the top officials of DOCX, Nationwide Title Clearing, Inc. and LPS also be subpoenaed. "These companies have been retained by MERS and its member-banks to produce the documents that I am alleging contain fraudulent information. It is one thing to go after these institutions with a civil*

47

action, but the only way to let them know that you are serious is to call them before a Grand Jury." O'Brien said, "There is no question in my mind that the officers of these banks and loan processing servicers made a conscious decision to commit fraud and participate in a scheme to deprive the public from knowing the true holder of their mortgage while at the same time avoiding paying billions of dollars in recording fees. It is my opinion that they acted as a criminal enterprise, crossing state lines to commit their crimes and in most cases using the U.S. Postal Service to send these documents to registries of deeds, thereby committing mail fraud. We need to know what they knew and when they knew it. Until the CEOs who allowed these fraudulent activities to happen under their watch are sent to jail for what they did, these types of illegal behaviors will continue." Just last week, O'Brien's Registry received 3 documents from Bank of America, all signed by a known robo- signer, Linda Burton. O'Brien said, "If they are sending them to me, of all people, it is safe to assume that they are sending them to registries across the country." O'Brien refuses to record any documents signed by a robo-signer on his list unless those documents are accompanied by an affidavit attesting to the signature. So far, he has not received one affidavit. "That clearly shows me that those documents were in fact fraudulent." O'Brien said that if he or anyone else went into one of these major banks and forged a signature on a loan document they would be arrested and sent into jail. So it begs the question, why haven't these CEO'S been held accountable? O'Brien cited the case of the individual who walked into a Wal-Mart and tried to make a purchase using a fraudulent One Million Dollar bill. He was arrested and charged with attempting to obtain property by false pretense and uttering a forged instrument. O'Brien said, "As far as I am concerned, this is what these banks have been doing for years. Make no mistake,

MERS and its member-banks are taking people's homes using fraudulent documents and that is something we do not do in America." In addition, O'Brien is zeroing in on the major foreclosure **law firms** that he believes have acted as a co-conspirator in flooding the registries of deeds with these fraudulent instruments. **"These attorneys should know better. They have acted as co-conspirators in perpetrating this fraud.** I am sending a letter to the Massachusetts Board of Bar Overseers asking that they conduct an independent investigation into the activities of these firms. Unlike our Massachusetts Attorney General Martha Coakley, I understand that there are other Attorneys General and other public officials across the country who would like nothing better than to sweep

48

this matter under the rug and grant these lenders, loan servicing companies and their foreclosure-mill attorneys immunity for the damage that they have caused, not only to our economy but to people's property rights. They would be willing to accept pennies on the dollar, a slap on the wrist, and a promise to never do it again. If that should happen, it would be the biggest sellout of the American People that I have ever seen. It would send the wrong message that the big boys can get away with anything. As I have been saying all along, they may think they are too big to fail, but as far as I am concerned, they are not to big to go to jail. The top officials at MERS, its member-banks, servicers and foreclosure-mill attorneys must be prosecuted and held accountable for their fraudulent schemes that brought profits to their institutions by cutting corners, circumventing land recordation systems through fraud, uttering and forgery."

NOTE: This is significant due to the fact the very issues Mr. O'Brian raises, is Related to the instant matter regarding the criminal misconduct of Defendant JPMC. In Davidson county Registry, are tainted by the same Fraudulent misconduct plaintiffs argues in this complaint. JPMC racketeering enterprise & Wilson & associates racketeering enterprise, Shellie Wallace is conducting criminal activity against plaintiff's and families throughout Davidson county and beyond.

160. The OIG   ( OFFICE OF INSPECTOR GENERAL) conducted an Audit on Defendant JPMCB exhibit V. this is significant as stated before, because of the identical tactics found in the OIG audit are the same as that of the Plaintiff. Example: excerpt from that audit.

http:  www.hudoig.gov Audit_Reports 2012-CH-1801.pdf

"*Chase did not establish an effective control environment to ensure the integrity of its foreclosure process. Because it failed to establish proper policies and procedures that fostered compliance with laws and regulations, its affiants signed foreclosure documents automatically without performing a due diligence review or verification of the facts, its notaries failed to authenticate signatures, and it used law firms that may have included inaccurate information on foreclosure documents. As a result, Chase engaged in improper practices by not fully complying with applicable foreclosure procedures when processing foreclosures on FHA-insured loans. This flawed control environment resulted in Chase's filing improper legal documents, thereby misrepresenting its claims to HUD.*"

161. On August 15, 2010 Plaintiff Sent by certified mail to CHF qualified written request for Documentation and proof of claim (exhibit 6) Chase did not Respond, and was unwilling to Validate the Debt or proof that they were in fact Creditors to plaintiffs alleged Loan.

162. On August 4, 2010 Defendant Wilson & Associates Racketeering Enterprise headed up by Shellie Wallace Sent Plaintiff a Notice (exhibit 4) that they were retained by Defendant CHF Racketeering enterprise to initiate a wrongful foreclosure proceedings on plaintiffs property. and the amount of Debt they were attempting to collect was 216, 522.52

the original loan amount is 208, 354.00. this is fraudulent misrepresentation, the Notice states " the **Lender** is entitled to collect all expense of foreclosure including, but not limited to, reasonable attorney's fees, cost of documentary evidence, abstacts, appraisals, and title reports". The Lender (US Treasury/Investors) has no privity to CHF or JPMC.

163. On December 3, 2010 Defendant Wilson & Associates Racketeering Enterprise headed up by Shellie Wallace sent plaintiff a Notice (exhibit 5) the Notice states " The Mortgage for the property in which you are living is about to be foreclosed. We expect that Ownership of the property will be transferred to Chase Home Finance LLC, who is **servicing** the loan for the **Mortgagee**". A mortgagee is a person or entity who Makes the Loan that is secured by the real property of the person (mortgagor) . JPMC nor CHF never made a loan to the Plaintiff nor are they in privity of the true Lender ( US Treasury/Investors).

164. On July 20, 2011 Wilson & Associates Racketeering enterprise headed up by Shellie Wallace sent plaintiff a Notice (exhibit 7 ) Stating that JPMC retained them to initiate Foreclosure proceedings," the amount of debt were attempting to collect is **229,565.41 (21,000) dollars more than the original amount of the Loan.** Notice how the Racketeering enterprise changed there approach from CHF to JPMC this is due to the investigation by the OCC, who found that Chase was initiating illegal foreclosures, so they merged with JPMC, because CHF was conducting illegal foreclosures throughout the country including plaintiff mortgage Loan. Inflated legal fee's

165. On august 2, 2011 Defendants Wilson & Associates Racketeering enterprise headed up by Shellie Wallace sent plaintiff a Notice (exhibit 8) the Notice states " The mortgage for the property in which you are living is about to be foreclosed. We expect that Ownership of the property to be transferred to JPMC. SBM Succesor by merger to CHF, who is **servicing** the Loan.

166. On November 21, 2011 Wilson & Associates Racketeering enterprise headed up by Shellie Wallace sent Plaintiff a Notice (exhibit 9) Notice of Trustee Sale schedule for January 18, 2012. This wrongful Trustee sale was based on the fraudulent Appointment of Successor Trustee executed by Wilson & associates enterprise and Shellie Wallace. JPMC or CHF refused to validate the Debt, and continued to Foreclose on plaintiff property, violating the FDCPA.

50

## CONSENT ORDER

167.   As one part of the government investigations disclosed by JPMC, the Office of
The Comptroller of the Currency ("OCC"), the Federal Reserve Board ("the Fed"), the Federal Deposit
Insurance Corporation ("FDIC"), and the Office of Thrift Supervision ("OTS") jointly conducted
"horizontal" examinations of foreclosure processing at the 14 largest federally regulated mortgage
servicers, including JPMC ("Interagency Review").

The OCC's First Senior Deputy Comptroller and Chief Counsel described the Interagency Review as
follows:

The primary objective of the examinations was to evaluate the adequacy of controls and governance over
bank foreclosure processes, including compliance with applicable federal and state law. Examiners also
evaluated bank self-assessments and remedial actions as part of this process, assessed foreclosure operating
procedures and controls, interviewed bank staff involved in the preparation of foreclosure documents, and
conducted an in-depth review of approximately 2,800 borrower foreclosure cases in various stages of
foreclosure. Examiners focused on foreclosure policies and procedures;      organizational structure and
staffing;      vendor management of third parties, including foreclosure attorneys; quality

**It is possible that more than "civil money penalties" may result from government investigations. As
the U.S. General Accounting Office reported, the U.S. Department of Justice "is also taking actions
to address foreclosure documentation issues. Justice staff could not comment on investigations, but
told us that they are working with investigatory and regulatory partners to look into the servicers'
foreclosure practices. While they said that federal civil and *criminal statutes could apply in complaints
or charges in areas of mortgage fraud, including mail and wire fraud,* false statements, Financial
Institutions Reform, Recovery, and Enforcement Act (FIRREA) civil actions, and fraud against the
government, if the mortgage loans involved were federally insured or guaranteed, Justice staff told
us that the state attorneys general and other regulators also have enforcement authority to address
these issues." GAO-11-433 at 37. (Emphasis supplied) 126 *See* Testimony of Julie L. Williams, First
Senior Deputy Comptroller and Chief Counsel of the OCC, at July 7, 2011 hearing before
subcommittees of the House Committee on Financial Services("WilliamsTestimony")at2-3,
http://financialservices.house.gov/UploadedFiles/070711wi liams.pdf**

Control and audits; accuracy and appropriateness of foreclosure filings; and loan document control,
endorsement, and assignment.

168.   On April 13, 2011, OCC, the Fed, FDIC, and OTS issued the Interagency Report, which, among
other things, concluded that:

a)      Deficiencies in servicers' processes, procedures, controls, and staffing resulted in numerous
inaccurate affidavits and other foreclosure-related documents. Examiners found that most servicers had
affidavit signing protocols that expedited the processes for signing foreclosure affidavits without ensuring
that the individuals who signed the affidavits personally conducted the review or possessed the level of

Case 3:12-cv-01222   Document 1-1   Filed 11/26/12   Page 51 of 207 PageID #: 56

knowledge of the information that they attested to in those affidavits....

b) [T]he servicers reviewed generally did not properly structure, carefully conduct, or prudently manage their third-party-vendor relationships with outside **law firms** and other third-party foreclosure services providers. Failure to effectively manage third-party vendors resulted in increased reputational, legal, and financial risks to the servicers.

c) Servicers typically used third-party **law firms** to prepare affidavits and other legal documents, to file complaints and other pleadings with courts, and to litigate on their behalf in connection with foreclosure and foreclosure-related bankruptcy proceedings. The servicers reviewed generally showed insufficient guidance, policies, or procedures governing the initial selection, management, or termination of the law firms that handled their foreclosures.

d) [P]roblems include instances in which law firms signed documents on behalf of servicers without having the authority to do so, or they changed the format and content of affidavits without the knowledge of the servicers. These defects could, depending upon the circumstances, raise concerns regarding the legality and propriety of the foreclosure even if the      servicer had  sufficient documentation available to demonstrate authority to foreclose.132

169. Having found that JPMC enterprise and others engaged in "unsafe and unsound practices related to residential mortgage loan servicing and foreclosure processing," the OCC on April 13, 2011 announced formal enforcement action against JPMC and other servicers.133

170. As part of that action, JPMC entered into a Consent Order with the OCC, 134 which requires JPMC to:

a) Correct the deficiencies in mortgage servicing and foreclosure processing identified in the Interagency Report

b) Provide robust oversight and controls of third-party vendors, including outside legal counsel and vendors who provide default and foreclosure processing services to ensure that those who act on their behalf comply with these obligations as well as all laws and regulations, both state and federal

c) Implement a comprehensive "revision" of its foreclosure processes for the purpose of restoring "integrity" to the foreclosure process; those revisions must be identified in "detailed Action Plans" acceptable to federal government regulators, and

52

d) Engage "independent firms" approved by federal government regulators for the purpose of conducting a "look-back" investigation to identify borrowers who (during the period from January 1, 2009 through December 31, 2010) suffered financial harm as a result of foreclosure processing deficiencies and to compensate them for financial injury.

According to Acting Comptroller of the Currency John Walsh:

These comprehensive enforcement actions, coordinated among the federal banking regulators, require major reforms in mortgage servicing operations.... 136 Our enforcement actions are intended to fix what is broken, identify and compensate borrowers who suffered financial harm, and ensure a fair and orderly mortgage servicing process going forward.137

171. On April 13, 2011, the Fed also announced an enforcement action against JPMC and other servicers, which entered into Consent Orders similar to the ones obtained by the OCC. In its press release, the Fed stated that forceful government action was needed to "address a *pattern of misconduct* and negligence related to deficient practices in residential mortgage loan servicing and foreclosure processing," which "represent *significant and pervasive compliance failures and unsafe and unsound practices* at these institutions." The following executives of JPMC signed the consent order"

a). On April 13, 2011 The United States of America Department of The Treasury Comptroller of Currency Issued a Stipulation and Consent to the issuance of a Consent Order in The matter of the Defendant JP Morgan chase Bank NA, attached as Exhibit W and it's Subsidiaries Defendant Wilson & associates, Shellie Wallace.

b). On March, 30, 2011 James Dimon, Barry Zubrow, Frank Bisignano, Laban Jackson, The duly elected and acting Board of Directors of JP Morgan Chase Bank NA, set their hands on behalf of JP Morgan Chase Bank NA to a stipulation and consent to the issuance of a consent order. (Attached) as exhibit A

c) on April 4, 2011 Douglas Braunstein The duly elected Board of directors of JP Morgan Chase Bank NA, set his hands on behalf of JP Morgan Case Bank NA to a Stipulation and consent to the issuance of a consent order

d). On April 31, 2011 James Crown, The duly elected Board of directors of JP Morgan Chase Bank NA, set his hands on behalf of JP Morgan chase Bank NA. To a Stipulation and consent to issuance of a consent order.

53

e). That the Comptroller of the Currency of the united States of America intends to impose a cease and desist order on JP Morgan Chase Bank NA, pursuant to 12 USC 1818 (b) for unsafe and unsound Banking practices relating to Mortgage servicing and the initiation and handling of Foreclosure proceedings.

f) That the Plaintiff is a victim of the findings by the OCC addressed in the consent order, pertaining to handling of foreclosure proceedings.


172. The Board of governors of the Federal Reserve System and the Office of the Comptroller of the currency (federal bank regulators) have required an **Independent Foreclosure review** to identify customers who may have Been financially injured as a result of errors, Misrepresentation, or other deficiencies made during the foreclosure process.

The Plaintiff alleged Mortgage Loan was active in the foreclosure process between January 1, 2009 and December 31, 2010. Plaintiff received Notice from The independent foreclosure review, that their Loan was eligible for an Independent review. Reference Number: 1606003150

## NOTICE OF NEW CREDITORS FRAUDULENT MISREPRESENTATION

173. On December 22, 2009 plaintiff received a Notice of new Creditor (exhibit 1) by way of US mail from defendant CHF Racketeering Enterprise . Claiming that the date of sale of the plaintiff mortgage loan was **December 15, 2009**, and JPMC was the new creditor, and CHF acting as agent for Creditor. **Who was the Creditor prior to December 15, 2009. ?**

174. On May 5, 2011 plaintiff received a Notice of new Creditor (exhibit 2) by way of US mail from Defendant JPMC Racketeering Enterprise, Claiming that the sale or transfer of plaintiff mortgage loan was **May 1, 2011**, and JPMC is the New **Creditor**, and current **Servicer**, And claiming that Evidence of transfer of ownership securing the mortgage loan is recorded in the lands records of the county in which the mortgage property is located.

175. On June 17, 2011 plaintiffs received a Notice of New Creditor ( exhibit 3) by way of US mail from Defendant JPMC Racketeering Enterprise, claiming that the sale or transfer of plaintiffs mortgage loan was **June 10, 2011**, and JPMC is the new Creditor, and current Servicer.

176. JPMC & CHF Racketeering Enterprise claimed to have sold, transferred plaintiff mortgage on three separate occasions, when in fact they never transferred or sold the Loan, this is the deceptive business practice they continue to use throughout the State of Tennessee and the Country, to deceive homeowners as

54

to the real party of interest. They just shuffle paper around, use the US mail to send out false and misleading statements, misrepresenting themselves as Creditors, when in fact there just merely Brokers for Investors on Wall street, and servicers for Certificate holders of plaintiffs pooled Mortgage Loan. When the homeowners default, JPMC enterprise attempts to re-attach the Note, as a debt instrument, claiming to be the owners of said debt instrument. When in fact the true owners are the US treasury, by way of the Federal Reserve Bank of New york, and Certificate holders.

177. The OCC, OIG, US Treasury, has cracked down on JPMC enterprise as evidence within this complaint confirms. They got caught with there hands in the cookie jar.


### CONCLUSION

The Defendant JPMC conveyed all Rights Title and Interest over to Ginnie Mae, thus have no capacity or Standing to collect on any Note/security signed by the plaintiff Sheri Baker aka Sheri Jones. There are no binding legal interim Mortgage assignments to the defendant JPMC. See
(U.S. Bank NA v. Ibanez, 08-misc-384283,) At the time JPMC executed foreclosure proceedings The Mortgage wasn't assigned. There isn't a Valid Assignment to JPMC. JPMC is a Servicer for Investors on Wall Street. JPMC has 0 credit risk, because it never funded its own monies. in Plaintiffs Transaction. JPMC is not the owner of Plaintiffs Mortgage, as overwhelming evidence indicates otherwise. JPMC has violated State, Federal laws, Ginnie mae Guidelines, RESPA, TILA, False claim act, just to name a few, JPMC has committed criminal acts to cover up there fraudulent scheme.
The Note/Security was intentionally separated after the execution of the mortgage, The Note/security was warehoused and sold to investors by way of The Federal reserve Bank Of New York, acting as fiscal Agent for the US Treasury, who literally and actually provided the funds for the loan giving to the Borrower. This all comes down to who is the real party of interest, who funded the Loan? The real Lender hasn't claimed default; the entity claiming ownership is a broker/dealer, with no authority from the real lender to act on its behalf. JPMC was useless in this transaction, it served no purpose. The Plaintiffs could of drawn up there own contract and took it to the Fed Window, for a loan from the taxpayers on a much better interest Rate. And wouldn't have a problem paying it Back, being that I borrowed it from myself.
The process of a Note being securitized is final and irreversible. You cannot unscramble eggs. A security cannot be used to foreclose, especially when the security has been paid in full. If you issue a certificate on the basis of a Note/security, and the certificate is paid by the issuer, how then can the issuer claim a debt of the Note that has 0 value. Its like taking someone's Note to the bank and getting a loan for it, then you pay off the loan, take the paid off note and try to collect on it. The certificate that JPMC paid off was an

55

extension of the Note/security by which it was issued on. The Note JPMC is Holding isn't worth the paper its written on. The Lender has not declared default upon the plaintiffs.

## REQUEST FOR PRODUCTION OF DOCUMENTS

178.  Pursuant to Rule 34.02 and 34.03 of the TN Rules of civil Procedure The Plaintiffs Request the following documents to be attached to the answer of this complaint:

1) Form **HUD-11704** (12/2007) **Commitment To Guarantee Mortgage-Backed Securities**

2) Form **HUD-11711B** (10/2007) **Certification and Agreement,** to show the issuer (JPMC) Agrees that after the delivery of securities backed by the referenced pool or loan package, it will not encumber any pooled mortgage by pledge or otherwise

3). Form **HUD-11711A** (10/2007) Release **of Security interest To** show the lending or financial institution who signed this document agreed to relinquish any and all rights Tile and interest it may have in the mortgages to be placed in the ginnie Mae Mortgage Backed Securitas Program

4.) Form **HUD-11708** (01/2006) Request **for Release of Documents** to show defendant JPMC Reason for Requesting documents, as there are 6 reasons to choose from:

A) Mortgage paid in full

b) Repurchase of Delinquent Loan

c) Foreclosure-with claim payment

d) Loss mitigation

e) Substitute

f) Other

5). Form **HUD-11705** (12/2007) Schedule **of Subscribers and Ginnie Mae Guaranty Agreement To** show The defendant JPMC (Issuer) was authorized to issue securities under the Ginnie Mae I and II, and The Federal Reserve Bank of New York was authorized to take Delivery of securities.

6) **HUD-11710-E** (01/2006) Liquidation **Schedule** To show Liquidation balance at the time the defendant JPMC re-purchased the mortgage and to show reason for removal.

56

7) Form HUD-11709 (10/2007) Master **Agreement for Servicer's Principle Interest custodial Account.**

8) The original contract between the substitute Trustee, Shellie Wallace and the Principle (owner of Note) that grants Shellie Wallace the right to act on their behalf, includes administering foreclosure. This is part of the debt verification requirement of the FDCPA pursuant 15 USC 1692g (coppola V arrow finacial Services, 302CV577, 202 WL 32173704 (D.CONN, Oct. 29. 2002)

## CLAIMS FOR RELIEF
## COUNT ONE: VIOLATION OF 18 USC §1962 (C,) RICO

179. Plaintiff Herein incorporated by reference all the foregoing paragraphs as though fully set forth herein.

180. This cause of action, Claim for releif which alleges violations of section 1962 (c) of Rico 18 USC § 1962 (c) is asserted against JPMC & Wilson & Associates, MERS and Shellie Wallace.

181. Each Defendant is a "Person" within the meaning of 18 USC § 1961 (3)

182. By engaging in a pattern of racketeering activity, specifically "mail or wire fraud", the Defendants subject to this count participated in a criminal enterprise affecting interstate commerce.

183. A separate count of mail fraud took place each and every time a fraudulent affidavit, pleading, assignment, Notice of New Creditor, Notices to Foreclose, was sent through the use of the US mail. Like wise is true for any documents sent via electronic mail. Such would constitute a separate act of wire fraud.

184. The criminal Enterprise affects interstate commerce in numerous ways. It is used to Conceal the true ownership of mortgage loans from the general public, including investors, borrowers, The government, and the IRS, but for the conspiracy, investors would be enable to have a clearer picture of the assets and debts of large banking and financial institutions in which they may consider investing.

57

185. The entire American economy has been affected by the conspiracy described in this complaint, which is exemplified by the JPMC, Wilson & Associates and MERS Enterprise. The foreclosure crisis and larger economic downturn were substantially contributed to, and are believed to have been caused by the JPMC and MERS enterprise and underlying conspiracy as it related to the fraud involved with the securitization of mortgage loans and the issuance of bogus Securities.

186. The "predicate acts" of fraud, which were accomplished through the U.S. mail, and the Internet, and which are specifically attributable to the Defendants subject to this count, is: a.) Administering foreclosure on behalf of entities which were not the real parties in interest, because The parties (Defendants) convey all rights, title and interest to another entity. And were not in privity of the true Lender.

b) Actively concealing the Defendants' lack of standing in their standard affidavits for foreclosure.

c.) The drafting, and processing of the fraudulent affidavits and documents and the subsequent Execution of the documents the rob-signers and employees Defendant law firm, and the filing of Fraudulent and forged affidavits as to loan ownership by robo-signers and employees of the Defendants law firm, services and processing companies.

187. On August 31, 2010 employees of Wilson & Associates (Foreclosure Mill #2) Drafted a "Appointment Of Successor Trustee" naming Shelllie Wallace as Trustee, and Chase as acting with authority of Holder. And transmitted thereafter to Foreclosure Mill #1 in Franklin county Ohio by US Mail via Internet or interstate wire facilities.

188. Foreclosure Mill #1 uses its employees Susan Massie( robo-signer) to Sign the affidavit as Vice president, and Melissa Hammocks name appeared as Notary but the signature on affidavits doesn't match

the Melissa Hammock signature registered with the Secretary of State of Ohio. As exhibit indicates.

189. On November 11, 2011 National Title corporation NTC Contracted with JPMC to Fabricate Corporate assignments of Deed of Trust, Naming MERS as Nominee for PRM, Fraudulently conveys, assigns Deed of Trust to JPMC, Thereafter transmitted to Foreclosure Mill #1, Franklin county , Ohio.

190. JPMC Enterprise employee signed the corporate assignment as Assistant Secretary for MERS, and Notarized at the Foreclosure Mill # 2, thereafter transmitted by US Mail to Davidson county Registry of Deeds where it was recorded on 11/16/11.

191. Defendants business operation, not just their fraudulent activites, are carried out by array of legal and mortgage servicing personnel, working across state boundaries, who engage in constant transfer of correspondence, legal documents, loan data, information, invoices account statements, financial instruments.. These information transfer occur primarily through interstate wire facilities or US Mail.

192. The Enterprise is an ongoing, continuing group or unit of persons and entities associated together for the common purpose of limiting costs and maximizing profits through rapid, automated prosecution of residential mortgage foreclosure lawsuits by the Wilson & associates firm. The Enterprise operated continuously throughout the State.

193. Shellie Wallace exerted control over the W&A Enterprise. In violation of 18 U.S.C. § 1962(c), she conducted or participated in the conduct of the affairs of the Enterprise by (a) filing or directing the filing of foreclosure lawsuits on the basis of untrue assertions of fact, some of them in court filings and property records containing counterfeit signatures and sham notarizations, all of them intended to create the false appearance of legal standing to bring residential mortgage foreclosure actions; and (b) systematically inflating or fabricating 21,000 worth of junk fees charged to Plaintiff for "default services" that are unessential, unperformed.

194. These predicate Scienter acts are related. They share common purpose of defrauding the plaintiff

59

And other homeowners. They share the common themes of "non-documentation" and

Concealment of the real parties in interest.


195. The predicate acts satisfy the RICO continuity requirement, they extend from in or

Beginning in 1998 and continuing unabated, the scheme meets the definition of "open-ended"

Continuity. The threat of continued criminal activity as part of this enterprise, without question still

Looming over the American economy. Alternatively, closed - ended continuity is present because

The scheme occurred over a period in excess of ten years.


196. As the result of the RICO enterprise of which these actions were part, the plaintiff's is being

Defrauded and there home has actually been put up for sale three times in an illegal foreclosure.

### Damages caused by Defendant's Scheme

197. Defendant's violations of Federal and State Laws and their pattern of racketeering activity have

directly and proximately caused the Plaintiff's to be injured in their property. These damages and injuries

include, (a) Payment of Fees to avoid dispossession of their home through fraudulent Trustee Sales: (b)

payment of legal Fees and cost to their counsel to challenge Defendant's attempt to seize their property

through foreclosure actions brought in the name of entities without legal standing to sue. (c) causing stress

to plaintiff's relating to the thought of possibly losing their home, resulting in doctor and medical bills


198. Under 18 USC § 1964 (c) Defendants are jointly and severally liable to Plaintiffs for three times the

damages that plaintiff sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

60

## CLAIM AND RELEIF

## CAUSE OF ACTION COUNT TWO

### Violation of Tennessee code Title § 66-3-101 Conveyances in Fraud

### Defendants JP Morgan and MERS

199. Plaintiff incorporate by this reference in paragraph 111-122 of this complaint as if set forth fully herein.

200. The Defendants executed a Fraudulent Corporate Assignment on 11/4/2011, filed in The Davidson county Registry of Deeds on 11/16/2011 a forged, groundless, materially misstated false claims against plaintiff property in the way of Fraudulently conveying property to JPMC to defraud the purchaser (plaintiffs) as to the True Lender, thus causing disturbance, hindered, Delaying Plaintiffs from pursuing their Purchase. All parties taking part in or who conspired with those who participated in the acts or practices in question are jointly and severally liable to the plaintiff.

201. Plaintiffs are entitled to declaratory Judgement, deeming the Corporate assignment to be clearly and utterly void

## CLAIM AND RELEIF

## CAUSE OF ACTION COUNT THREE

### Common law/statutory Fraud and injurious falsehood

### Defendant JP Morgan chase Bank and Wilson & associates, Shellie Wallace, MERS

202. Plaintiff incorporates by this reference each and every paragraph of this complaint as if set forth fully

61

herein.

203. "The common law action for fraud may be stated as follows:

Black v. Black , 166 S.W.3d 699 (Tenn. 2005) (referencing the requirement that fraud must be pleaded with specificity); Hodges v. S.C. Toof & Co., 833 S.W.2d 896 (Tenn. 1992) ("A person acts fraudulently when (1) the person intentionally misrepresents an existing, material fact or produces a false impression, in order to mislead another or to obtain an undue advantage, and (2) another is injured because of reasonable reliance upon that misrepresentation."); Dozier v. Hawthorne Development Co., 262 S.W.2d 705, 711 (Tenn. Ct. App. 1953) (for concealment or non-disclosure to constitute fraud, the party charged with fraud must have knowledge of an existing fact or condition and a duty to disclose the fact or condition)..

First Nat'l Bank v. Brooks Farms , 821 S.W.2d 925, 927 (Tenn. 1991) (quoting Haynes v. Cumberland Builders, Inc., 546 S.W.2d 228, 232 (Tenn. Ct. App. 1976)); see also Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 (Tenn. 1992); Dobbs v. Guenther, 846 S.W.2d 270, 274 (Tenn. Ct. App. 1993). 'Tennessee courts have recognized that fraud by its nature is often difficult to prove and thus may be properly proved by wholly circumstantial evidence.' Edwards v. Travelers Ins. of Hartford, 563 F.2d 105, 112 (6th Cir. 1977) (citing Parrott v. Parrott, 48 Tenn. 681, 687 (1870))." 42 S.W.3d at 67-68.

204. In a real estate transaction this occurs when a party makes a false representation of fact or a false promise to induce the plaintiff to enter into an agreement, the plaintiff relies on the false promise by entering into the agreement, and the reliance causes injury to the plaintiff. The presence of fraud in a contractual proceeding makes the contract voidable by the party upon whom the fraud was perpetrated. Fraud occurs generally where there is an intentional deception made for personal gain or to damage another. For civil verses a criminal lain under contract law, there are six elements: 1) a "material misrepresentation:" 2) "which is false;" 3) which Defendant knew "to be false or made reckless" 4) which was made in order to induce Plaintiff to act in a certain manner; 5) that Plaintiff so acted in reliance on the misrepresentation:

205.   The forged and publicly filed "false" foreclosure affidavits are the key elements to the Defendants being able to perpetrate the fraudulent foreclosures. The defendants conspired together and "knew" the "material representations were "false". The material representation to the county clerk and the property owner, were made so that the courts and the property owner and judge rely on such and the property owner is being injured as a result with the facing of this foreclosure. There could possibly be no more serious injury to a homeowner that the illegal divestment of her private property.

206. Defendants made numerous material misrepresentations to plaintiffs relating to plaintiffs' mortgage

62

loans and applications for modification of those loans, as specified above in detail. These representations included, but were not limited to, the uniform oral representation that if Plaintiffs complied with the terms of their trail plans, they would receive permanent loan modifications. In addition, defendants made the common, uniform representation that plaintiffs loan modification application were still being processed, at times when in reality they were not still being processed, either because they were dead, or hopeless, or there was a temporary moratorium on loan modification process.

207.    Plaintiff was induced to signing a Loan Modification based on fraudulent misrepresentation, defendant Chase Home finance LLC, Merger to JPMC claiming to be the Lender, MERS acting as Nominee for Lender. Chase was never the Lender in Plaintiffs Mortgage, the actual Lender was never disclosed in the Loan modification Agreement. On page 6 of 6 of the Agreement, the signature for the pretender Lender is a robo-signer who signed for the Nominee MERS also. Both signatures are identical, and unidentifiable by design.

208. Plaintiffs are informed and believe, and based thereon allege, that defendants' representations were in fact false, and that at the time defendants made these misrepresentations, defendants knew them to be false, and made them with the intention to induce plaintiffs' to act in reliance on said representation as alleged herein, or with the expectation that plaintiffs would do so.

209. Plaintiffs reasonably and justifiably relied on defendants' representation. At the time misrepresentation were made by defendants, and at the time plaintiffs took the actions alleged herein, or failed to act as alleged herein, plaintiffs were ignorant of the falsity of defendants; misrepresentation and believed them to be true, In reasonable and justifiable reliance on such misrepresentation, plaintiffs were induced to, and in fact did, take certain actions, to their detriment, and/or forego or delay multiple, alternatives options that would have been available to them.

210. As a direct foreseeable, and proximate result of defendants' wrongful actions alleged herein, Plaintiffs have been injured and damaged in amounts to be determined according to proof at the time of trail. Had plaintiffs known the true facts, they would not have taken the actions they did, in respect to the Investment (MBS) transaction, executed by the signature of the Plaintiff, Sheri Baker, aka Sheri Jones on October 24th 2008, when Plaintiff thought she was signing a promise to pay, Negotiable instrument under UCC article 3.when in fact she was signing a pre-destined Security under UCC article 8. Had plaintiffs known they were dealing with corporate thugs, and Banksters, who uses the funds of Taxpayers, to lend back to them, after the taxpayer bailed there scummy, greedy belly, out of a collapsed economy that they created, they would have taken other actions altogether. In particular, Plaintiffs were induced to, and did, take certain actions to their detriment. In addition, or in the alternative, plaintiffs were induced to, and did forego or

63

delay certain alternative actions, including:

(a) Selling their residence:

(b) Initiating legal action at an earlier juncture:

(c) Seeking alternative remedies at an earlier juncture:

(d) Avoiding damage to credit score: or

(e) Negotiating for a short sale. Deed in lieu of foreclosure, debt restructuring, or other alternatives to foreclosure.

202.    In doing the acts alleged in this cause of action, defendants JPMC and MERS acted intentionally, Scienter, willfully, and with the intent to injure plaintiffs with malice, fraud, and oppression as a result, Defendants are jointly and severally liable for their acts of fraud by their misrepresentation and all damages stemming from such, plaintiffs seek punitive and exemplary damages in an amount sufficient to punish defendant and to deter such conduct in the future. Including attorney fees. And the Loan Modification Agreement declared Void.

**(Declaratory Relief)**

211.  As alleged in plaintiff claim regarding defendant's wrongful filing of mortgages, foreclosure, unjust enrichment and conspiracy, plaintiff's right have been violated.

212. Defendants have filed mortgages, threatened foreclosure, , have no lawful right to foreclose and have unlawfully deprived or attempted to deprive plaintiff of their home.

213. Plaintiff seeks a declaratory judgment against Defendants stating that Defendants have violated Plaintiff right and that the Defendants had and have no rights to hold mortgages In the name of JPMC, and/

64

or on plaintiffs property and that the Defendants are entitled to no further payments from plaintiff or recognition in plaintiff's title to their property.

**(Quiet Title)**

214.   The Plaintiff is entitled to have his property as referred to herein quitted in her name until and unless some party comes forward during this litigation who has a right to enforce the loans upon the house free and clear of all encumbrances.

215. The originators of the loans, were In fact, a means by which JPMC and the Defendants could insulate themselves from liability for the breach of contract, the violation of lending and recording laws, and for all the reason stated in the allegations of this complaint.

216. The Defendant have not loaned any money to plaintiff.

217. The Defendants have no contractual relationship with plaintiff.

218. The Defendants are not the holders in due course of the promissory notes/Security on plaintiff property.

219. Overwhelming evidence indicates The Defendants conveyed all title rights and interest over

to Ginnie Mae .

220. No one who has interest in the plaintiff property has made any claim of that interest.

221. The plaintiff is entitled to have the title to the property quited in her name as to the Defendants, where a mortgage was ever recorded In the name of JPMC, and MERS.

## CLAIM AND RELEIF

## CAUSE OF ACTION  COUNT FOUR

## VIOLATION OF  THE  FAIR DEBT COLLECTION PRACTICES ACT.

## DEFENDANTS, WILSON & ASSOCIATES, SHELLIE WALLACE

222.    Plaintiffs hereby incorporate by reference all the foregoing paragraphs as though fully set forth heron.

223.    On January 18, 2012 Defendant Law firm made contact with plaintiff and identified themselves as a "Debt collector" for pretender lender JPMC racketeering enterprise.

224. Federal law stipulates that a debt be verified as required by FDCPA pursuant to 15 USC 1692g. The following required documentation is what constitutes legal validation of debt under federal law:

- Complete payment history, and Original agreement (wet-ink Note) that bears the signature of the alleged debtor wherein she agreed to pay the Original creditor.

- Letter of assignment from the original creditor to the debt collector. (Agreement with debt collector client (the principle) that grants them the authority to collect on this debt.) coppola v. Arrow financial Services, 302CV577, 2002 WL 32173704(D.conn cot 29, 2002) who is the principle? Who owns the Security?

225.    Furthermore, under FDCPA section 809 (b), a debt collector is not allowed to pursue collection activity until the debt is FULLY validated. This would mean that the foreclosure sale would have to be suspended until the debt is validated.

226.    The debt collector was asked by the plaintiffs to validate the debt, in which they were unable and or unwilling to adhere to federal law.

227. Verification of the alleged debt is crucial because the True, real and actual Beneficiary of the Note/Security must be correctly identified in order to receive payment. The rationale is to protect the obligor from being subject to multiple demands for payment on a single Note/security.

228. An English case law and history of property rights helton v. Hently, a 1680 case said: "an indebted

66

merchant owed his debt to the person who had lent him the Money, not to a debt collector who came around bearing a note".

English case law is still valid in America since the US is heir to tradition of common law from English law.

229. Chase, Wilson & associates is a debt collector within the meaning of FDCPA - **803 15 USC 1692a.** The monies allegedly owed by plaintiffs, are" Debts" within the meaning of FDCPA - **803 15 USC 1692a**

230. Tennessee incorporates by reference, and requires compliance with, the provision of the Federal fair Debt Collection Practices Act, 15 U.S.C. § 1692

231. By the acts and practices described herein defendants have violated these laws, as follows, without limitation:

Using false, deceptive, or misleading representation or means in connection with the collection of any debt, 15 USC § 1692e, by, without limitation, Sending out Notices to Foreclose on Plaintiff property with no legal binding Authority to to do so, inflating plaintiff loan 21,000 more than the original amount, with no legal authority to do so, falsely promising to consider Plaintiffs in good faith for Loan modification on the condition that they submit forbearance payments: Using false representation or deceptive means to collect or attempt to collect on any debt. Using unfair or unconscionable means to collect or attempt to collect any debt, by way of using Robo-signers to sign as Vice President, giving illegal authority to Shellie Wallace, to act as Trustee, to collect on a debt that the Plaintiff have no obligation to fulfill by these reasons:

a) The obligation of Note/security has been fulfilled the original lender has Been paid in full

b.) The Defendant JPMC by way of "Guaranty Agreement" conveyed all rights title and Interest over to ginnie Mae, Thus not having standing to collect any alleged debt.

c) The defendant JPMC was never a Lender /Creditor in the Mortgage Transaction.

e) The Note/security was bundled with thousands of other FHA & VA victims into a Pool, as Mortgage Backed Securitas (MBS). Issued to investors, by way of book entry, through the Federal Reserve Bank of New York, acting as fiscal agent for the US Treasury. Once the Clearing Bank, (Federal reserve bank of new York) receives the Fed wire. It then credits JPMC account with taxpayer money. Then JPMC pays the warehouse Lender, (remember the warehouse lender only temporarily funded the loan at closing, just long enough for JPMC to do there dirty work, which usually takes 60-90 days.)

**15 U.S.C. § 1692f. Unfair practices.**

(6) Taking or threatening to take any no judicial action to effect dispossession or disablement of property if
— (A) there is no present right to possession of the property claimed as collateral through an enforceable
security interest;

232. The Defendants, W&A, Shellie Wallace, has threaten to take non-judicial action against Plaintiffs
property, with no Present Right to possession of the Property, because JPMC, Conveyed all Rights Title
and Interest to Ginnie Mae, and is not the Lender and has no Nexis to the Lender which has been proven in
this complaint.

233. Pursuant to FDCPA-813, any Debt collector who fails to comply with any provision of this Title with
respect to any person is Liable to such person. Such amount as the court may allow, without regard to a
minimum individual recovery, together with a reasonable attorney's fee as determined by the court.

## CLAIM AND RELEIF

## CAUSE OF ACTION COUNT FIVE

## VIOLATION OF THE TENNESSEE CONSUMER PROTECTION ACT

### (47-18-104a. UNFAIR OR DECEPTIVE ACTS)

### Defendants, JP Morgan chase,

234. Plaintiffs hereby incorporation by reference all the foregoing paragraphs as though fully set forth
herein.

235. By their conduct as alleged herein, defendants have engaged in unlawful, deceptive, and or unfair acts.
In violation of 47-18-104:

A. Unfair or Deceptive acts

236. The Defendants have engaged in the following unfair and or deceptive acts:

**(14) Causing confusion or misunderstanding with respect to the authority of a salesperson,
representative or agent to**
Negotiate the final terms of a consumer transaction;

237. The Defendants. JPMC conspired by the meetings of the Mind, orchestrated by the defendant JPMC
to induce plaintiff into signing a Security instrument Transactions under article 8, disguised as a consumer

68

Transaction under article 3 Negotiable Instruments. For the sole purpose of securitizing Plaintiffs Note/Security with a pre-set interest rate of 6%, that wasn't negotiable due to the requirements of the "Pool". Defendant then sold plaintiffs Note/security for 5.50% without disclosing this to the Plaintiff, thus not allowing the plaintiff to seek other alternatives, like looking to get the 5.50% or less. Bundle Plaintiffs Note/security along with thousands of other victims to create a 200 million dollar bogus pool, in which they receive .50 % of the 6% charged to borrower. Then selling the pool as a pass-through MBS to investors at 5.500 % collecting .44 basic points and paying Ginnie Mae 0.06% for guaranty fee. They just net about 900,000 for servicing fee. Passed all interest principle, taxes to the investor, never having to ever put the Loan on their Books. How clever is that scheme. In doing so conveyed all rights, title and interest to ginnie Mae. Violating "guaranty Agreement" with ginnie Mae, Federal and state laws rules and regulations.

238  The non-party PRM Improperly endorsed the Note/security to JPMC per instructions by JPMC; this deceptive act was a violation of TCA, any Broker or pretender Lender who use their own name in a Loan Transaction **must** assign the Mortgage to the entity that Funded the Loan. JPMC did not fund the Loan. A warehouse Lender temporarily funded the Loan; PRM received a broker's fee for the Transaction. JPMC arranged The Securitization transaction week's maybe months prior to Plaintiffs Closing.

239.  The non-party PRM improperly assigned the Deed of Trust to Chase Manhattan Mortgage Corp. But never registered the Assignment of Deed thus deeming the document Null and void. Exhibit p

**(4) Using deceptive representations or designations of geographic origin in connection with goods or services;**

240.  The plaintiff discovered these unfair and deceptive acts around July of 2011.

241. **47-18-109. Private right of action - Damages - Notice to division.**
(A)(1) Any person who suffers an ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value wherever situated, as a result of the use or employment by another person of an unfair or deceptive act or practice declared to be unlawful by this part, may bring an action individually to recover actual damages.
(2) The action may be brought in a court of competent jurisdiction in the county where the alleged unfair or deceptive act or practice took place, is taking place, or is about to take place, or in the county in which such person resides, has such person's principal place of business, conducts, transacts, or has transacted business, or, if the person cannot be found in any of the foregoing locations, in the county in which such person can be found.

(3) If the court finds that the use or employment of the unfair or deceptive act or practice was a willful or knowing violation of this part, the court may award three (3) times the actual damages sustained and may provide such other relief as it considers necessary and proper.

## CLAIM AND RELEIF COUNT SIX

### Procurement of Breach of Contracts TCA 47-50-109

242. Plaintiffs herein incorporate by reference all the foregoing paragraphs as though fully set herein.

243. Plaintiffs entered into a written Forbearance agreement with defendant Chase Home Finance LLC .for modification of the terms of their loans requiring forbearance, loan modification and/or good faith consideration for a loan modification or forbearance agreement. The promises contained in the agreement (both express and implied), in conjunction with specific. uniform criteria contained in the waterfall formula, plus further representation made by defendants, provide sufficient material terms for the formation of legally binding contracts between plaintiff and defendant JPMC for the modification of plaintiffs loans. This information constitutes a sufficient specified standard for ascertainment of the material terms of the agreement.

244. In addition. defendants made common, uniform oral representation to plaintiff that if plaintiff complied with the terms of there trial plans, forbearance agreements, they would receive permanent loan modifications, and or genuine and timely consideration for such loan modifications. These common uniform oral representations were part of the agreement as well.

245. Adequate legal consideration supports the agreement. The consideration flowing from defendants was the promise to modify loans and to consider, in good faith and in a timely manner, plaintiffs request to modify their loans, the consideration flowing from plaintiffs include but not limited to, the following:

(a) Plaintiffs' foregoing or delaying selling their residence:

70

(b) Plaintiffs' foregoing or delaying bankruptcy to restructure or discharge their alleged financial obligation, that was eventually taken over by defendant JPMC

(c) Plaintiffs' foregoing or delaying legal action at an earlier juncture:

(d) Plaintiffs' foregoing or delaying alternative remedies at an earlier juncture:

246. Plaintiffs' performed all conditions, covenants and promises required to be performed by plaintiffs in accordance with the terms and conditions of the agreement, except for such performance as a may be excused by defendants' conduct.

247. Defendants request and except interim payments under Forbearance plan as a condition for promised permanent loan modification without reasonable basis to believe that the loans would be permanently modified, and without taking diligent or reasonable steps to consider in good faith or implement permanent loan modification.

248. Defendants breached the agreements (including covenant of good faith and fair dealing inherent in every contract) by failing to consider the application in good faith and in timely manner, and in most instances, by failing to provide permanent loan modifications, as agreed. Defendants excepted interim payments after the last designated forbearance payment Date (1/1/10) of which the defendants were suppose to except regular payments. Therefore Breaching the Contract. (See exhibit G)

249. Plaintiff's suffered Damages due to Defendants failure to consider in good faith, and timely manner. The Defendants intentionally and delivery stalled the process to incur BOGUS Fees from plaintiff.

Example: prior to loan modification plaintiffs Pinciple Remaining Balance was 204,000.00 after the forbearance plan,

Defendants denied permanent modification prior to plaintiff filing complaint with her senator.

a) ACCURED INTEREST AND OTHER INFLATED FEES $19,318.78

b) LATE CHARGES        $ 62.38 X 30

C) PUBLICATION OF SALE COST $925.00

d) FORECLOSURE ATTORNEY FEES $740.00

250. Defendants in some case has assigned various labels or titles to some of these agreements, such as "repayment plans," "agreement to cure delinquency," "forbearance agreement" or "request for modification and affidavit". These titles or Characterizations are not legally determinative as to whether the Agreements were in fact legally binding contracts between plaintiffs and defendants.

71

251. Defendants also provided language in Plaintiffs Forbearance plan such as, " if your account is not current once the forbearance period has ended, collection and/or foreclosure activity will resume." And tricky term like " Any delinquency will be reported in accordance to the terms of the Note and security instrument without regard to this instrument". The Plaintiff thought at the time that "delinquency" meant not making any payments; plaintiff had no ideal that if she payed her forbearance plan she would still be considered delinquent. Who in their right mind would sign any agreement that would consider you delinquent, while you make payments on time? This is the trickery JPMC racketeering enterprise conducts on daily basis, the forbearance plan is a illegally prepared document designed to incur funds from the plaintiff, The Defendants also use the language "covenant" this agreement is far from any covenant, It was not an agreement between two parties of interest, being that CHF was not and never could be a party of interest. The Defendant CHF a subservice for JPMC, who violated the "agreement" with, sent Ginnie Mae, who owns all rights, and tile to plaintiffs Mortgage at the time of bogus executed forbearance plan this agreement through the mail.

252. Defendants may not escape the legally binding nature of the Agreements through formalistic distinctions or clever semantics. Instead, under the totality of the circumstance, consideration existed and legally binding contracts were created.

253. As a direct, proximate and foreseeable result of defendants procumentive' breaches of the Agreements, Plaintiffs have been damaged in an amount to be determined according to proof at time of trail, including equitable and/or injunctive relief, and potentially recession, as specified in the prayer.

## CLAIM AND RELEIF COUNT SEVEN

## CONSPIRACY TO COMMIT WRONGFUL FORECLOSURE BY CREATION, OPERATION

## OF THE MERS SYSTEM

254. Plaintiff incorporates by this reference each and every paragraph of this Complaint as it set forth herein

255. Upon information and belief, Defendants and each of them, did knowingly and willfully conspire and agree among themselves to engage in a conspiracy to promote, encourage, facilitate and actively engage in and benefit from wrongful foreclosures perpetrated on Plaintiffs as alleged herein, specifically in the First Claim for Relief, and the actions of the Defendant conspirators were taken as part of the business policies and practices of each Defendant conspirator in participating in the MERS system.

72

256. The MERS system was known by Defendant conspirators as being used by the Defendant co-conspirators named in the first, second and third Claims for relief to facilitate the wrongful foreclosures complained of herein.

257. Specifically, the MERS system was designed to remove the need for recordation of transfers of deeds of trust as alleged herein. This component of the design of the MERS System facilitated the wrongful foreclosures complained of herein by making it easier to transfer

258. Defendants for purposes of this as the "Defendant conspirators", and each of them, did knowingly and willfully conspire and agree among themselves to engage in a conspiracy to promote, encourage, facilitate and actively engage in and benefit from collecting mortgage payments and wrongful foreclosures perpetrated on Plaintiffs as alleged herein. The actions of the Defendant conspirators were taken as part of the business policies and practices of each Defendant conspirator in participating in the MERS system.

259. The MERS system was known by Defendant conspirators as being used by the Defendant co-conspirators to facilitate a fraud on the public records and the wrongful foreclosures complained of herein.

260. Specifically, the MERS system was designed to remove the need for recordation of transfers of deeds of trust as alleged herein. This component of the design of the MERS System facilitated the illegal mortgage registration, transfer and wrongful foreclosures, by making it easier to transfer the purported beneficial interest in a mortgage and for the purpose of foreclosing on a property, despite the fact that the mortgage no longer provided security for a note as a result of the note having been separated from the deed of trust as alleged herein.

261. The MERS system does not track the transfer of the notes nor to what entity the notes were transferred.

262. The MERS system does not track the identity of the holders of the note on the Plaintiff's properties.

263. Upon information and belief, the Defendant conspirators are or have been creators and/or directors of MERSCORP, Inc., MERS, Inc. and/or members of the MERS system, and, as to Defendant conspirators, and participated in the design and coordination of the MERS system described in this complaint.

264. Yet to be named Defendants' participation as shareholders, directors, operators, or members of MERSCORP, Inc. and/or MERS, Inc. are as follows:

73

265. MERSCORP, Inc. is the operating company that owns and operates the MERS System described herein, and is the parent company of Mortgage Electronic Registration Systems, Inc. ("MERS, Inc.").

266. Defendants are members and/or shareholders of MERS or the agents of such

267. Whenever this Complaint refers to any corporation's act, deed, or transaction, it means that such corporation engaged in the act, deed, or transaction by or through its members, officers, directors, agents, employees, or other representatives while they actively were engaged in the creation, management, direction, control, or transaction of its business or affairs.

268. The illegal use of the Mail, and the internet and which are specifically attributable to the Defendants subject to this Count, are:

269. Bringing suit on behalf of entities which were not the real parties in interest, and which had no standing to sue. This involved, and involves, the use of the MERS artifice.

270. Actively concealing the plaintiffs' lack of standing in their standard complaints for foreclosure, usually entitled, "Complaint to Foreclose Mortgage and to Enforce Lost

271 Loan Documents." It is believed that in 80% or more of these mortgages held and foreclosure complaints filed by the Defendants, the original loan documents do not exist.

272. Although MERS is the mortgagee or Nominee of record, it has never been the "owner" or "holder" of the Note. Most importantly, MERS is never the agent of the actual holder in due course or the owner of the Note. MERS works for the servicing agent, which, as with MERS, is not the holder in due course or the owner of the Note. MERS never has a relationship with the owners of the Note.

273. Alternatively, closed-ended continuity is present because the scheme occurred over a period in excess of ten years.

274. As the result of the enterprise of which these actions were part, the Plaintiffs, have suffered damages, in that they have made a mortgage payment to a servicing entity not entitle to the proceeds of the Note. Plaintiffs, regardless of whether they are in foreclosure, have the title to their property clouded by the listing of MERS as Nominee for pretender lender JPMC in the public record.

275. The measure of the damages for the Plaintiff is the average of the accelerated amount demanded from the Class Members by foreclosing entity in the subject foreclosure Complaints. Members not

74

currently in foreclosure are entitled to damages in the amount of the MERS illegal publicly recorded mortgage.

276.    Since the real parties in interest are not parties to the foreclosures or Mortgagees of record, the mortgages were truly not subject to being foreclosed upon.

277.    The fair market value of the properties at the time of foreclosure is for this reason the measure of the damages suffered by the Class Members. The illustrive example is as follows:

278.    The value of the propertys was $200,000.00,.

279.    The plaintiffs are entitled to judgment in the amount of three times their actual damages, which should be arrived in the manner indicated in the preceding paragraph. plus costs and a reasonable attorneys' fee under 18 U.S.C. §1964[c],

**MERS/Merscorp, Inc.:**

280.    MERS/Merscorp, Inc. was created in or about 1998, and its purpose, from the outset, was to enact the fraudulent scheme enterprise herein complained.

281  ..Its overt acts include the following:

a   Creation of the MERS artifice;

b.  Planning, designing, and enacting the MERS criminal enterprise of which Plaintiff complains herein

c.     Arranging for the use of the MERS as "mortgagee"or Nominee in the standard mortgages at issue;

d.     Drafting of the standard MERS language to be included in such mortgages;

e.     Entering into one or more "agreements for signing authority" which purported to allow employees of Servicing Agents and foreclosure mill law firms to execute assignments in which the "assignor" and "assignee" are straw men actually not possessed of the capacity stated, and of which the person executing the document has no knowledge;

f.      Creation and maintenance of an acceptable public image for MERS;

g.     Owning and maintaining the registration and licensure of the MERS entity, Mortgage Electronic Registration Systems, Inc, with the necessary state agencies. plus other ministerial acts designed to maintain the corporate shield and to mimic the actions expected of normal corporations so as to fraudulently disguise its true nature;

h.     Facilitating the use of the MERS artifice by other participants in the scheme.

282.    These predicate acts are related. They share a common purpose,

75

defrauding the Class Members and other borrowers of their money and property. They share the common themes of "non-documentation" and concealment of the real parties in interest.

283. The predicate acts satisfy the continuity requirement: they extend from in or about 1998 through and continue unabated at the present time, which meets the definition of "open-ended" continuity. In the alternative, the participants in the RICO enterprise engaged in a pattern of racketeering activities continuously for a period of time exceeding ten years in duration, which as a matter of law suffices to establish "closed- ended" continuity.

284. As the result of the enterprise of which these actions were part, the Plaintiffs have suffered damages,. The measure of the damages for the Plaintiffs is the average of the accelerated amounts demanded from the plaintiff by the Defendant Firm in the subject complaints "to Foreclose Mortgage and to Enforce Lost Loan Documents." Since the real parties in interest had already been paid, the mortgages were truly not subject to being foreclosed upon, and the fair market value of the properties for this reason is the measure of the damages suffered by the plaintiffs. The manner in which damages should be calculated is set forth herein.

285. The Plaintiffs are entitled to judgment in the amount of three times their actual damages, which should be arrived at using the formula set forth in said paragraph, plus costs and a reasonable attorneys' fees.

**CLAIM AND RELEIF COUNT 8**

**VIOLATION OF TENNESSEE RICO ACT**

**CIVIL PROCEEDINGS 39-12-206**

286. Pursuant to TCA 39-12-206 Any Circuit or Chancery court may after making due provision for the rights of innocent persons, in compliance with the Tennessee rules of Civil Procedure, enjoin violations of the provision of this part by issuing appropriate orders and judgements, including but not limited to:

a) Ordering any defendant to divest the defendant of any interest in any enterprise, including real property

b) imposing reasonable restrictions upon the future activities or investments of any defendant, including but not limited to, prohibiting any defendant from engaging in the same type of endeavor as the enterprise in which the defendant was engaged in violation of the provision of this part:

76

c) Ordering the suspension or revocation of a license, permit or prior approval guaranteed to any enterprise by any agency of the state

## JURY TRIAL DEMAND

286. Pursuant to rule 36 k of the TN rules of civil Procedure, Plaintiffs demand a trail by jury of all non-equity claims asserted in this complaint as set forth fully herein

## PRAYER DEMAND FOR RELEIF

287. WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully request that Defendants be cited to appear in person and answer herein, as required by law, and that plaintiffs have following relief:

1. Cost, Fees, and such additional relief as the court may deem just and proper that the plaintiffs is entitled to and punitive damages as may be necessary and appropriate to punish the past and present and deter future reprehensible misconduct.

2 Equitable relief as to the clearing and quieting of the title to plaintiffs property in relation to Defendants filing of false documents, Fraudulent misrepresentation, failure to disclose the true Lender conveying all Rights Title and Interest to Ginnie Mae, Therefore lack standing.

3. Defendants conduct be determined to have violated the Racketeer influenced and corruption Act, 18 USC 1962 (c)

4. Declaratory Judgment that JPMC, its agents, servants, employees, or representatives lack the authority and standing to foreclose on plaintiffs Mortgage.

5 Defendants conduct be determined to have violated the Tennessee consumer protection act 47-18-109. and determine whether treble damages should be awarded.

6 Defendants conduct be determined to have violated the Fair Debt Collection Practices 15. USC § 1692.

77

Affecting Interstate Commerce.

7.    with respect to the Plaintiffs property, a injunctive relief, consisting of a permanent injunction preventing Defendants from continuing their illegal business practices, and their wrongful foreclosure attempts.

8.    for punitive damages on the Fraud cause of action.

9.    That the court order a independent Audit in regards to JPMC and Wilson & associates criminal activity involving the Fraudulent documents recorded in the registry of Deeds land records of Davidson County. Taxed to the defendants.

10.    Defendants conduct be determined to have breached the forebearance plan contract, and the Loan modification agreement be determined as null and void, due to fraudulent misrepresentation.
11. for cost of suit incurred herein:

12.  For such other and further relief as the court may deem just and proper.

Dated October 16, 2012                    By:_____  _____

                                                         Pro- se litigants  Sheri L Baker

                                                                    Deryl L Baker

                                                                    165 Timber ridge drive
                                                                    Nashville, TN 37217
                                                                    (615-506-6272)

# CERTIFICATE OF SERVICE

I, hereby certify that a copy of the foregoing has been sent via US Mail on this 20th day of October, 2012 to the following:

JP Morgan Chase Bank NA
3415 Vision Drive
Columbus, OH 43219

Wilson & Associates
1521 Merrill Drive- suite D-220
Little Rock AR 72211

Shellie Wallace
1521 Merrill Drive suite D-220
Little Rock AR 72211

Chase Home finance LLC
3415 vision Drive
Columbus, OH 43219

Mortgage Electronic Registration Systems INC.
PO Box 2026
Flint, Michigan 48501-2026

Pro- see Litigants
Sheri L Baker (aka Sheri l Jones
Deryl l. baker

**CHASE** 🅾

**Chase Home Finance LLC**
OH4-7382
3415 Vision Drive
Columbus, OH 43219-6009

December 22, 2009

SHERI L JONES
165 TIMBER RIDGE DR
NASHVILLE TN 37217

*Exhibit 1*

FILED
2012 OCT 19 PM 3:54
DAVIDSON CO. CHANCERY CT.

| | |
|---|---|
| Account Ending In: | 5523 |
| Date of Loan: | October 24, 2008 |
| Original Amount of Loan: | $208,354.00 |
| Mortgage Property Address: | |
| | 165 TIMBER RIDGE DR |
| | NASHVILLE, TN 37217 |

**SUBJECT: NOTICE OF NEW CREDITOR**

We are sending you this **Notice** in accordance with the requirements of the "Helping Families Save Their Homes Act of 2009." Your mortgage loan (referenced above) has been sold or transferred to JPMorgan Chase Bank, N.A. ("Chase"). Chase is the New Creditor of your loan.

- This **Notice** is provided for informational purposes only.
- You are not required to take any action as a result of this **Notice**.
- This **Notice** does not affect the servicing of your mortgage loan or change your servicer. Please continue to make payments on your mortgage loan to your current servicer at the same address to which you were instructed by your servicer to make payments (unless or until you are advised differently by your servicer). Any mortgage payments that are not sent timely to your servicer may result in late fees and other charges

*The term "we" means Chase. The terms "you" and "your" mean the mortgage borrower(s) identified above.*

LC-CHEN-0809B

# NOTICE OF NEW CREDITOR

*Please note the following information regarding the transfer of your mortgage loan:*

1. The identity (name), address and telephone number of the New Creditor is:

   > JPMorgan Chase Bank, N.A.
   > 111 Polaris Parkway
   > Columbus, OH 43240-2050
   > 1-800-848-9136

2. The date of the sale of your mortgage loan to the New Creditor was: December 15, 2009.

3. Chase Home Finance, LLC is acting as the agent for the creditor. If you have any questions regarding this Notice, please contact Chase Home Finance, LLC at the address and phone number below:

   > Chase Home Finance, LLC
   > 3415 Vision Drive
   > Columbus, OH 43219
   > 1-800-848-9136

4. Evidence of transfer of ownership of your mortgage loan or the instrument securing your mortgage loan is recorded in the land records of the county in which the mortgaged property is located.

5. Any investor or creditor that purchases your loan is required under federal law to give you written notice. **If you have any questions concerning this Notice, please feel free to contact us toll-free at:**

   **1-800-848-9136**

LC-CHEN-0809B

JPMorgan Chase Bank, N.A.
OH4-7382
3415 Vision Drive
Columbus, OH 43219-6009

# CHASE ○

*Exhibit 2*

FILED
2012 OCT 12 PM 3:54
CLERK & MASTER
DAVIDSON CO CHANCERY CT.
D.C.R.M

00027364 ALN0 ZA 11125
SHERI L JONES
165 TIMBER RIDGE DR
NASHVILLE TN 37217

| | |
|---|---|
| Account Ending In: | 5523 |
| Date of Loan: | October 24, 2008 |
| Original Amount of Loan: | $208,354 |
| Mortgage Property Address: | 165 TIMBER RIDGE DR<br>NASHVILLE, TN 37217 |

**SUBJECT:** Required Notice of New Creditor

Federal law requires that we tell you when we sell or transfer your loan even if it's an internal transfer to another Chase entity. As a result, we're writing to let you know JPMorgan Chase Bank, N.A. is now the creditor of your loan.

You can find more information on the back of this letter. Here are some highlights:

- The servicer of your mortgage loan is not changing, so you should make your payments in the same way, on the same due date, **using the address on your monthly statement.**
- We are not making any other changes to your mortgage.
- We are not changing your enrollment or participation in any other Chase services or programs.

*Customer Care* *direct line* *888-310-1362*

We appreciate your business. If you have any questions about this notice, please contact us at 800-848-9136, between 8:00 a.m. and 12:00 a.m., Monday through Thursday, 8:00 a.m. to 10:00 p.m., Friday, Eastern Time or between 8:00 a.m. and 5:00 p.m., Saturday, Eastern Time. This is a toll-free number.

*3 mos*
*past due $4,903.94*

*5-9-11 - Loren 4:37 CST*
*Ask are we ~~sale~~ doing a short sale?*
*Dont ~~access~~ have access to the ~~Have I need~~*
*~~foreclosure~~ normally after 3 mos*
*(over)*

# NOTICE OF NEW CREDITOR

*The following information is about the sale or transfer of your mortgage loan:*

1. The name, address and phone number of the New Creditor and the current Servicer is:

   > JPMorgan Chase Bank, N.A.
   > 3415 Vision Drive
   > Columbus, OH 43219
   > 800-848-9136

   > **Please do not send your payments to this address.**
   > **Use the address on your monthly statement.**

2. The date of the sale or transfer of your mortgage loan to the New Creditor was: May 1, 2011.

3. Evidence of transfer of ownership of your mortgage loan or the instrument securing your mortgage loan is recorded in the land records of the county in which the mortgaged property is located.

4. Any investor or creditor that purchases your loan is required under federal law to give you written notice. If you have any questions concerning this Notice, please feel free to contact us toll-free at 800-848-9136.

S/W
RO2- inquire by
research copy - 614-422-7595- Fax copy.

JPMorgan Chase Bank, N.A.
OH4-7382
3415 Vision Drive
Columbus, OH 43219-6009

00002499 ALN0 ZA 11168
SHERI L JONES
165 TIMBER RIDGE DR
NASHVILLE TN 37217

*EXHIBIT 3*

**FILED**

June 17, 2011

| | |
|---|---|
| Account Ending In: | 5523 |
| Date of Loan: | October 24, 2008 |
| Original Amount of Loan: | $208,354 |

| | |
|---|---|
| Mortgage Property Address: | 165 TIMBER RIDGE DR |
| | NASHVILLE, TN 37217 |

**SUBJECT:** Required Notice of New Creditor

Federal law requires that we tell you when we sell or transfer your loan even if it's an internal transfer to another Chase entity. As a result, we're writing to let you know JPMorgan Chase Bank, N.A. is now the creditor of your loan.

You can find more information on the back of this letter. Here are some highlights:

- The servicer of your mortgage loan is not changing, so you should make your payments in the same way, on the same due date, using the address on your monthly statement.
- We are not making any other changes to your mortgage.
- We are not changing your enrollment or participation in any other Chase services or programs.

We appreciate your business. If you have any questions about this notice, please contact us at 800-848-9136, between 8:00 a.m. and 12:00 a.m., Monday through Thursday, 8:00 a.m. to 10:00 p.m., Friday, Eastern Time or between 8:00 a.m. and 5:00 p.m., Saturday, Eastern Time. This is a toll-free number.

(over)

## NOTICE OF NEW CREDITOR

*The following information is about the sale or transfer of your mortgage loan:*

1.  The name, address and telephone number of the New Creditor and the current Servicer is:

    JPMorgan Chase Bank, N.A.
    3415 Vision Drive
    Columbus, OH 43219
    800-848-9136

    **Please do not send your payments to this address.
    Use the address on your monthly statement.**

2.  The date of the sale or transfer of your mortgage loan to the New Creditor was: June 10, 2011.

3.  Evidence of transfer of ownership of your mortgage loan or the instrument securing your mortgage loan is recorded in the land records of the county in which the mortgaged property is located.

4.  Any investor or creditor that purchases your loan is required under federal law to give you written notice. If you have any questions concerning this Notice, please feel free to contact us toll-free at 800-848-9136.



**W**ILSON & **A**SSOCIATES, P.L.L.C.

**Attorneys at Law – Arkansas and Tennessee**
1521 Merrill Drive, Suite D-220
Little Rock AR 72211
501-219-9388
Fax: 501-219-9458
Internet: www.wilson-assoc.com

THIS LAW FIRM IS A DEBT COLLECTOR ATTEMPTING TO COLLECT A DEBT. ANY INFORMATION OBTAINED CAN BE USED FOR THE PURPOSE OF COLLECTING THE DEBT.

August 4, 2010

EXHIBIT A

Ms. Sheri Jones
165 Timber Ridge Drive
Nashville, TN 37217

RE:     Sheri Jones
        165 Timber Ridge Drive
        Nashville, Tennessee 37217
        Loan No. 1880985523 / W&A No. 700-193508
        FHA No. 482-3996867-703

Dear Ms. Jones:

      THIS IS AN ATTEMPT TO COLLECT A DEBT. ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE. HOWEVER, IF YOU HAVE PREVIOUSLY BEEN DISCHARGED FROM A CHAPTER 7 OR 13 BANKRUPTCY, THIS LETTER IS NOT AN ATTEMPT TO COLLECT THE DEBT FROM YOU PERSONALLY. IF YOU HAVE RECEIVED SUCH A DISCHARGE, THIS LETTER ONLY SERVES AS NOTICE OF THE POTENTIAL FORECLOSURE AS REQUIRED BY EITHER YOUR SECURITY INSTRUMENT, STATE LAW, AND/OR THE FEDERAL FAIR DEBT COLLECTION PRACTICES ACT.

      Wilson & Associates, P.L.L.C. has been retained by Chase Home Finance LLC to initiate foreclosure proceedings on the above-referenced property. You are currently in default under the terms of your note and deed of trust/mortgage in that you have failed to make the payments due through the date of this letter. The debt has been accelerated. The amount of the debt that we are attempting to collect and the total amount currently due on your loan as of the date of this letter is $216,522.52. Because of interest, late charges, and other charges that may vary from day to day, the exact amount due on the day that you pay may be greater. If you make a payment that will be received after the date of this letter, you should contact our Loss Mitigation Department at 501-224-5239 to confirm what additional amounts have become due.

      We are required by your security instrument to advise you that you have a right to reinstate the loan after acceleration and a right to assert in any foreclosure proceeding that no default exists, or any other defense you may have to acceleration and foreclosure. The lender is entitled to collect all expenses of foreclosure including, but not limited to, reasonable attorney's fees, costs of documentary evidence, abstracts, appraisals, and title reports.



# WILSON & ASSOCIATES, P.L.L.C.

**Attorneys at Law – Arkansas and Tennessee**
1521 Merrill Drive, Suite D-220
Little Rock AR 72211
501-219-9388
Fax: 501-219-9458
Internet: www.wilson-assoc.com

THIS LAW FIRM IS A DEBT COLLECTOR ATTEMPTING TO COLLECT A DEBT. ANY INFORMATION OBTAINED CAN BE USED FOR THE PURPOSE OF COLLECTING THE DEBT.

**Exhibit 5**

FILED 2012 OCT 19 PM 3:54

December 3, 2010

Occupants
165 Timber Ridge Drive
Nashville, Tennessee 37217

*AVISO IMPORTANTE PARA PERSONAS DE HABLA HISPANA. ESTE ES UN AVISO MUY IMPORTANTE. SI NO ENTIENDE EL CONTENIDO, OBTENGA UNA TRADUCCION INMEDIATAMENTE. SI USTED NO RESPONDE DENTRO DE VEINTE (20) DIAS PUEDE SER QUE LE HAGAN MUDAR DE LA CASA 0 APARTAMENTO EN DONDE VIVE.*

RE:    Sheri L. Jones
       165 Timber Ridge Drive
       Nashville, Tennessee 37217
       W&A No. 700-193508
       FHA No. 482-3996867-703

Dear Mortgagor(s) and/or Occupant(s):

The mortgage for the property in which you are living is about to be foreclosed (sometimes referred to as repossessed). We expect that ownership of the property will be transferred to Chase Home Finance LLC, who is servicing the loan for the mortgagee, probably within the next 60 to 90 days. Shortly thereafter, it is probable that that ownership will be transferred to the Secretary of Housing and Urban Development (HUD).

HUD generally requires that there be no one living in properties for which it accepts ownership unless certain conditions are met. We have enclosed a copy of those conditions in Attachment 1. These conditions should be read carefully to help you decide whether you wish to apply to continue living in the house.

If you wish to submit a request to continue to live in this property after HUD becomes owner, your written request must be received by HUD within 20 days of the date at the top of this letter. Oral requests are not permitted. We recommend that you use the enclosed Attachment 2, "Request for Occupied Conveyance," in making your request as it gives HUD information which you wish to include with your request, you may write it on the second page of the form or on additional pages which can be attached to the form. Also, please fill out boxes 1, 7 and 8 of the enclosed Attachment 3, "Request for Verification of Employment," and send it to HUD with your request. Your request must be sent to the Chief Property Officer at the following address:

EXHIBIT 6

Sheri L. Jones
165 Timber Ridge
Nashville TN. 37217

Chase Home Finance LLC
3415 Vision Drive
Columbus, OH 43219-6009

August 15, 2010

FILED 2012 OCT 19 PM 3: 54 CLERK & MASTER DAVIDSON CO. CHANCERY C.T. B.C.

Reference: Property Address: 165 Timber Ridge DR. Nashville TN. 37217.

Loan No. 1928000142

NOTICE:

## Second Request for Documentation and proof of claim

Dear Chase Bank

this is my second attempt on requesting proof of claim which may be substantiated by presenting the following debt details within 10 days of receipt of this notice to the address listed above:

1) Proof of the existence of the account or contract in the actual flesh and blood name of Sheri I Jones duly signed and witnessed by both parties **not a unilateral agreement** and upon which signed page there is reference to entire agreement.

2) Proof of Claim that you are the current holder of due course of the original Above mentioned Debt Instrument and it has not been onsold to another party. I wish to have the aforementioned instrument presented to me for visual inspection. Not a copy, not an affidavit, but the actual **MY ORIGINAL WET INK SIGNATURE PROMISSORY NOTE.** You are Required by law to maintain good care of my legal instrument as per USC Title 18, part 1, Chapter 101 § 2071.

3) Copy of the actual account whereby bank assay has occurred showing actual loss incurred of the alleged debt from your client. Please stipulate via an affidavit that you are a creditor of the note in accordance to Generally Accepted accounting principles (GAAP)

Please be advised that I will be filing a law suit against Chase Bank requesting presentment of my **ORIGINAL WET INK SIGNATURE** with the CIRCUIT COURT OF DAVIDSON COUNTY, TENNESSEE. A copy of the case will be forwarded to you, and your attorney.

You were unable to comply with my request and as such have defaulted on your administrative process. As a matter of courtesy, I will further extend my request from this date for another 10 days for you to provide me with proof of claim..expiring ( August 25, 2010.) You are hereby given notice that failure to produce proof of claim after this courtesy means you will have exhausted your administrative process and no further claims can be made against me nor my property.

SINCERLY

Sheri L Jones

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Chase Home Finance
3415 Vision Drive
Columbus, ohio
43219

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _James a. Holsinger_  ☐ Agent ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

3. Service Type
☐ Certified Mail  ☐ Express Mail
☐ Registered  ☐ Return Receipt for Merchandise
☐ Insured Mail  ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)  ☐ Yes

2. Article Number
(Transfer from service label)

7010 1060 0001 5458 2815

PS Form 3811, February 2004   Domestic Return Receipt   102595-02-M-1540



**THIS LAW FIRM IS A DEBT COLLECTOR ATTEMPTING TO COLLECT A DEBT. ANY INFORMATION OBTAINED CAN BE USED FOR THE PURPOSE OF COLLECTING THE DEBT.**

**W**ILSON & **A**SSOCIATES, P.L.L.C.

Attorneys at Law – Arkansas and Tennessee
1521 Merrill Drive, Suite D-220
Little Rock AR 72211
501-219-9388
Fax: 501-219-9458
Internet: www.wilson-assoc.com



July 20, 2011

Ms. Sheri L. Jones
165 Timber Ridge Drive
Nashville, TN 37217

RE:    Sheri L. Jones
       165 Timber Ridge Drive
       Nashville, Tennessee 37217
       Loan No. 1880985523 / W&A No. 700-193508
       FHA No. 482-3996867-703

Dear Ms. Jones:

      **THIS IS AN ATTEMPT TO COLLECT A DEBT. ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE. HOWEVER, IF YOU HAVE PREVIOUSLY BEEN DISCHARGED FROM A CHAPTER 7 OR 13 BANKRUPTCY, THIS LETTER IS NOT AN ATTEMPT TO COLLECT THE DEBT FROM YOU PERSONALLY. IF YOU HAVE RECEIVED SUCH A DISCHARGE, THIS LETTER ONLY SERVES AS NOTICE OF THE POTENTIAL FORECLOSURE AS REQUIRED BY EITHER YOUR SECURITY INSTRUMENT, STATE LAW, AND/OR THE FEDERAL FAIR DEBT COLLECTION PRACTICES ACT.**

      Wilson & Associates, P.L.L.C. has been retained by JPMorgan Chase Bank, N.A., SBM to Chase Home Finance, LLC to initiate foreclosure proceedings on the above-referenced property. You are currently in default under the terms of your note and deed of trust/mortgage in that you have failed to make the payments due through the date of this letter. The debt has been accelerated. The amount of the debt that we are attempting to collect and the total amount currently due on your loan as of the date of this letter is $229,565.41. Because of interest, late charges, and other charges that may vary from day to day, the exact amount due on the day that you pay may be greater. If you make a payment that will be received after the date of this letter, you should contact our Loss Mitigation Department at 501-734-2100 to confirm what additional amounts have become due.

      We are required by your security instrument to advise you that you have a right to reinstate the loan after acceleration and a right to assert in any foreclosure proceeding that no default exists, or any other defense you may have to acceleration and foreclosure. The lender is entitled to collect all expenses of foreclosure including, but not limited to, reasonable attorney's fees, costs of documentary evidence, abstracts, appraisals, and title reports.



# Wilson & Associates, P.L.L.C.

**Attorneys at Law – Arkansas and Tennessee**
1521 Merrill Drive, Suite D-220
Little Rock AR 72211
501-219-9388
Fax: 501-219-9458
Internet: www.wilson-assoc.com

**THIS LAW FIRM IS A DEBT COLLECTOR ATTEMPTING TO COLLECT A DEBT. ANY INFORMATION OBTAINED CAN BE USED FOR THE PURPOSE OF COLLECTING THE DEBT.**

*Exhibit 8*

August 2, 2011

Occupants
165 Timber Ridge Drive
Nashville, Tennessee 37217

*AVISO IMPORTANTE PARA PERSONAS DE HABLA HISPANA. ESTE ES UN AVISO MUY IMPORTANTE. SI NO ENTIENDE EL CONTENIDO, OBTENGA UNA TRADUCCION INMEDIATAMENTE. SI USTED NO RESPONDE DENTRO DE VEINTE (20) DIAS PUEDE SER QUE LE HAGAN MUDAR DE LA CASA O APARTAMENTO EN DONDE VIVE.*

RE:   Sheri L. Jones
      165 Timber Ridge Drive
      Nashville, Tennessee 37217
      W&A No. 700-193508
      FHA No. 482-3996867-703

Dear Mortgagor(s) and/or Occupant(s):

The mortgage for the property in which you are living is about to be foreclosed (sometimes referred to as repossessed). We expect that ownership of the property will be transferred to JPMorgan Chase Bank, N.A., SBM to Chase Home Finance, LLC, who is servicing the loan for the mortgagee, probably within the next 60 to 90 days. Shortly thereafter, it is probable that that ownership will be transferred to the Secretary of Housing and Urban Development (HUD).

HUD generally requires that there be no one living in properties for which it accepts ownership unless certain conditions are met. We have enclosed a copy of those conditions in Attachment 1. These conditions should be read carefully to help you decide whether you wish to apply to continue living in the house.

If you wish to submit a request to continue to live in this property after HUD becomes owner, your written request must be received by HUD within 20 days of the date at the top of this letter. Oral requests are not permitted. We recommend that you use the enclosed Attachment 2, "Request for Occupied Conveyance," in making your request as it gives HUD information which you wish to include with your request, you may write it on the second page of the form or on additional pages which can be attached to the form. Also, please fill out boxes 1, 7 and 8 of the enclosed Attachment 3, "Request for Verification of Employment," and send it to HUD with your request. Your request must be sent to the Chief Property Officer at the following address:



# WILSON & ASSOCIATES, P.L.L.C.

**Attorneys at Law – Arkansas and Tennessee**
1521 Merrill Drive, Suite D-220
Little Rock AR 72211
501-219-9388
Fax: 501-219-9458
Internet: www.wilson-assoc.com

THIS FIRM PRACTICES IN MULTIPLE STATES AND MAY BE CONSIDERED TO BE A DEBT COLLECTOR IN SOME JURISDICTIONS. TO THE EXTENT IT IS APPLICABLE, THE FOLLOWING NOTICE IS PROVIDED: THIS FIRM IS A DEBT COLLECTOR ATTEMPTING TO COLLECT A DEBT. ANY INFORMATION OBTAINED CAN BE USED FOR THE PURPOSE OF COLLECTING THE DEBT.

November 21, 2011

**EXHIBIT 9**

95712

FILED
2012 OCT 19 PM 3:54
CLERK & MASTER
DAVIDSON CO. CHANCERY

Tenants of
165 Timber Ridge Drive
Nashville, TN 37217

RE:  Sheri L. Jones
     165 Timber Ridge Drive
     Nashville, Tennessee 37217
     W&A No. 700-193508
     FHA No. 482-3996867-703

Dear Tenants:

Pursuant to the enclosed Notice of Trustee's Sale, please be advised that the property commonly known as 165 Timber Ridge Drive, Nashville, Tennessee 37217 is scheduled to be sold at foreclosure sale.

**THE LAW FIRM OF WILSON & ASSOCIATES, P.L.L.C. COLLECTS DEBTS FOR MORTGAGE LENDERS. ANY INFORMATION OBTAINED IN THIS REGARD MAY BE USED FOR THAT PURPOSE. If you have any questions, please feel free to contact our Loss Mitigation Department at 501-734-2100.**

Sincerely,

WILSON & ASSOCIATES, P.L.L.C.

Shellie Wallace

Enclosure

cc:

CSERVICEtoTenantsTN_1_msherrod_111121_1136

# NOTICE OF TRUSTEE'S SALE

WHEREAS, default has occurred in the performance of the covenants, terms, and conditions of a Deed of Trust Note dated October 24, 2008, and the Deed of Trust of even date securing the same, recorded November 5, 2008, as Instrument No. 20081105-0110252 in Office of the Register of Deeds for Davidson County, Tennessee, conveying certain property therein described to Key Title as Trustee for Mortgage Electronic Registration Systems Inc., as a separate corporation that is acting solely as a nominee for Primary Residential Mortgage, Inc. and Primary Residential Mortgage, Inc.'s successors and assigns; and the undersigned, Shellie Wallace of Wilson & Associates, P.L.L.C., having been appointed Successor Trustee.

NOW, THEREFORE, notice is hereby given that the entire indebtedness has been declared due and payable; and that an agent of Shellie Wallace of Wilson & Associates, P.L.L.C., as Successor Trustee, by virtue of the power, duty, and authority vested in and imposed upon said Successor Trustee will, on **January 18, 2012 on or about 10:00 A.M., at the Bridgestone Arena, Nashville, Tennessee,** offer for sale certain property hereinafter described to the highest bidder **FOR CASH,** free from the statutory right of redemption, homestead, dower, and all other exemptions which are expressly waived in the Deed of Trust, said property being real estate situated in Davidson County, Tennessee, and being more particularly described as follows:

> **Land in Davidson County, Tennessee, being Lot Number 61 on the plan of Priest Lake Park, section 2, as of record in book 4175, pages 56, 57, 58, Register Office for Davidson County, Tennessee. Said lot number 61 fronts 86.97 feet on the northeasterly margin of Timber Ridge Drive and runs back between lines 148.43 feet on the northwesterly line and 139.90 feet on the southeasterly line and 103.28 foot broken line at the rear.**

**ALSO KNOWN AS: 165 Timber Ridge Drive, Nashville, Tennessee 37217**

The HB 3588 letter was mailed to the borrower(s) pursuant to Tennessee Code Annotated 35-5-117. This sale is subject to all matters shown on any applicable recorded plat; any unpaid taxes; any restrictive covenants, easements, or setback lines that may be applicable; any statutory rights of redemption of any governmental agency, state or federal; any prior liens or encumbrances as well as any priority created by a fixture filing; and to any matter that an accurate survey of the premises might disclose. In addition, the following parties may claim an interest in the above-referenced property: **Sheri L. Jones**

The sale held pursuant to this Notice may be rescinded at the Successor Trustee's option at any time. The right is reserved to adjourn the day of the sale to another day, time, and place certain without further publication, upon announcement at the time and place for the sale set forth above. **W&A No. 700-193508**

DATED November 21, 2011



# LOAN MODIFICATION AGREEMENT

Borrower ("I")[1]:  SHERI L JONES
Lender ("Lender"):   CHASE HOME FINANCE LLC
Date of First Lien Security Instrument (the "Mortgage") and Note (the "Note"):  OCTOBER 24, 2008
Loan Number: **1880985523**  (the "Loan")
Property Address: **165 TIMBER RIDGE DR, NASHVILLE, TENNESSEE 37217**  (the "Property")

"MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, (888) 679-MERS.

If my representations in Section 1 continue to be true in all material respects, then the provisions of Section 2 of this Loan Modification Agreement ("Agreement") will, as set forth in Section 2, amend and supplement (i) the Mortgage on the Property, and (ii) the Note secured by the Mortgage. The Mortgage and Note together, as may previously have been amended, are referred to as the "Loan Documents." Capitalized terms used in this Agreement have the meaning given to them in the Loan Documents.

I have provided confirmation of my financial hardship and documents to permit verification of all of my income to determine whether I qualify for the offer described in this Agreement. This Agreement will not take effect unless and until the Lender signs it.

1.  **My Representations.** I represent to the Lender and agree:

    A.  I am experiencing a financial hardship, and as a result, am either in default under the Loan Documents or a default is imminent.

    B.  The Property is neither in a state of disrepair, nor condemned.

    C.  There has been no change in the ownership of the Property since I signed the Loan Documents.

    D.  I am not a party to any litigation involving the Loan Documents, except to the extent I may be a defendant in a foreclosure action.

    E.  I have provided documentation for all income that I earn.

    F.  All documents and information I provide pursuant to this Agreement are true and correct.

2.  **The Modification.** The Loan Documents are hereby modified as of **JANUARY 01, 2011** (the "Modification Effective Date"), and all unpaid late charges are waived. The Lender agrees to suspend any foreclosure activities so long as I comply with the terms of the Loan Documents, as modified by this Agreement. The Loan Documents will be modified, and the first modified payment will be due on the date set forth in this Section 2:

    A.  The Maturity Date will be: **DECEMBER 01, 2040.**

---

[1]  If there is more than one Borrower or Mortgagor executing this document, each is referred to as "I". For purposes of this document words signifying the singular (such as "I") shall include the plural (such as "we") and vice versa where appropriate.

WF101 V2 2-23-10 LOAN MODIFICATION AGREEMENT - CHAMP    ver. 10_23_2010_01_30_33          Page 1 of 6 pages

B. The modified principal balance of my Note will include all amounts and arrearages that will be past due (excluding unpaid late charges) and may include amounts towards taxes, insurance, or other assessments. The new principal balance of my Note is **$224,477.97** (the "New Principal Balance").

C. The Interest Bearing Principal Balance will re-amortize over 360 months.

Interest will begin to accrue as of **DECEMBER 01, 2010.** The first New monthly payment on the New Principal Balance will be due on **JANUARY 01, 2011,** and monthly on the same date thereafter.

My payment schedule for the modified Loan is as follows:

I promise to pay interest on the New Principal Balance at the rate of **4.500%** annually. I promise to make consecutive monthly payments of principal and interest in the amount of **$1,137.40,** which is an amount sufficient to amortize the New Principal Balance over a period of **360** months.

The above terms in this Section 2.C shall supersede any provisions to the contrary in the Loan Documents, including but not limited to provisions for an adjustable or step interest rate.

D. I agree to pay in full (i) the New Principal Balance, and (ii) any other amounts still owed under the Loan Documents, by the earliest of the date I sell or transfer an interest in the Property, subject to Section 3.E below, the date I pay the entire New Principal Balance, or the Maturity Date.

E. I will be in default if I do not (i) pay the full amount of a monthly payment on the date it is due, or (ii) comply with the terms of the Loan Documents, as modified by this Agreement. If a default rate of interest is permitted under the current Loan Documents, then in the event of default, the interest that will be due on the New Principal Balance will be the rate set forth in Section 2.C.

3. **Additional Agreements.** I agree to the following:

A. That this Agreement shall supersede the terms of any modification, forbearance, or workout plan, if any, that I previously entered into with the Lender.

B. To comply, except to the extent that they are modified by this Agreement, with all covenants, agreements, and requirements of the Loan Documents including my agreement to make all payments of taxes, insurance premiums, assessments, impounds, and all other payments, the amount of which may change periodically over the term of my Loan. This Agreement does not waive future escrow requirements. If the Loan includes collection for tax and insurance premiums, this collection will continue for the life of the Loan.

C. That the Loan Documents are composed of valid, binding agreements, enforceable in accordance with their terms and are hereby reaffirmed.

D. That all terms and provisions of the Loan Documents, except as expressly modified by this Agreement, remain in full force and effect; nothing in this Agreement shall be

understood or construed to be a satisfaction or release in whole or in part of the obligations contained in the Loan Documents; and that except as otherwise specifically provided in, and as expressly modified by, this Agreement, the Lender and I will be bound by, and will comply with, all of the terms and provisions of the Loan Documents.

E. That, as of the Modification Effective Date, notwithstanding any other provision of the Loan Documents, I agree as follows: If all or any part of the Property or any interest in it is sold or transferred without the Lender's prior written consent, the Lender may, at its option, require immediate payment in full of all sums secured by the Mortgage. However, the Lender shall not exercise this option if federal law prohibits the exercise of such option as of the date of such sale or transfer. If the Lender exercises this option, the Lender shall give me notice of acceleration. The notice shall provide a period of not less than thirty (30) days from the date the notice is delivered or mailed within which I must pay all sums secured by the Mortgage. If I fail to pay these sums prior to the expiration of this period, the Lender may invoke any remedies permitted by the Mortgage without further notice or demand on me.

F. That, as of the Modification Effective Date, a buyer or transferee of the Property will not be permitted, under any circumstance, to assume the Loan. In any event, this Agreement may not be assigned to, or assumed by, a buyer of the Property.

G. If any document is lost, misplaced, misstated, or inaccurately reflects the true and correct terms and conditions of the Loan Documents as amended by this Agreement, within ten (10) days after my receipt of the Lender's request, I will execute, acknowledge, initial, and deliver to the Lender any documentation the Lender deems necessary to replace or correct the lost, misplaced, misstated or inaccurate document(s). If I fail to do so, I will be liable for any and all loss or damage which the Lender reasonably sustains as a result of my failure.

H. All payment amounts specified in this Agreement assume that payments will be made as scheduled.

I. If the Borrower(s) received a discharge in a Chapter 7 bankruptcy subsequent to the execution of the Loan Documents, the Lender agrees that such Borrower(s) will not have personal liability on the debt pursuant to this Agreement.

J. That in agreeing to the changes to the original Loan Documents as reflected in this Agreement, the Lender has relied upon the truth and accuracy of all of the representations made by the Borrower(s), both in this Agreement and in any documentation provided by or on behalf of the Borrower(s) in connection with this Agreement. If the Lender subsequently determines that such representations or documentation were not truthful or accurate, the Lender may, at its option, rescind this Agreement and reinstate the original terms of the Loan Documents as if this Agreement never occurred.

K. That MERS holds only legal title to the interests granted by the Borrower in the mortgage,
but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of lender including, but not limited to, releasing and canceling the mortgage Loan.

L.    I acknowledge and agree that if the Lender executing this Agreement is not the current holder or owner of the Note and Mortgage, that such party is the authorized servicing agent for such holder or owner, or its successor in interest, and has full power and authority to bind itself and such holder and owner to the terms of this modification.

**THIS WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

(SIGNATURES CONTINUE ON FOLLOWING PAGES)

WF101 V2 2-23-10 LOAN MODIFICATION AGREEMENT - CHAMP   ver. 10_23_2010_01_30_33          Page 4 of 6 pages

**TO BE SIGNED BY BORROWER ONLY**

BORROWER SIGNATURE PAGE TO MODIFICATION AGREEMENT BETWEEN CHASE HOME FINANCE LLC AND SHERI L JONES, LOAN NUMBER 1880985523 WITH A MODIFICATION EFFECTIVE DATE OF JANUARY 01, 2011

In Witness Whereof the Borrower(s) have executed this agreement.

Date: 10-28-10

Borrower - **SHERI L JONES**

**TO BE SIGNED BY LENDER ONLY**

**LENDER** SIGNATURE PAGE TO YOUR MODIFICATION AGREEMENT BETWEEN CHASE HOME FINANCE LLC AND SHERI L JONES, LOAN NUMBER 1880985523 WITH A MODIFICATION EFFECTIVE DATE OF JANUARY 01, 2011

In Witness Whereof, the Lender has executed this Agreement.

**CHASE HOME FINANCE LLC**
Lender

By: _____

Date: _____11-2-10_____

Mortgage Electronic Registration Systems, Inc. – Nominee For Lender

By: _____

Date: _____11-2-10_____

Case 3:12-cv-01222   Document 1-1   Filed 11/26/12   Page 99 of 207 PageID #: 104

3 + 0 3 + 1 8 8 0 9 8 5 5 2 3 + 1 + 5 0 m


EXHIBIT C

OMB Approval No. 2501-0018 (Exp. 10/31/2004)

# Prospectus
# Ginnie Mae I
Single-Family Mortgages

U.S. Department of Housing
and Urban Development
Government National Mortgage Association

Public reporting burden for this collection of information is estimated to average 15 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. This agency may not collect this information, and you are not required to complete this form, unless it displays a currently valid OMB control number.

The information is required by Sec. 306(g) of the National Housing Act or by Ginnie Mae Handbook 5500.3, Rev. 1

$ 200,019,917.00

5.500 % Ginnie Mae I Mortgage-Backed Securities
(Single-Family Mortgages)

Guaranteed as to the Timely Payment of Principal and Interest
by the Government National Mortgage Association
(Backed by the Full Faith and Credit of the United States)

Issued by: JP MORGAN CHASE BANK N.A.

| Ginnie Mae Pool No. | First Payment Due: |
|---|---|
| 688110XSF | 01/15/2009 |
| Issue Date: 12/01/2008 | Maturity Date: 12/15/2038 |
| Depository: The Federal Reserve Bank of New York | Transfer Agent: The Bank of New York |

The securities offered hereby (the "Securities") provide for the timely payment of principal and interest on the fifteenth day of each month, except as stated herein, commencing in the month following the month of issuance. Interest will accrue on the Securities at the per annum rate specified above; installments of principal will be payable in relation to payments of principal on the underlying pool of mortgages described herein. The maturity date for the Securities is based on the mortgage with the latest maturity. See "Maturity, Prepayment, and Yield" herein for a discussion of certain significant factors that should be considered by prospective investors in the Securities offered hereby.

The Government National Mortgage Association ("Ginnie Mae") guarantees the timely payment of principal and interest on the Securities. The Ginnie Mae guaranty is backed by the full faith and credit of the United States of America.

The Securities are exempt from the registration requirements of the Securities Act of 1933, as amended, and are "exempted securities" within the meaning of the Securities Exchange Act of 1934, as amended.

## Ginnie Mae Guaranty

Ginnie Mae is a wholly-owned corporate instrumentality of the United States of America within the Department of Housing and Urban Development with its principal office at 451 Seventh Street, S.W., Washington, D.C. 20410. Timely payment of the principal of and interest on the Securities is guaranteed by Ginnie Mae pursuant to Section 306(g) of the National Housing Act of 1934, as amended (the "National Housing Act"). Section 306(g) provides that "[t]he full faith and credit of the United States is pledged to the payment of all amounts which may be required to be paid under any guaranty under this subsection." An opinion, dated December 9, 1969, of William H. Rehnquist, Assistant Attorney General of the United States, states that such guaranties under Section 306(g) of mortgage-backed securities of the type offered hereby are authorized to be made by Ginnie Mae and "would constitute general obligations of the United States backed by its full faith and credit."

## Borrowing Authority–United States Treasury

Ginnie Mae, in its corporate capacity under Section 306(d) of the National Housing Act, may issue to the United States Treasury its general obligations in an amount outstanding at any one time sufficient to enable Ginnie Mae, with no limitations as to amount, to perform its obligations under its guaranty of the timely payment of the principal of and interest on the Securities offered hereby. The Treasury is authorized to purchase any obligations so issued.

The Treasury Department has indicated that it will make loans to Ginnie Mae, if needed, to implement the aforementioned guaranty as stated in the following letter:

---

The Secretary of the Treasury
Washington

February 13, 1970

Dear Mr. Secretary:

I wish to refer to your letter of November 14, 1969 asking whether the timely payment of principal and interest on mortgage-backed securities of the pass-through type guaranteed by the Government National Mortgage Association under Section 306(g) of the National Housing Act under its management and liquidating function is a function for which the Association may properly borrow from the Treasury.

It is the opinion of the Treasury Department that the Association may properly borrow from the Treasury for the purpose of assuring the timely payment of principal and interest on guaranteed pass-through type mortgage-backed securities as described in Chapter 3 paragraph 6 of the Mortgage-Backed Securities Guide dated December 1969. Accordingly, the Treasury will make loans to the Association for the foregoing purposes under the procedure provided in subsection (d) of Section 306 of Title III of the National Housing Act.

Sincerely,
DAVID M. KENNEDY

The Honorable George Romney
Secretary of the Department of
      Housing and Urban Development
Washington, D.C. 20410

---

## Single-Family Mortgages

The Securities are based on and backed by a pool of mortgage loans (the "Mortgages") described below. The Issuer has represented that the Mortgages are single-family, level payment mortgages ("SF") insured by the Federal Housing Administration ("FHA") or guaranteed by the Department of Veterans Affairs ("VA"), the Rural Housing Service ("RHS") or the Secretary of Housing and Urban Development ("HUD"). The term "mortgage," as used herein, includes both a note and the mortgage or deed of trust by which it is secured.

The Issuer has also represented, except as otherwise disclosed in the "Annex—Special Disclosure" (the "Annex"), that (a) the first scheduled monthly payment for each Mortgage is not more than 48 months prior to the Issue Date, (b) at least 80% of the original principal amount of the pool constitutes Mortgages that have maturities that are within 30 months of the maturity of the Mortgage with the latest stated maturity, (c) at least 90% of the original principal amount of the pool constitutes Mortgages that have original maturities of 20 years or more, (d) each Mortgage provides for repayment in equal monthly installments that are fully amortizing to maturity, (e) each Mortgage bears interest at a fixed rate of interest throughout the term thereof, which exceeds the interest rate of the Securities by 0.50%, and (f) no Mortgage is more than 60 days delinquent as to scheduled payments as of the Issue Date.

If any of the foregoing representations, or any other representation made by the Issuer, is incorrect with respect to any Mortgage, the Issuer may be required by Ginnie Mae to purchase the Mortgage from the pool. Additionally, if any Mortgage comes into default and continues in default for a period of 90 days or more, the Issuer is permitted to purchase it from the pool. In either event the remaining principal balance of the Mortgage will be passed through to the Security Holders as an unscheduled recovery of principal. See "Maturity, Prepayment, and Yield" herein.

If any Mortgage is also a buydown mortgage, the Issuer is required to state that fact in the Annex. A buydown mortgage is a single-family, level payment mortgage loan for which funds have been provided by someone other than the borrower to reduce the borrower's monthly payments during the early years of the loan. A buydown loan is based on an assessment that the borrower will be able to make higher payments in later years. Increases in the required monthly payments or such loans may result in a higher prepayment rate than that of non-buydown, single-family, level payment loans. Consequently, this may accelerate the payment of principal of the Securities.

## Book-Entry Registration

The Securities initially will be issued and maintained in uncertificated, book-entry form. Subsequent to closing, however, an investor may request that its Security be issued in certificated form. So long as they are maintained in book-entry form, the Securities may be transferred only on the book-entry system of the Depository. In the case of book-entry Securities, Ginnie Mae guarantees only that payments will be made to the Depository in whose name the Security is registered.

Investors in book-entry Securities will ordinarily hold such Securities through one or more financial intermediaries, such as banks, brokerage firms, and securities clearing organizations. An investor in a book-entry Security may transfer its beneficial interest only by complying with the procedures of the appropriate financial intermediary and must depend on its financial intermediary to enforce its rights with respect to a book-entry Security.

## Certificated Registration

By request made through the Issuer or a securities dealer, accompanied by a transfer fee, an investor in book-entry Securities may receive from the transfer agent ("TA") for the Securities a Security in fully registered, certificated form.

Securities held in fully registered, certificated form will be fully transferable and assignable, but only on the security register maintained by the TA (the "Security Register"). A Security Holder of a fully registered, certificated Security or its designated representative may transfer ownership or obtain a denominational exchange of its Security on the Security Register upon surrender of the Security to the TA at its Ginnie Mae transfer window, or through the mail, if the Security is duly endorsed by the Security Holder using the form of assignment on the reverse side thereof or any other written instrument of transfer acceptable to Ginnie Mae. A service charge in an amount determined by Ginnie Mae will be imposed for any registration of transfer or denominational exchange of a Security, and payment sufficient to cover any tax or governmental charge in connection therewith will also be required.

## Payments of Principal and Interest

The Issuer is required to pay principal and interest to registered holders of the Securities in monthly installments by the fifteenth calendar day of each month, except as stated below, with the first such payment to be made by the fifteenth calendar day of the first month following the month in which the Issue Date occurs.

Amounts payable on each Security in respect of interest on each monthly payment date will equal the product of (i) one-twelfth of the interest rate specified on the cover page hereof, and (ii) the remaining principal balance of such Security at the end of the prior month. Principal payments on each monthly payment date will equal the sum of (i) all scheduled principal payments due on the Mortgages on the first day of the month of such payment date, and (ii) all unscheduled payments (including prepayments) and other recoveries received on the Mortgages during the preceding month. The maturity date for the Securities is set forth on the cover page hereof and is based on the latest maturity date of any Mortgage included in the pool.

The Issuer is required to pay to investors holding certificated Securities and make available to the Depository, as Security Holder of book-entry Securities, the full amount described above on each monthly payment date regardless of whether sufficient amounts have been collected on the Mortgages.

Monthly payments on the Securities will be allocated among the holders of each Security in the proportion that the initial principal amount of such Security bears to the initial aggregate principal amount of the Securities.

Monthly payments on Securities held in book-entry form will be made available for Automated Clearing House (ACH) transfer on the fifteenth day of each month (or, if such day is not a business day, the first business day following such fifteenth day) to the Depository for allocation and payment to the investors in accordance with the Depository's procedures.

Monthly payments on Securities held in fully registered, certificated form will be paid to the Security Holder in whose name the Securities are registered on the last day of the month preceding the month in which the payment is made. Payments will be made by check or, at the Issuer's election and with the consent of the Security Holder, by ACH transaction or other electronic transfer, or in such other manner as may be prescribed by Ginnie Mae. Final payment on a fully registered, certificated Security will be made only upon surrender of the outstanding certificate.

## Denominations

The Securities will be issued in minimum dollar denominations representing initial principal balances of $25,000 and in multiples of $1 in excess thereof.

## Servicing of the Mortgages

Under contractual arrangements between the Issuer and Ginnie Mae, the Issuer is responsible for servicing and otherwise administering the Mortgages in accordance with FHA, VA, RHS or PIH requirements, as applicable, Ginnie Mae requirements, and servicing practices generally accepted in the mortgage lending industry.

As compensation for its servicing and administrative duties, the Issuer will be entitled to retain from each interest payment collected on a Mortgage one-twelfth of 0.50% of the actual principal amount of such Mortgage. Late payment fees and similar charges collected will be retained by the Issuer as additional compensation. The Issuer will pay (a) to Ginnie Mae monthly a guaranty fee of not more than one-twelfth of 0.06% of the outstanding principal amount of the Mortgages and (b) all other costs and expenses incident to the servicing of the Mortgages.

## Custodial Agent

The underlying loan documentation for the Mortgages will be held in custody by a document custodian acceptable to Ginnie Mae.

## Termination of Pool Arrangement

The pool arrangement may be terminated at any time prior to the maturity date of the Securities, provided that the Issuer and all holders of the outstanding Securities have entered into an agreement for such termination. Upon formal notification with satisfactory evidence that all parties to the termination agreement have concurred, and return of all certificated Securities to Ginnie Mae for cancellation, the guaranty will be terminated.

## Federal Income Tax Aspects

A Security Holder generally will be treated as owning a pro rata undivided interest in each of the Mortgages. Accordingly, each Security Holder will be required to include in income its pro rata share of the entire income from the Mortgages, including interest (without reduction for servicing fees, to the extent those fees represent reasonable compensation for services) and discount, if any. The income must be reported in the same manner and at the same time as it would have been reported had the Security Holder held the Mortgages directly.

A Security Holder will generally be entitled to deduct its pro rata share of servicing fees, to the extent those fees represent reasonable compensation for services. However, an individual, trust, or estate that holds a Security directly or through a pass-through entity (e.g., a partnership) must treat servicing fees as miscellaneous itemized deductions, which are deductible only to a limited extent in computing taxable income and which are not deductible in computing alternative minimum taxable income.

Interest paid on the Securities will qualify as portfolio interest. Consequently, payment of interest to a Security Holder who is a non-resident alien or a foreign corporation will not be subject to withholding tax provided that the Security Holder properly certifies to the withholding agent the Security Holder's status as a foreign person.

**THE FOREGOING REPRESENTS ONLY A SUMMARY OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES RELATED TO AN INVESTMENT IN A SECURITY.**

**PROSPECTIVE INVESTORS SHOULD CONSULT THEIR OWN TAX ADVISORS REGARDING THE TAX TREATMENT OF THE ACQUISITION, OWNERSHIP, AND DISPOSITION OF A SECURITY.**

### Maturity, Prepayment, and Yield

An investor considering a purchase of the Securities should consider the following factors.

1.      The rate of principal payments (including prepayments) of the Mortgages underlying the Securities will affect their weighted average lives and the yields realized by investors in the Securities. The Mortgages do not contain "due-on-sale" provisions. Any Mortgage may be prepaid in full or in part at any time without penalty. The rate of payments (including prepayments and recoveries in respect of liquidations) on the Mortgages depends on a variety of economic, geographic, social, and other factors, including prevailing market interest rates. The rate of prepayments with respect to single-family mortgage loans has fluctuated significantly over the years. Also, there is no assurance that prepayment patterns for the Mortgages will conform to patterns for conventional fixed-rate mortgage loans. In general, if prevailing mortgage interest rates fall materially below the stated interest rates on the Mortgages (giving consideration to the cost of refinancing), the rate of prepayment of those Mortgages would be expected to increase. Conversely, if mortgage interest rates rise materially above the stated interest rates on the Mortgages, the rate of prepayment of those Mortgages would be expected to decrease.

2.     Following any Mortgage default and the subsequent liquidation of the underlying mortgaged property, Ginnie Mae guarantees that the principal balance of the Mortgage will be paid to Security Holders. As a result, defaults experienced on the Mortgages will accelerate the distribution of principal of the Securities. Prepayments may also result from the repurchase of any Mortgage as described herein.

3.     The yields to investors will be sensitive in varying degrees to the rate of prepayments (including liquidations and repurchases) on the Mortgages. In the case of Securities purchased at a premium, faster than anticipated rates of principal payments could result in actual yields to investors that are lower than the anticipated yields. In the case of Securities purchased at a discount, slower than anticipated rates of principal payments could result in actual yields to investors that are lower than the anticipated yields.

4.     Rapid rates of prepayments on the Mortgages are likely to coincide with periods when prevailing interest rates are lower than the interest rates on the Mortgages. During such periods, the yields at which an investor may be able to reinvest amounts received as principal payments on the investor's Securities may be lower than the yield on those Securities. Slow rates of prepayments on the Mortgages are likely to coincide with periods when prevailing interest rates are higher than the interest rates on the Mortgages. During such periods, the amount of principal payments available to an investor for reinvestment at such high rates may be relatively low.

5.     It is highly unlikely that the Mortgages will prepay at any constant rate until maturity or that all of the Mortgages will prepay at the same rate at any one time. The timing of changes in the rate of prepayments may affect the actual yield to an investor, even if the average rate of principal prepayments is consistent with the investor's expectation. In general, the earlier a prepayment of principal on the Mortgages, the greater the effect on an investor's yield. As a result, the effect on an investor's yield of principal prepayments occurring at a rate higher (or lower) than the rate anticipated by the investor during the period immediately following the Issue Date is not likely to be offset by a later equivalent reduction (or increase) in the rate of principal prepayments.

6.     The effective yield on any Security will be less than the yield otherwise produced by its stated interest rate and purchase price because interest will not be paid to the Security Holder until the fifteenth calendar day of the month following the month in which interest accrues on the Security.

Case 3:12-cv-01222   Document 1-1   Filed 11/26/12   Page 106 of 207   PageID #: 111



**ExiHBiT D**

# NOTE

MIN 1001464-0192800142-2  
MERS TELEPHONE: (888) 679-6377

October 24, 2008  
[Date]

165 TIMBER RIDGE DRIVE, NASHVILLE, TENNESSEE 37217  
[Property Address]

**1. PARTIES**

"Borrower" means each person signing at the end of this Note, and the person's successors and assigns. "Lender" means **PRIMARY RESIDENTIAL MORTGAGE INC.**, and its successors and assigns.

**2. BORROWER'S PROMISE TO PAY; INTEREST**

In return for a loan received from Lender, Borrower promises to pay the principal sum of Two Hundred Eight Thousand Three Hundred Fifty Four And 00/100 Dollars (U.S. $ 208,354.00), plus interest, to the order of Lender. Interest will be charged on unpaid principal, from the date of disbursement of the loan proceeds by Lender, at the rate of Six percent (6.000%) per year until the full amount of principal has been paid.

**3. PROMISE TO PAY SECURED**

Borrower's promise to pay is secured by a mortgage, deed of trust or similar security instrument that is dated the same date as this Note and called the "Security Instrument." The Security Instrument protects the Lender from losses which might result, if Borrower defaults under this Note.

**4. MANNER OF PAYMENT**

(A) Time

Borrower shall make a payment of principal and interest to Lender on the first day of each month beginning on December 1, 2008. Any principal and interest remaining on the first day of November, 2038 will be due on that date, which is called the "Maturity Date."

(B) Place

Payment shall be made at 4750 WEST WILEY POST WAY, SUITE 200, SALT LAKE CITY, UTAH 84116 or at such place as Lender may designate in writing by notice to Borrower.

(C) Amount

Each monthly payment of principal and interest will be in the amount of U.S. $ 1,249.19. This amount will be part of a larger monthly payment required by the Security Instrument, that shall be applied to principal, interest and other items in the order described in the Security Instrument.

(D) Allonge to this Note for payment adjustments

If an allonge providing for payment adjustments is executed by Borrower together with this Note, the covenants of the allonge shall be incorporated into and shall amend and supplement the covenants of this Note as if the allonge were a part of this Note. [Check applicable box]

[ ] Graduated Payment Allonge    [ ] Growing Equity Allonge    [ ] Other [specify]

**5. BORROWER'S RIGHT TO PREPAY**

Borrower has the right to pay the debt evidenced by this Note, in whole or in part, without charge or penalty, on the first day of any month. Lender shall accept prepayment on other days provided that borrower pays interest on the amount prepaid for the remainder of the month to the extent required by Lender and permitted by regulations of the Secretary. If Lender makes a partial prepayment, there will be no changes in the due date or in the amount of the monthly payment unless Lender agrees in writing to those changes.

**6. BORROWER'S FAILURE TO PAY**

(A) Late Charge for Overdue Payments

If Lender has not received the full monthly payment required by the Security Instrument, as described in Paragraph 4(C) of this Note, by the end of fifteen calendar days after the payment is due, Lender may collect a late charge in the amount of Four percent (4.000%) of the overdue amount of each payment.

(B) Default

If Borrower defaults by failing to pay in full any monthly payment, then Lender may, except as limited by regulations of the Secretary in the case of payment defaults, require immediate payment in full of the principal balance remaining due and all accrued interest. Lender may choose not to exercise this option without waiving its rights in the event of any subsequent default. In many circumstances regulations issued by the Secretary will limit Lender's rights to require immediate payment in full in the case of payment defaults. This Note does not authorize acceleration when not permitted by HUD regulations. As used in this Note, "Secretary" means the Secretary of Housing and Urban Development or his or her designee.

(C) Payment of Costs and Expenses

FHA Multistate Fixed Rate Note - 10/95

Page 1 of 2

Initials: ____

usfnote

If Lender has required immediate payment in full, as described above, Lender may require Borrower to pay costs and expenses including reasonable and customary attorneys' fees for enforcing this Note to the extent not prohibited by applicable law. Such fees and costs shall bear interest from the date of disbursement at the same rate as the principal of this Note.

## 7.   WAIVERS

Borrower and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Lender to demand payment of amounts due. "Notice of dishonor" means the right to require Lender to give notice to other persons that amounts due have not been paid.

## 8.   GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to Borrower under this Note will be given by delivering it or by mailing it by first class mail to Borrower at the property address above or at a different address if Borrower has given Lender a notice of Borrower's different address.

Any notice that must be given to Lender under this Note will be given by first class mail to Lender at the address stated in Paragraph 4(B) or at a different address if Borrower is given a notice of that different address.

## 9.   OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. Lender may enforce its rights under this Note against each person individually or against all signatories together. Any one person signing this Note may be required to pay all of the amounts owed under this Note.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Note.

_Sheri L. Jones_ _____   (Seal)            _____   (Seal)
SHERI L. JONES                                  -Borrower                                                              -Borrower

Social Security No.: ▬▬▬▬

_____   (Seal)            _____   (Seal)
                                                -Borrower                                                              -Borrower

Pay to the order of:  JPMorgan Chase Bank, N.A.
_____
Without Recourse
PRIMARY RESIDENTIAL MORTGAGE INC.

By: _____

Name and Title: _____
            COLLEEN FISHER
            ASSISTANT SECRETARY
Closing Date: October 24, 2008

FHA Multistate Fixed Rate Note - 10/95

JPMorgan Chase Bank, N.A.

Pay to the Order of:
Without Recourse
JPMorgan Chase Bank, NA
By: _Laura Bergeron_
Laura Bergeron, Assistant Treasurer

```
18809855231209200810311631
```

ExHiBiT E

When Recorded Return to
**PRIMARY RESIDENTIAL MORTGAGE INC.**
**4750 WEST WILEY POST WAY, SUITE 200**
**SALT LAKE CITY, UTAH 84116**
Attn.: SHIPPING DEPT./DOC. CONTROL

## Assignment of Deed of Trust

FOR VALUE RECEIVED, Mortgage Electronic Registration Systems, Inc. ("MERS"), as nominee for **PRIMARY RESIDENTIAL MORTGAGE INC.** its successors and assigns, hereby assign and transfer to **CHASE MANHATTAN MORTGAGE CORPORATION** its successors and assigns, all its right, title and interest in and to a certain mortgage executed by SHERI L. JONES, A SINGLE WOMAN as Trustor, to KEY TITLE as Trustee, and bearing the date of the 24th day of October, 2000 and recorded on the _____ day of _____ A.D. _____ in the office of the Recorder of DAVIDSON County, State of TENNESSEE in Book _____ at Pages _____, situated in said County and described as:

**LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF.**

Signed on the _____ day of _____, _____

Mortgage Electronic Registration Systems, Inc. ("MERS")

By _____
Assistant Secretary

| MIN: 1001464-0192800142-2 | MERS Phone: 1-888-679-6377 |

mersam2

State of             :
County of          ) ss:

      On the _____ day of _____ A.D. _____, before me, a Notary Public, personally appeared _____, to me known, who being duly sworn, did say that he or she is the Assistant Secretary of Mortgage Electronic Registration Systems, Inc., and that said instrument was signed on behalf of said corporation

_____
                        Notary Public

**Address of Preparer:**
PRIMARY RESIDENTIAL MORTGAGE INC.
4750 WEST WILEY POST WAY, SUITE 200
SALT LAKE CITY, UTAH 84116
Attn.: SHIPPING DEPT./DOC. CONTROL

| MIN: 1001464-0192800142-2 | MERS Phone: 1-888-679-6377 |
| --- | --- |

**CHASE O**

March 11, 2010

00003607 EMC ZA 10071 - 1880985523 P485
SHERI L JONES
165 TIMBER RIDGE DR
NASHVILLE   TN 37217

*Exhibit G*

2012 OCT 19  PM 3: 55
CLERK & MASTER
DAVIDSON CO. CHANCERY CT.

**FILED**

**Document Receipt Confirmation**
Account: 1880985523 (the "Loan")
Property Address:   165  TIMBER RIDGE DR
                    NASHVILLE, TN 37217

Dear Mortgagor(s):

Chase Home Finance LLC is writing to confirm receipt of your recently submitted documentation on the above-referenced account for the Making Home Affordable program ("MHA").  Please note that once your Loan and documentation are fully reviewed, it may be determined that additional documentation is required under the MHA.  If so, we will notify you of the specific documents required.  Otherwise, you will be contacted by our office in the near future with a decision on your modification request.

In the meantime, please continue to make your trial period payments on time.  Thank you for your interest in the MHA.

We value you as a customer and want to ensure your continued satisfaction.

Sincerely,
Chase Home Finance LLC
(866) 550-5705
(800) 582-0542 TDD/Text Telephone

For California customers, the state Rosenthal Fair Debt Collection Practices Act and the federal Fair Debt Collection Practices Act require that, except under unusual circumstances, collectors may not contact you before 8 a.m. or after 9 p.m. They may not harass you by using threats of violence or arrest or by using obscene language. Collectors may not use false or misleading statements or call you at work if they know or have reason to know that you may not receive personal calls at work. For the most part, collectors may not tell another person, other than your attorney or spouse, about your debt. Collectors may contact another person to confirm your location or enforce a judgment. For more information about debt collection activities, you may contact the Federal Trade Commission toll-free at (877) FTC-HELP or www.ftc.gov.

**Chase Home Finance LLC is attempting to collect a debt, and any information obtained will be used for that purpose.**

We may report information about your account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

SER1 1880985523  ¢_____  CUSTOMER SERVICE  INV X21/800  09/23/10  16:48:07

SHERI L JONES                    OC TYPE F.H.A.         MAN 0

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     IR 6.00000  BR 00    615-415-3373

165 TIMBER RIDGE DR      NASHVILLE TN 37217        1 615-370-7000

_ _____ < COKMPLETED A LOAN HISTORY RECONCILIATION      >: 09/24/10

----~HIST-------------------* LOAN HISTORY *--------------------(MORE)

PROC-DT DUE-DT TRAN  TRAN-DESCRIPTION           TRAN-EFFECTIVE-DATE

  TRAN-AMT  PRINCIPAL  INTEREST  ESCROW   AMOUNT/CD/DESCRIPTION

11-02-09 08-09 172 PAYMENT

  1,559.47   215.86  1,033.33  310.28

       206,449.44      1,496.51

11-02-09 08-09 172 PAYMENT

  1,559.47-   0.00    0.00   0.00  1,559.47-

11-02-09 08-09 172 PAYMENT

  950.00    0.00    0.00   0.00   950.00

10-26-09 00-00 632 STATUTORY EXPENSES

   0.75    0.00    0.00   0.00   0.75  3RD REC CORP ADV

10-08-09 10-09 351 HOMEOWNERS INSURANCE

  917.00-   0.00    0.00  917.00-      PAYEE = 59510

             1,186.23

---* PF2 FOR ADDL MESSAGES *---------------------------------------

ACTIVE LOSS MITIGATION         LOSS MIT IND = 1 ACTIVE LOSS MITIGATI

ACTIVE FORECLOSURE         FULL SETTLEMENT    12/14/09

LOAN IS IN FORECLOSURE, F/C STOP = 5  NO NOTICES = P

SER1 1880985523  ¢_____  CUSTOMER SERVICE  INV X21/800  09/23/10  16:48:07

SHERI L JONES                    OC TYPE F.H.A.        MAN 0

            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    IR 6.00000 BR 00   615-415-3373

165 TIMBER RIDGE DR      NASHVILLE TN 37217         1 615-370-7000

_ _____ < COKMPLETED A LOAN HISTORY RECONCILIATION     >: 09/24/10

----~HIST---------------* LOAN HISTORY *-------------------(MORE)

PROC-DT DUE-DT TRAN TRAN-DESCRIPTION          TRAN-EFFECTIVE-DATE

   TRAN-AMT  PRINCIPAL  INTEREST  ESCROW   AMOUNT/CD/DESCRIPTION

                  643.49-

12-01-09 09-09 172 PAYMENT

   950.00    0.00    0.00    0.00   950.00

11-24-09 00-00 745 CORPORATE ADVANCE ADJUSTMENT

    5.10    0.00    0.00    0.00    5.10  3RD REC CORP ADV

11-24-09 00-00 745 CORPORATE ADVANCE ADJUSTMENT

    5.10-   0.00    0.00    0.00    5.10- NON REC CORP ADV

11-12-09 00-00 632 STATUTORY EXPENSES

    0.85    0.00    0.00    0.00    0.85  NON REC CORP ADV

11-05-09 11-09 310 MORTGAGE INSURANCE DISBURSEMENT

   93.56-   0.00    0.00   93.56-        PAYEE = RBP

                 1,402.95

---* PF2 FOR ADDL MESSAGES *------------------------------------------

ACTIVE LOSS MITIGATION        LOSS MIT IND = 1 ACTIVE LOSS MITIGATI

ACTIVE FORECLOSURE            FULL SETTLEMENT    12/14/09

LOAN IS IN FORECLOSURE, F/C STOP = 5  NO NOTICES = P

SER1 1880985523  C_____   CUSTOMER SERVICE INV X21/800 09/23/10 16:48:07

SHERI L JONES                        TYPE F.H.A.      MAN 0

             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    IR 6.00000 BR 00  615-415-3373

165 TIMBER RIDGE DR    NASHVILLE TN 37217        1 615-370-7000

_ _____ < COKMPLETED A LOAN HISTORY RECONCILIATION     >: 09/24/10

----~HIST--------------------* LOAN HISTORY *--------------------(MORE)

PROC-DT DUE-DT TRAN TRAN-DESCRIPTION         TRAN-EFFECTIVE-DATE

  TRAN-AMT PRINCIPAL INTEREST  ESCROW  AMOUNT/CD/DESCRIPTION

01-04-10 11-10 310 MORTGAGE INSURANCE DISBURSEMENT

   92.37-    0.00    0.00  92.37-      PAYEE = RBP

               517.95-

01-02-10 09-09 168 REPAY OF ESCROW ADVANCE

   0.00    0.00    0.00  310.28-  310.28

01-02-10 09-09 172 PAYMENT

  1,559.47   216.94  1,032.25  310.28

      206,232.50       425.58-

01-02-10 09-09 172 PAYMENT

  1,559.47-   0.00    0.00    0.00  1,559.47-

01-02-10 09-09 172 PAYMENT

  950.00    0.00    0.00    0.00   950.00

---* PF2 FOR ADDL MESSAGES *----------------------------------------

ACTIVE LOSS MITIGATION        LOSS MIT IND = 1 ACTIVE LOSS MITIGATI

ACTIVE FORECLOSURE        FULL SETTLEMENT    12/14/09

LOAN IS IN FORECLOSURE, F/C STOP = 5  NO NOTICES = P

SER1 1880985523  ¢_____   CUSTOMER SERVICE INV X21/800 09/23/10 16:48:07

SHERI L JONES     /\/\/\/\/\/\/\/\/   : TYPE F.H.A.      MAN 0

              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    IR 6.00000 BR 00  615-415-3373

165 TIMBER RIDGE DR     NASHVILLE TN 37217        1 615-370-7000

_ _____ < COKMPLETED A LOAN HISTORY RECONCILIATION      >: 09/24/10

----~HIST----------------* LOAN HISTORY *--------------------(MORE)

PROC-DT DUE-DT TRAN TRAN-DESCRIPTION          TRAN-EFFECTIVE-DATE

  TRAN-AMT  PRINCIPAL  INTEREST  ESCROW   AMOUNT/CD/DESCRIPTION

10-02-09 11-09 310 MORTGAGE INSURANCE DISBURSEMENT

   93.56-    0.00    0.00   93.56-      PAYEE =  RBP

                2,103.23

09-30-09 08-09 172 PAYMENT

  950.00    0.00    0.00    0.00   950.00

09-25-09 00-00 632 STATUTORY EXPENSES

    5.10    0.00    0.00    0.00    5.10  NON REC CORP ADV

09-04-09 11-09 310 MORTGAGE INSURANCE DISBURSEMENT

   93.56-   0.00    0.00  93.56-       PAYEE =  RBP

                2,196.79

09-04-09 00-00 745 CORPORATE ADVANCE ADJUSTMENT

   10.00    0.00    0.00    0.00   10.00 3RD REC CORP ADV

---* PF2 FOR ADDL MESSAGES *-----------------------------------

ACTIVE LOSS MITIGATION         LOSS MIT IND = 1 ACTIVE LOSS MITIGATI

ACTIVE FORECLOSURE         FULL SETTLEMENT      12/14/09

LOAN IS IN FORECLOSURE, F/C STOP = 5  NO NOTICES = P

SER1 1880985523  ¢_____  CUSTOMER SERVICE  INV X21/800  09/23/10 16:48:07

SHERI L JONES                    OC  TYPE F.H.A.        MAN 0

              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    IR 6.00000 BR 00   615-415-3373

165 TIMBER RIDGE DR     NASHVILLE TN 37217      1 615-370-7000

_ _____ < COKMPLETED A LOAN HISTORY RECONCILIATION     >: 09/24/10

----~HIST--------------------* LOAN HISTORY *----------------------(MORE)

PROC-DT DUE-DT TRAN TRAN-DESCRIPTION        TRAN-EFFECTIVE-DATE

   TRAN-AMT  PRINCIPAL  INTEREST   ESCROW   AMOUNT/CD/DESCRIPTION

05-28-10 10-09 173 PAYMENT                  05-27-10

     0.00    218.03  1,031.16  310.28  1,559.47-

        206,014.47          577.15-

05-27-10 00-00 632 STATUTORY EXPENSES

    75.00    0.00    0.00    0.00   75.00  3RD REC CORP ADV

05-05-10 10-09 173 PAYMENT                  05-01-10

   950.00    0.00    0.00    0.00   950.00   *May*

05-03-10 10-09 161 ESCROW ADVANCE

    92.37    0.00    0.00   92.37

05-03-10 11-10 310 MORTGAGE INSURANCE DISBURSEMENT

    92.37-   0.00    0.00   92.37-     PAYEE = RBP

                    887.43-

---* PF2 FOR ADDL MESSAGES *------------------------------------------

ACTIVE LOSS MITIGATION        LOSS MIT IND = 1 ACTIVE LOSS MITIGATI

ACTIVE FORECLOSURE            FULL SETTLEMENT    12/14/09

LOAN IS IN FORECLOSURE, F/C STOP = 5  NO NOTICES = P

SER1 1880985523  C_____  CUSTOMER SERVICE  INV X21/800  09/23/10  16:48:07

SHERI L JONES  ☾☾☾☾☾☾ CC TYPE F.H.A.  MAN 0

      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  IR 6.00000 BR 00  615-415-3373

165 TIMBER RIDGE DR  NASHVILLE TN 37217  1 615-370-7000

_ _____ < COKMPLETED A LOAN HISTORY RECONCILIATION  >: 09/24/10

----~HIST----------------* LOAN HISTORY *-------------------(MORE)

PROC-DT DUE-DT TRAN TRAN-DESCRIPTION  TRAN-EFFECTIVE-DATE

  TRAN-AMT PRINCIPAL INTEREST ESCROW  AMOUNT/CD/DESCRIPTION

04-05-10 10-09 173 PAYMENT  04-01-10

  950.00  0.00  0.00  0.00  950.00  *April*

04-02-10 10-09 161 ESCROW ADVANCE

  92.37  0.00  0.00  92.37

04-02-10 11-10 310 MORTGAGE INSURANCE DISBURSEMENT

  92.37-  0.00  0.00  92.37-  PAYEE = RBP

      795.06-

03-24-10 00-00 632 STATUTORY EXPENSES

  3.40  0.00  0.00  0.00  3.40  3RD REC CORP ADV

03-17-10 00-00 633 MISC FORECLOSURE AND BANKRUPTCY EXPENSES

  130.00  0.00  0.00  0.00  130.00  3RD REC CORP ADV


---* PF2 FOR ADDL MESSAGES *-------------------------------------

ACTIVE LOSS MITIGATION  LOSS MIT IND = 1 ACTIVE LOSS MITIGATI

ACTIVE FORECLOSURE  FULL SETTLEMENT  12/14/09

LOAN IS IN FORECLOSURE, F/C STOP = 5  NO NOTICES = P

SER1 1880985523  C_____  CUSTOMER SERVICE  INV X21/800  09/23/10  16:48:07

SHERI L JONES                    4/9C  TYPE F.H.A.        MAN 0

            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    IR 6.00000 BR 00  615-415-3373

165 TIMBER RIDGE DR    NASHVILLE TN 37217        1 615-370-7000

_ _____ < COKMPLETED A LOAN HISTORY RECONCILIATION    >: 09/24/10

----~HIST-----------------* LOAN HISTORY *-------------------(MORE)

PROC-DT  DUE-DT  TRAN  TRAN-DESCRIPTION          TRAN-EFFECTIVE-DATE

   TRAN-AMT  PRINCIPAL  INTEREST  ESCROW    AMOUNT/CD/DESCRIPTION

                  359.24-

06-01-10  11-09  168  REPAY OF ESCROW ADVANCE

    0.00      0.00    0.00   310.28-  310.28

06-01-10  11-09  172  PAYMENT

   1,559.47   219.12  1,030.07  310.28

        205,795.35          266.87-

06-01-10  11-09  172  PAYMENT

    1,559.47-   0.00    0.00    0.00  1,559.47-

06-01-10  11-09  172  PAYMENT

     950.00    0.00    0.00    0.00   950.00      *line*

05-28-10  10-09  168  REPAY OF ESCROW ADVANCE

    0.00      0.00    0.00   310.28-  310.28

---* PF2 FOR ADDL MESSAGES *-----------------------------------

ACTIVE LOSS MITIGATION          LOSS MIT IND = 1 ACTIVE LOSS MITIGATI

ACTIVE FORECLOSURE             FULL SETTLEMENT    12/14/09

LOAN IS IN FORECLOSURE, F/C STOP = 5  NO NOTICES = P

SER1 1880985523   ¢_____   CUSTOMER SERVICE  INV X21/800  09/23/10  16:48:07

SHERI L JONES         ~~~~~~~OC TYPE F.H.A.        MAN 0

               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    IR 6.00000 BR 00   615-415-3373

165 TIMBER RIDGE DR    NASHVILLE TN 37217        1 615-370-7000

_ _____ < COKMPLETED A LOAN HISTORY RECONCILIATION    >: 09/24/10

----~HIST-----------------* LOAN HISTORY *-------------------(MORE)

PROC-DT DUE-DT TRAN TRAN-DESCRIPTION          TRAN-EFFECTIVE-DATE

   TRAN-AMT  PRINCIPAL  INTEREST  ESCROW    AMOUNT/CD/DESCRIPTION

                   359.24-

06-01-10 11-09 168 REPAY OF ESCROW ADVANCE

   0.00     0.00    0.00  310.28-  310.28

06-01-10 11-09 172 PAYMENT

   1,559.47   219.12  1,030.07  310.28

          205,795.35      266.87-

06-01-10 11-09 172 PAYMENT

   1,559.47-   0.00    0.00    0.00  1,559.47-

06-01-10 11-09 172 PAYMENT

   950.00    0.00    0.00    0.00  950.00

05-28-10 10-09 168 REPAY OF ESCROW ADVANCE

   0.00     0.00    0.00  310.28-  310.28

---* PF2 FOR ADDL MESSAGES *------------------------------------

ACTIVE LOSS MITIGATION       LOSS MIT IND = 1 ACTIVE LOSS MITIGATI

ACTIVE FORECLOSURE       FULL SETTLEMENT   12/14/09

LOAN IS IN FORECLOSURE, F/C STOP = 5  NO NOTICES = P



EXHIBIT H

FILED 2012 OCT 19 PM 3:55 CLERK & MASTER DAVIDSON CO. CHANCERY CT. B.C. &M

September 10, 2009

Sheri L Jones


165 Timber Ridge Dr
Nashville, TN 37217

**Forbearance Plan Agreement**
Account: 1880985523 (the "Loan")
Property Address: 165 Timber Ridge Dr
                 Nashville TN 37217 (the "Property")

Dear Mortgagor(s):

Chase Home Finance LLC is writing in response to your recent request for
a Forbearance Plan on the above-referenced account.

All the provisions of the Note and security instrument, except as herein
provided, shall remain in full force and effect. Upon the breach of any
of the provisions of this Agreement, Chase Home Finance LLC may, at its
option and without further notice to you, terminate this Agreement and
continue collection and/or foreclosure proceedings according to the term
of the Note and security instrument, without regard to this instrument.

In order for us to continue processing this workout option, we first need
to confirm your acceptance of the terms and conditions outlined in this
Agreement. To accept this Agreement, please review the following
information, sign and date one copy of the enclosed Acknowledgement of
Borrower(s), and return it to the address provided below within five (5)
days of the date of this letter. The additional copy should be retained
for your records.

Please note that this Agreement will not be valid until a signed copy is
received by Chase at the address indicated. If the Agreement is not
returned, collection and/or foreclosure action will commence or continue.

As of September 10, 2009, your Loan is paid through 07/01/09. The
total amount past due is $ 3,181.32.

Below we have detailed the proposed payment schedule. Please note that
Chase may find it necessary to increase your regular monthly payment
during this period to cover changes in your monthly escrow charges,
interest rate adjustments, or other adjustments allowed by your Note and
Deed of Trust/Mortgage, as applicable. Please adjust your payments
accordingly.

**Payment Schedule**

| PLAN | DATE | AMT | PLAN | DATE | AMT |
|------|------|-----|------|------|-----|
| 01 | 10/01/09 | 950.00 | 02 | 11/01/09 | 950.00 |
| 03 | 12/01/09 | 950.00 | 04 | 01/01/10 | 6,972.09 |

If once the Forbearance Plan begins on your account, you do not meet the terms of this Agreement, please remember Chase Home Finance LLC may, without further notice to you, terminate the Forbearance Plan and continue collection and/or foreclosure proceedings according to the terms of your Note and Mortgage. After the final payment of the Forbearance Plan, regular payments will become due in addition to any delinquent payments, fees and/or charges. If your account is not current once the Forbearance period has ended, collection and/or foreclosure activity will resume.

**During your Forbearance period under this Forbearance Plan, payment should be sent in the form of certified funds (i.e., cashier's check or money order) to the address below. Please ensure that your account number appears on your payment.** If you elect to remit your payment(s) by regular mail, we recommend that you send them certified mail to ensure their delivery.

Overnight/Regular Mail: Chase Home Finance LLC
Attention Homeowner's Assistance Department
Mail Code OH4-7354
3415 Vision Drive
Columbus, OH 43219-6009

This Forbearance Plan does not alter any reporting made to credit reporting agencies by Chase Home Finance LLC. Any delinquency will be reported in accordance to the terms of the Note and security instrument without regard to this instrument.

*Code City- CHASE-*

*ST CODE OH -*

*Hume Chase Home Finance LLC*

*Western Union- Quick Collect*

## ACKNOWLEDGEMENT OF BORROWER(S)

Account: 1880985523

Borrower(s): Sheri L Jones

Property Address: 165 Timber Ridge Dr
                  Nashville TN 37217

BY SIGNING BELOW, Borrower(s) accepts and agrees to the terms and covenant contained in the document above.

**Borrower 1**

Sheri L. Jones
_____
(Print Name)

_Sheri L. Jones_
_____
(Signature)

9-18-09
_____
(Date)

**Borrower 2**

_____
(Print Name)

_____
(Signature)

_____
(Date)

**Borrower 3**

_____
(Print Name)

_____
(Signature)

_____
(Date)

**Borrower 4**

_____
(Print Name)

_____
(Signature)

_____
(Date)

**Borrower 5**

_____
(Print Name)

_____
(Signature)

_____
(Date)

**Borrower 6**

_____
(Print Name)

_____
(Signature)

_____
(Date)

**EXHIBIT I**

# DECLARATION OF CINDY WALKER

I, Cindy Walker, declare and state as follows:

1.  I am over eighteen years of age, and I am qualified to make this declaration. If called as a witness, I could and would competently testify to the following based on my own personal knowledge, with the exception of those matters based on information and belief, which I believe to be true. I currently reside in Riverside County.

2.  I was employed by J.P. Morgan Chase in its loss mitigation dept., in Rancho Bernardo, San Diego, from roughly 2006 through June 2010. I was employed initially as a loss mitigation rep., and then later as a junior underwriter. My loan modification responsibilities were to handle calls from borrowers who were seeking loan modifications; to process applications for those mortgage customers; and to assist in compiling loan modification documents necessary for those borrowers to receive loan modifications. The borrowers I handled were almost entirely borrowers with Chase or WAMU, or were serviced by EMC. Because my duties and experience regarding Chase, EMC and J.P. Morgan Chase were overlapping, and without any significant distinction, any references to Chase in this document are also generally references to EMC and J.P. Morgan Chase.

3.  During my employment at Chase, I handled well over 10,000 calls from borrowers seeking loan modifications. As far as I know, very few actually received the *permanent* loan modifications they sought – perhaps a handful per month (and some months there were none). Many were placed in temporary plans, with short term reduced mortgage payments, but the vast majority were not given the permanent loan modifications they needed.

4.  Employees in the Rancho Bernardo office commonly joked that a document shredder was connected to the fax machine. This joke was common because borrower documents were consistently lost, misplaced, or destroyed by Chase. In fact, under Chase policy, for a while documents sent via fax were shredded if not retrieved within 24 hours, and often they were shredded without notice. This was of course quite frustrating.

5.      Chase was committed to delaying, obstructing and preventing *permanent* loan modifications for its borrowers, including those whose loans were serviced by EMC. This policy was implemented as follows:

      i.      Deceive Callers. Employees were instructed to deceive borrowers in discussing loan modification applications – including their status and the prospects for obtaining permanent loan modifications. Management at Chase (including Hollie Bartleson, Carol Tom, Ken Holland, and Lewis R.) instructed employees to tell borrowers that 1) their loan mod applications were still "in process," even when they were actually dead or hopeless; and 2) documents had not yet been received, or were incomplete, even though this was false. Management discouraged employees from admitting that the borrowers' documents had become out-dated (based on excessive Chase delays), instead telling employees to fabricate a story to "appease" the borrowers. I personally heard these instructions. In fact, even during a few months when Chase imposed a freeze on loan mods, management told me and other employees to deceive borrowers by claiming that their loans were still being processed, when this was false.

      ii.      Document Shuffle. Most documents sent in by loan modification applicants mysteriously disappeared, or expired within a few months of receipt, because they became outdated based upon delays implemented by Chase. Although borrowers were asked to deliver multiple documents, and mostly did as they were told, the people in my dept. rarely received the full document packages.

      iii.      Red Tape. Chase erected an army of procedural barriers and red tape to obstruct and delay loan mods, making a successful permanent loan mod very difficult.

      iv.      Poor Hiring & Training. Management hired mostly inexperienced employees, and then provided inadequate training. This was especially true in the underwriting dept. Many employees were therefore incompetent. Chase preferred it this way.

      v.      Rotate Assignments. Chase rotated assignments on loan files, which was done monthly. It resulted in additional delays, and prevented employees from forming relationships with the borrowers being deceived.

6.   Chase management in the Rancho Bernardo office, including Holly Bartleson, Carol
Tom, and others, trained and instructed employees to delay and encumber the loan modification
process. The company's "ferris wheel" system was used to delay, obstruct, and reject loan
modification applications. Chase management encouraged this. This was evident from the general
culture and attitude implemented and encouraged by Chase, instructions from Chase management,
conversations with other employees, and office training in Rancho Bernardo.

7.   Employees in the Rancho Bernardo office commonly joked that the loss mitigation
department was a "ferris wheel" or a "merry-go-round." This was because applicants were forced
through frustrating cycles of red tape, delays, lost documents, rotating personnel, and deceit.
Borrowers were seldom able to avoid going around in circles, rarely achieving the permanent loan
modifications they needed. It should be noted, however, that Chase did not instruct me to deceive
borrowers during my first couple years of employment. The Chase policy encouraging employees to
deceive borrowers was implemented roughly in 2008, and continued into 2010, at least through the
end of my employment.

8.   Management at Chase told me that Chase employees were required to take notes
documenting all loss mitigation calls, and that every conversation was recorded. I was also informed
that all of these records were retained by Chase.

9.   This declaration is a summary, not a comprehensive description.

I declare under penalty of perjury under the laws of the State of California that the foregoing
is true and correct. Executed on November ___, 2010, in Riverside County, California.

NOV 29 2010

*Cindy Walker*
Cindy Walker

X:\D\546-01\Declarations\Cindy Walker.doc

3

**EXHIBIT J**

Case 8:10-cv-01023-DOC -JCG   Document 50   Filed 08/16/11   Page 66 of 76   Page ID #:1026

FILED

2012 OCT 19 PM 3:55

CLERK & MASTER
DAVIDSON CO. CHANCERY CT.
BY_____ D.C.


## DECLARATION OF DEBRA STILLWELL

I, Debra Stillwell, declare and state as follows:

1.      I am over eighteen years of age, and I am qualified to make this declaration. If called as a witness, I could and would competently testify to the following based on my own personal knowledge. I currently reside in San Diego County.

2.      I was employed by J.P. Morgan Chase for just over 8 years in its loss mitigation dept., in Rancho Bernardo, San Diego, from March 18, 2002, through June 2010. I was employed initially as a loss mitigation rep., and then as a trainer, and later as a junior underwriter. Some of my duties were as follows:  handle calls from borrowers who were seeking loan modifications; process applications for those mortgage customers; assist in compiling loan modification documents necessary for borrowers to receive loan modifications; ensure that files were complete; forward complete files to senior underwriters. The borrowers I handled were almost entirely serviced by Chase, WAMU and EMC. My duties and experience regarding Chase, J.P. Morgan Chase, and EMC largely were largely overlapping, and without any significant distinction. Because of this, any references to Chase in this document are also generally references to EMC and J.P. Morgan Chase.

3.      During my employment at Chase, I handled thousands of calls from borrowers seeking loan modifications. As far as I know, very few actually received the *permanent* loan modifications they sought. Many were placed in temporary plans, with short term reduced mortgage payments, but the vast majority were not given the permanent loan modifications they needed.

4.      Employees in the Rancho Bernardo office commonly joked that a document shredder was connected to the fax machine. This joke was common because borrower documents were consistently lost, misplaced, or shredded by Chase. This was horribly frustrating for both borrowers and for employees.

5.      Chase delayed and obstructed *permanent* loan modifications for its borrowers, including those whose loans were serviced by Chase or EMC. This policy was implemented as follows:

Case 3:12-cv-01222   Document 1-1   Filed 11/26/12   Page 127 of 207 PageID #: 132

i.   <u>Deceive Callers</u>. Management at Chase (including Hollie Bartleson, Jeff Neal, and Greg Kiesel), instructed employees to tell borrowers whatever it takes to make Chase "look good" or to "appease" borrowers. I personally heard these instructions. In fact, during two months in late 2009 or 2010, when Chase imposed a freeze on loan mods, management (including Hollie Bartleson, Jeff Neal and Greg Kiesel) told me and other employees to deceive borrowers by claiming that their loans were still being processed, or were still in review, when this was false. Employees were thus instructed to deceive borrowers in discussing loan modification applications. Chase reprimanded employees who did not follow these instructions. Borrowers were told these lies, and were told to keep making payments – which was important to Chase.

ii.   <u>Document Shuffle</u>. Most documents sent in by loan modification applicants disappeared, or expired shortly after receipt, because they became outdated based upon delays implemented by Chase. Although borrowers were asked to deliver multiple documents, and mostly did as they were told, the people in my department rarely received the full document packages.

iii.   <u>Red Tape</u>. There were procedural barriers and red tape in place to obstruct and delay loan mods, making a successful permanent loan mod very difficult.

iv.   <u>Poor Hiring & Training</u>. Management hired mostly inexperienced employees, and then provided inadequate training. Many employees were therefore incompetent, especially in the underwriting department. Chase preferred it this way.

v.   <u>Rotate Assignments</u>. Chase constantly rotated assignments on loan files. This resulted in additional delays, and prevented employees from forming relationships with the borrowers being deceived. This was very frustrating for borrowers and employees.

6.   Employees in the Rancho Bernardo office frequently commented that the loss mitigation department was a "ferris wheel" or a "merry-go-round." This was because applicants were forced through frustrating cycles of red tape, delays, lost documents, rotating personnel, and deceit. Borrowers were seldom able to avoid going around in circles, rarely achieving the permanent loan modifications they needed. It should be stated, however, that Chase did not instruct me to deceive borrowers during my first several years of employment. The Chase policy encouraging

1   employees to deceive borrowers was implemented later, roughly when the foreclosure crises began,

2   and continued at least through the end of my employment in June 2010.

3       7.    Chase management in the Rancho Bernardo office erected hurdles that encumbered

4   and delayed the loan modification process. The company's "ferris wheel" system was used to delay,

5   obstruct, and reject permanent loan modification applications. Chase management encouraged this.

6       8.    Management at Chase told me that Chase employees were required to take notes

7   documenting all loss mitigation calls, and that, beginning in 2008/2009, every conversation was

8   supposed to be recorded. I was also informed that all of these records were retained by Chase.

9       9.    In summary, Chase dealt a raw deal to its loan mod applicants. This declaration is a

10   summary, not a comprehensive description.

11       I declare under penalty of perjury under the laws of the State of California that the foregoing

12   is true and correct. Executed on 4/26, 2011, in San Diego County, California.

13

14                     Debra Stillwell

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT K

2012 OCT 19 PM 3: 55

FILED

CLERK & MASTER
DAVIDSON CO. CHANCERY CT.

### DECLARATION OF ERIKA MARIA PENALOZA

I, Erika Maria Penaloza, declare and state as follows:

1. I am over eighteen years of age, and I am qualified to make this declaration on my own behalf. If called as a witness, I could and would competently testify to the following based on my own personal knowledge, with the exception of those matters based on information and belief, which I believe to be true. I currently reside in the County of Riverside.

2. I was employed by J.P. Morgan Chase as a bilingual loss mitigator in the Chase Loss Mitigation Department, located in Rancho Bernardo, San Diego, from roughly August 2008 through June 2009. I quit in June, 2009. Like most personnel in the Loss Mitigation Department, my primary responsibility was to handle calls from borrowers who were in need of, or who were seeking, loan modifications; to process loan modification applications for mortgage customers; and to advise in compiling loan modification documents and packages necessary for such borrowers to be eligible for loan modifications. Although I was employed by J.P. Morgan Chase, the borrowers I handled were almost entirely borrowers with Chase or WAMU, or whose loans were serviced by EMC. Because my duties and experiences regarding Chase and EMC and J.P. Morgan Chase were largely overlapping, and mostly without significant distinction, any reference to Chase in this declaration is also a reference generally to EMC and J.P. Morgan Chase, unless otherwise noted.

3. During my employment at Chase, I handled roughly 40 calls a day, which was roughly 800 calls per month, which amounted to roughly 8,000 calls during the term of my employment. Virtually all of the callers were seeking a loan modification from Chase or EMC, and yet (to my knowledge) very few, perhaps 10 or so, actually received the *permanent* loan modifications they sought. Although many were placed in temporary plans, with short term reduced mortgage payments, the vast majority were not given the permanent loan modifications they needed.

4. A common joke in the Rancho Bernardo office was that a "document shredder was hooked-up to the fax machine." This joke was popular because the borrowers' documents were constantly lost or misplaced, especially those delivered by fax. In fact, the office at one point had

1

Case 3:12-cv-01222   Document 1-1   Filed 11/26/12   Page 130 of 207 PageID #: 135

1    only one fax machine, which was completely inadequate to handle the quantity of documents that

2    Chase required borrowers to fax to the office.

3        5.    In my experience, Chase was committed to delaying, obstructing or denying

4    permanent loan modifications for its borrowers, including those whose loans were serviced by EMC.

5    This policy was implemented through a variety of tactics, including the following:

6            a.    Document Shuffle.  Although borrowers were asked to deliver multiple

7    documents, the loan modification dept. rarely received the full document packages. The majority of

8    documents sent by loan modification applicants mysteriously disappeared or expired within 60 days

9    of receipt because they became outdated based upon other delays implemented by Chase.

10           b.    Deceive Callers. Borrowers were deceived as to the status of their applications

11   for loan modifications and the prospects for obtaining permanent loan modifications. Management

12   at Chase instructed employees to say whatever was necessary to "make Chase look good." In fact,

13   even during a 2 month period when Chase imposed a hold on loan mods, management told the

14   employees (including me) to deceive borrowers by stating that their loans were still being processed,

15   when this was false.

16           c.    Poor Hiring & Training.  Chase hired mostly young and inexperienced

17   employees, and then provided improper or incomplete training. Many employees were therefore

18   incapable. Chase provided scripts for all employees in the call center.

19           d.    Rotate Assignments.  Chase rotated assignments on loan modification files;

20   this was done roughly every 30 days to prevent employees from developing relationships with the

21   borrowers being victimized by Chase policies.

22           e.    Red Tape.  Management erected numerous procedural hurdles (red tape) to

23   limit the granting or implementation of loan mods, thereby rendering it very difficult to achieve a

24   successful permanent loan modification.

25       6.    Employees in the Rancho Bernardo office often referred to the Loss Mitigation

26   Department as a "ferris wheel" or a "merry-go-round." The reason for this was that loan

27   modification applicants were filtered through repeating cycles of delays, lost documents, changing

28   requirements, procedural barriers, and rotating personnel. The result was that borrowers were seldom

2

C:\Documents and Settings\Carmen V\Local Settings\Temporary Internet Files\Content.IE5\ZMAA2MAG\Erica%20Penalozal[1].doc

1   able to avoid going around and around in circles – rarely accomplishing the goal of a permanent loan

2   modification.

3       7.   Chase management in the Rancho Bernardo office, including VP Holly Bartleson and

4   Supervisor Vickie Brown Wilson, instructed employees to elongate and delay the loan modification

5   process, through several methods. It was clear during my employment at Chase that the company's

6   "ferris wheel" system was used to delay, obstruct, and reject loan modification applications, a

7   system that Chase management encouraged.  This conclusion is based on the Rancho Bernardo

8   office training, instructions from management, conversations with multiple Chase employees, and

9   the general culture and attitude implemented and fostered by Chase.

10      8.   My understanding was that all Chase employees in the Loss Mitigation Department

11  were required to take notes documenting all borrower calls, and that every conversation was

12  recorded.  Chase management further informed me that all of these records were retained by Chase,

13  perhaps in Ohio.

14      9.   This document is obviously only a summary, not a comprehensive listing.

15      I declare under penalty of perjury under the laws of the State of California that the foregoing

16  is true and correct.  Executed on October _11_, 2010, in Riverside County, California.

17

18                                          _Erika Maria Penaloza_
                                            ERIKA MARIA PENALOZA

19

20

21

22

23

24

25

26

27

28

3

EXHIB L

# DECLARATION OF JANET MOYNIHAN

I, Janet Moynihan, declare and state as follows:

1.    I am over eighteen years of age, and I am qualified to make this declaration. If called as a witness, I could and would competently testify to the following based on my own personal knowledge, with the exception of those matters based on information and belief, which I believe to be true. I currently reside in Carlsbad, San Diego County.

2.    I was employed by J.P. Morgan Chase as a loss mitigation specialist in the Chase loss mitigation/loan modification dept., in Rancho Bernardo, San Diego, from roughly August 2008 through April 2009. Like most people in the loss mitigation department, my primary responsibility was to handle calls from borrowers who were seeking loan modifications; to process applications for those mortgage customers; and to assist in compiling loan modification documents (packages) for those borrowers to receive loan modifications. The borrowers I handled were almost entirely borrowers with J.P. Morgan Chase or WAMU, or were serviced by EMC. Because my duties and experience regarding Chase, EMC and J.P. Morgan Chase were overlapping, and largely without significant distinction, any reference to Chase in this document is also generally a reference to EMC and J.P. Morgan Chase.

3.    During my employment at Chase, I handled thousands of calls from borrowers seeking loan modifications. As far as I know, very few actually received the *permanent* loan modifications they sought. Many were placed in reduced payment forbearance plans, which were temporary, with short term reduced mortgage payments, but the majority of borrowers were not given the permanent loan modifications they needed.

4.    The Rancho Bernardo office used a DRI software program for "servicing notes," and Fidelity software for borrower data (like loan status, investor, servicer, and more).

5.    Chase was committed to delaying or preventing *permanent* loan modifications for its borrowers, including those whose loans were serviced by EMC. This policy was implemented as follows:

DECLARATION OF JANET MOYNIHAN

machine, which was overloaded because it was not capable of supporting the vast sum of documents that Chase required borrowers to fax in.

8. Employees in the Rancho Bernardo office often joked that the loan modification or loss mitigation department was a "ferris wheel" or a "merry-go-round." This was because loan modification applicants were forced through repeating cycles of delays, lost documents, red tape, and rotating personnel. Borrowers were seldom able to avoid going around and around in circles, rarely achieving the permanent loan modifications they sought.

9. My understanding was that all Chase employees in the Rancho Bernardo office were required to take notes documenting all calls, and that every conversation was recorded. Management further informed me that all of these records were retained by Chase. On at least one occasion, management retrieved one of my calls and played it.

10. This document is a summary, not a comprehensive description.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on December 31, 2010, in San Diego County, California.

Janet Moynihan

DECLARATION OF JANET MOYNIHAN



Exhibit M

Comptroller of the Currency
Administrator of National Banks

FILED
2012 OCT 19 PM 3:55
CLERK & MASTER
DAVIDSON CO. CHANCERY CT.
R.C.B.M.

September 7, 2010

The Honorable Bob Corker
ATTN: Stephanie Parsons
3322 West End Avenue, Suite 610
Nashville TN 37203

Re:     Case#: 01273643
        Represents: Sheri L. Jones
        JPMORGAN CHASE BANK, NATIONAL ASSOCIATION

Dear Mr. Corker:

This letter acknowledges a case has been opened in the Customer Assistance Group of the Office of the Comptroller of the Currency (OCC) on behalf of your constituent.   Please make note of the case number listed above.  You should reference this case number when inquiring about the case by phone or include this number on any correspondence you may provide to this office. We will review the information you have provided, contact the bank if necessary for additional information and inform you of our decision.

While complaint processing times vary, the average complaint is usually completed within 60 days.  If you would like to check the status of your case online, please visit www.helpwithmybank.gov and click on the Check Case Status link.  If you have questions, please contact this office at the number below.

Sincerely,

*Customer Assistance Group*

Case 3:12-cv-01222   Document 1-1   Filed 11/26/12   Page 135 of 207 PageID #: 140



## United States Senate

135 Dirksen Senate Office Building
Washington, DC 20510
(202) 224-3344
Fax: (202) 228-0566

COMMITTEES:
BANKING, HOUSING
AND URBAN AFFAIRS
FOREIGN RELATIONS
ENERGY AND NATURAL RESOURCES
SPECIAL COMMITTEE ON AGING

September 13, 2010

Ms. Sheri Jones
165 Timber Ridge Drive
Nashville, TN 37217

Dear Ms. Jones,

In response to the request my office made to the Office of the Comptroller of the Currency on your behalf, I received the enclosed correspondence.

I will be in contact with you as soon as I receive further correspondence from the OCC. Please do not hesitate to contact my office for further assistance.

Sincerely,

Bob Corker
United States Senator

BC/sp



**W**ILSON & **A**SSOCIATES, P.L.L.C.

Attorneys at Law – Arkansas and Tennessee
1521 Merrill Drive, Suite D-220
Little Rock AR 72211
501-219-9388
Fax: 501-219-9458
Internet: www.wilson-assoc.com

THIS LAW FIRM IS A DEBT COLLECTOR ATTEMPTING TO COLLECT A DEBT. ANY INFORMATION OBTAINED CAN BE USED FOR THE PURPOSE OF COLLECTING THE DEBT.

August 24, 2010

**VIA CERTIFIED MAIL**

Ms. Sheri L. Jones
165 Timber Ridge Drive
Nashville, TN 37217

RE:    Sheri L. Jones
       165 Timber Ridge Drive
       Nashville, Tennessee 37217
       Loan No. 1880985523 / W&A No. 700-193508
       FHA No. 482-3996867-703

Dear Ms. Jones:

IF YOU HAVE PREVIOUSLY BEEN DISCHARGED FROM A CHAPTER 7 OR 13 BANKRUPTCY, THIS LETTER IS NOT AN ATTEMPT TO COLLECT THE DEBT FROM YOU PERSONALLY. THIS LETTER ONLY SERVES AS NOTICE OF THE UPCOMING FORECLOSURE AS REQUIRED BY EITHER YOUR SECURITY INSTRUMENT, TENNESSEE ANNOTATED, AND/OR THE FEDERAL FAIR DEBT COLLECTION PRACTICES ACT.

Pursuant to the enclosed Notice of Trustee's Sale, please be advised that the property commonly known as 165 Timber Ridge Drive, Nashville, Tennessee 37217 is scheduled to be sold at foreclosure sale.

IF THE ORIGINAL CREDITOR IS DIFFERENT FROM THE CREDITOR ON THE ATTACHED NOTICE OF SALE, THEN UPON YOUR WRITTEN REQUEST WITHIN THIRTY (30) DAYS OF THE RECEIPT OF THIS NOTICE, WE WILL PROVIDE YOU WITH THE NAME AND ADDRESS OF THE ORIGINAL CREDITOR.

THE LAW FIRM OF WILSON & ASSOCIATES, P.L.L.C. COLLECTS DEBTS FOR MORTGAGE LENDERS. ANY INFORMATION OBTAINED IN THIS REGARD MAY BE USED FOR THAT PURPOSE. If you have any questions, please feel free to contact our Loss Mitigation Department at 501-734-2100.

Sincerely,

WILSON & ASSOCIATES, P.L.L.C.

Shellie Wallace

Enclosure
cc:
CSERVICEtoPrimaryDebtorTN_2_tcrow_100818_1435

# NOTICE OF TRUSTEE'S SALE

WHEREAS, default has occurred in the performance of the covenants, terms, and conditions of a Deed of Trust Note dated October 24, 2008, and the Deed of Trust of even date securing the same, recorded November 5, 2008, as Instrument No. 20081105-0110252 in Office of the Register of Deeds for Davidson County, Tennessee, executed by Sheri L. Jones, conveying certain property therein described to Key Title as Trustee for "MERS" is Mortgage Electronic Registration Systems, Inc. as a separate corporation action soley as a nominee for Primary Residential Mortgage Inc. and Primary Residential Mortgage Inc.'s successors and assigns.; and the undersigned, Shellie Wallace of Wilson & Associates, P.L.L.C., having been appointed Successor Trustee.

NOW, THEREFORE, notice is hereby given that the entire indebtedness has been declared due and payable; and that an agent of Shellie Wallace of Wilson & Associates, P.L.L.C., as Successor Trustee, by virtue of the power, duty, and authority vested in and imposed upon said Successor Trustee will, on **October 6, 2010 on or about 10:00 A.M., at the The Sommet Center, Nashville, Tennessee,** offer for sale certain property hereinafter described to the highest bidder **FOR CASH,** free from the statutory right of redemption, homestead, dower, and all other exemptions which are expressly waived in the Deed of Trust, said property being real estate situated in Davidson County, Tennessee, and being more particularly described as follows:

**Land in Davidson County, Tennessee, being Lot No. 61 on the plan of Priest Lake Park, section 2, as of record in book 4175, pages 56, 57, 58, Register Office for Davidson County, Tennessee. Said lot number 61 fronts 86.97 feet on the northeasterly margin of Timber Ridge Drive and runs back between lines 148.43 feet on the northwesterly line and 139.90 feet on the southeasterly line and 103.28 foot broken line at the rear.**

**ALSO KNOWN AS: 165 Timber Ridge Drive, Nashville, Tennessee 37217**

This sale is subject to all matters shown on any applicable recorded plat; any unpaid taxes; any restrictive covenants, easements, or setback lines that may be applicable; any statutory rights of redemption of any governmental agency, state or federal; any prior liens or encumbrances as well as any priority created by a fixture filing; and to any matter that an accurate survey of the premises might disclose. In addition, the following parties may claim an interest in the above-referenced property: **Sheri L. Jones**

The sale held pursuant to this Notice may be rescinded at the Successor Trustee's option at any time. The right is reserved to adjourn the day of the sale to another day, time, and place certain without further publication, upon announcement at the time and place for the sale set forth above. **W&A No. 700-193508**

DATED August 24, 2010.

EXHIBIT P



**For More Information about MERS.**
**Visit our website:**
**www.mersinc.org**

To:      Requester

From:    MERS Servicer Identification System

RE:      100146401928001422
         MIN is active on MERS

Date:    09/02/2010



---

**Have you tried our online Servicer Identification System?**
**It offers additional search options, and is available 24/7 at www.mers-servicerid.org.**

Servicer information for this loan appears below:

JP Morgan Chase Bank NA
1000150
Monroe, LA
(800) 848-9136

Investor information for this loan appears below:

JP Morgan Chase Bank NA
1000150
Monroe, LA
(800) 848-9136



When Recorded Return To:
CHASE
P.O. BOX 8000
MONROE, LA 71203

Loan #: 1880985523

BILL GARRETT, Davidson County
Trans: T20110072409 DOTNSSN
Recvd: 11/18/11 12:57   1 pgs
Fees:12.00 Taxes:0.00

**20111116-0089631**

## CORPORATE ASSIGNMENT OF DEED OF TRUST

— Contact JPMORGAN CHASE BANK, N.A. for this instrument 780 Kansas Lane, Suite A, Monroe, LA 71203, telephone # (866) 756-8747, which is responsible for receiving payments.
FOR GOOD AND VALUABLE CONSIDERATION, the sufficiency of which is hereby acknowledged, the undersigned, MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS") AS NOMINEE FOR PRIMARY RESIDENTIAL MORTGAGE, INC., ITS SUCCESSORS AND ASSIGNS, (ASSIGNOR), (MERS Address: P.O. Box 2026, Flint, Michigan 48501-2026) by these presents does convey, grant, sell, assign, transfer and set over the described DEED OF TRUST with all interest secured thereby, all liens, and any rights due or to become due thereon to JPMORGAN CHASE BANK, NATIONAL ASSOCIATION, WHOSE ADDRESS IS 700 Kansas Lane, MC 8000, Monroe, LA 71203 (866)756-8747, ITS SUCCESSORS OR ASSIGNS, (ASSIGNEE).

Maximum principal indebtedness for Tennessee recording tax purposes is zero. Mortgage tax paid on original filing.
Said DEED OF TRUST was made by SHERI L. JONES to MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. and recorded in Book n/a, Page n/a, and/or as Instrument # 20081105-0110252 in the Register's Office of DAVIDSON County, Tennessee.

Date: __11 / 04 / 2011__ (MM/DD/YYYY)

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS") AS NOMINEE FOR PRIMARY RESIDENTIAL MORTGAGE, INC., ITS SUCCESSORS AND ASSIGNS

By: _____
      Kimberly Neal
      Assistant Secretary
_____

STATE OF OHIO
COUNTY OF FRANKLIN
The foregoing instrument was acknowledged before me on __11 / 04 / 2011__ (MM/DD/YYYY) by Kimberly Neal as Assistant Secretary of MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS") AS NOMINEE FOR PRIMARY RESIDENTIAL MORTGAGE, INC., ITS SUCCESSORS AND ASSIGNS, who, being authorized to do so, executed the foregoing instrument for the purposes therein contained. He/she/they is (are) personally known to me.

_____
      Benito E Caldwell
Notary Public - State of OHIO,
Commission expires: 1/28/15

> BENITO E. CALDWELL
> NOTARY PUBLIC, STATE OF OHIO
> FRANKLIN COUNTY
> My Comm. Expires January 28, 2015

Document Prepared By: E. Lance/NTC, 2100 Alt. 19 North, Palm Harbor, FL 34683 (800)346-9152
JPCFA 15052866 – CHASE DP3352671   MIN 100146401928001422 MERS PHONE 1-888-679-MERS
FRMTN1

**▌|||▌|||▌||| *15052866* |||▌|||▌**

700 - A3508



This Instrument Prepared by:
*WILSON & ASSOCIATES, P.L.L.C.*
1521 Merrill Drive, Suite D-220
Little Rock, Arkansas 72211
(501) 219-9388

BILL GARRETT, Davidson County
Trans:T20100057331 APTSUBTR
Recvd: 09/13/10 12:04    2 pgs
Fees:12.00 Taxes:0.00

20100913-0072591

2012 OCT 19  PM 3:56

FILED

## APPOINTMENT OF SUCCESSOR TRUSTEE

WHEREAS, on October 24, 2008, Sheri L. Jones executed a Deed of Trust in favor of Key Title, as Trustee for "MERS" is Mortgage Electronic Registration Systems, Inc. as a separate corporation action soley as a nominee for Primary Residential Mortgage Inc. and Primary Residential Mortgage Inc.'s successors and assigns., to secure the payment of a Deed of Trust Note of even date therewith in the principal amount of two hundred eight thousand three hundred fifty-four and 00/100 DOLLARS ($208,354.00), and payable to "MERS" is Mortgage Electronic Registration Systems, Inc. as a separate corporation action soley as a nominee for Primary Residential Mortgage Inc. and Primary Residential Mortgage Inc.'s successors and assigns.; and

WHEREAS, said Deed of Trust was duly recorded November 5, 2008, as Instrument No. 20081105-0110252 in the Register s Office of Davidson County, Tennessee.

NOW, THEREFORE, the undersigned owner and holder of said Deed of Trust and Deed of Trust Note, or acting with the authority of the holder of said Deed of trust and Deed of Trust Note, for satisfactory reasons and in accordance with the terms and conditions of said Deed of Trust, does nominate and appoint Shellie Wallace as Successor Trustee and Deanna Dorrough as Co-Trustee. As Successor Trustee, Shellie Wallace acts in the place and stead of the aforementioned Trustee named in said Deed of Trust, and said Shellie Wallace, as said Successor Trustee, is vested with all rights, powers, duties, privileges, and immunities of the original Trustee named in said instrument. As Co-Trustee, Deanna Dorrough is authorized to execute any deeds or notices in the stead of the Successor Trustee. All actions taken by the Successor Trustee and Co-Trustee are hereby ratified and approved. All other Appointments of Successor Trustee in connection with said property are hereby REVOKED.

Beneficiary has appointed the substitute trustee prior to the first notice of publication as required by T.C.A. §35-5-101 and ratifies and confirms all actions taken by the substitute trustee subsequent to said date of substitution and prior to the recording of this substitution.

IN WITNESS WHEREOF, the owner and holder of said Deed of Trust and Deed of Trust Note has caused this instrument to be executed by and through its duly authorized representative on this __31__ day of __august__, __2010__.

Chase Home Finance LLC

700-193508

1

By: _Susan Massie_

Title: _Susan Massie_ _Vice President_

## ACKNOWLEDGMENT

STATE OF _____Ohio_____

COUNTY OF _____Franklin_____

Before me, the undersigned notary public of the state and county aforesaid, personally appeared _____Susan Massie_____, with whom I am personally acquainted (or proved to me on the basis of satisfactory evidence), and who, upon oath, acknowledged such person to be the president (or other such officer authorized to execute the instrument) of Chase Home Finance LLC, the within-named bargainor, a corporation, and that such officer executed the foregoing instrument for the purposes therein contained by personally signing the name of the corporation.

Witness my hand and seal at office in _____Ohio_____ this 31 day of _August_, _2010_.

MELISSA HAMMOCK
Notary Public, State of Ohio
My Comm. Expires May 4, 2015

Notary Public

My Commission Expires: _____

DAOST_gmcnatt_100826_1510

FILED

2012 OCT [illegible] PM 4:01

DAVID [illegible]

Notary Commission Clerk
Ohio Secretary of State
TEL 614-644-4559
www.sos.state.oh.us

SOS Form 2007 (rev. 01-07)

## NOTARY PUBLIC
### (Non-Attorney Only)
Application for the Appointment of

Name: Melissa Hammick

**\* FORMER NAME:** _____
*\* If different on previous commission*

Residence Address:

744 Pin Oak Pl.

City: Washington C.H    Zip: 43160

County: Fayette

Written Signature (do not print):

X Melissa Hammick

Expiration of present (or former) Commission:

Date: _____, 20_____

County: _____

| OFFICE USE ONLY |
|---|
| Commission Date  MAY 0 5 2010 |
| Commissioning _____ |

EXHIBIT S

## For the Information of Applicants

1. Section 147.02(B) of the Revised Code provides that, with respect to the certificate appearing on the reverse of this page, no judge or justice shall issue such a certificate until he or she is satisfied from personal knowledge that the applicant possesses the qualifications necessary to properly discharge the duties of the office of notary public, or until the applicant has passed an examination under such rules and regulations as the judge may prescribe. Because the practice varies among counties, it is recommended that an applicant for commission as a notary public begin by inquiring of the bar association of his/her county or the clerk of common pleas court as to the procedure required by the common pleas court in his/her county.

2. A notary public whose term of office has expired before application for reappointment is made and who, knowing that the term has expired, has performed any notarial act after such expiration, is ineligible for reappointment. Therefore, an applicant who has held a commission, and who does not apply until after its expiration, must make and subscribe the affidavit on the back of this page before reappointment.

3. Fill in the blanks on the front of this application with your full name and residence address, including county. If the address is faulty or omitted, the commission cannot reach you.

4. R.C. 147.05 provides that, before entering upon the duties of the office, a notary public shall leave his/her commission (with the oath endorsed thereon) with the clerk of court of common pleas of the county in which the notary public resides. The clerk will record and index the commission.

Powers and duties of a notary public are set forth in sections 147.01-147.371, inclusive, of the Ohio Revised Code.

Please return this completed application with the $70 application fee to:

NOTARY DEPARTMENT
Columbus Bar Association
175 S. 3rd St., Suite 1100
Columbus, OH 43215

Search Foreclosure Ha  Search  EXHIBIT U

- Sign Up
- Sign In

Foreclosure Hamlet

**Supporting, Informing & Connecting People in Foreclosure**

- Main
- FL Bar Wall Of Shame
- My Page
- Wall Of Shame
- Links, Resources, Events
- Forum
- Videos
- ISO CA Robosigners
- ISO Signers
- Blogs
- Chat: (Please click the audio icon to hear notifications)

- All Blog Posts
- My Blog
- Add


w.foreclosurehamlet

# Dear Ohio Attorney General - Chase Home Finance LLC, Wrongful Foreclosures & Corrupted Land Records

- Posted by L on September 29, 2010 at 9:30am
- View Blog

September 28, 2010

RE: Chase Home Finance, LLC - Across America: Wrongful foreclosures & Corrupted Land Records

Case 3:12-cv-01222   Document 1-1   Filed 11/26/12   Page 144 of 207 PageID #: 149

(Robosigner Beth Cottrell, Whitney K Cook, Stacy Spohn, Christina Trowbridge)

Dear Mr. Richard Cordray,

On November 5, 2009, the State of Ohio filed a civil lawsuit against American Home Mortgage Servicing, Inc ("AHMSI"). To me, a non-lawyer, the focus of that lawsuit against a Texas company doing business across America, is AMHSI's modus
operadi of predatory mortgage servicing including foreclosure "manufacturing" practices.

Today, Attorney Generals across America, including California, Illinois, Texas, and Iowa, are opening investigations into Ally Financial after its own alarming admission of "technical deficiencies" and "procedural errors" in foreclosure actions that dispossess families of their American homes and effectively eradicate the families' stability, perhaps forever.

In Franklin County Ohio sits a unit of Chase Home Finance, LLC. Sir, this company begs for an investigation by your agency. The
wrongful acts that continue unabated include the same ones for which you are investigating AHMSI and the same ones to which Ally Financial has admitted.

Chase Home Finance, LLC employs, what we foreclosure fraud fighters call "robosigners". These are low level employees upon whom is bestowed a dubious "signing authority" for tens of financial institutions in order to fabricate the necessary paperwork in order to evict a family from their home.
Then, in the event further documentation is required to create and clear a marketable chain of title, they are at the ready, pens in hand!

Case 3:12-cv-01222   Document 1-1   Filed 11/26/12   Page 145 of 207 PageID #: 150

· Beth Cottrell is one such employee of Chase Home Finance, LLC. She, and her cohorts (Whitney K Cook, Dana Heisel, Stacy Spohn, etc), have signed hundreds of thousands of assignments of mortgage, allonges to promissory notes, affidavits of indebtedness, affidavits of lost instruments, answers to interrogatories, and verifications of Florida foreclosure actions signed under penalty of perjury. Ms. Cottrell admits in an attached deposition that she reads nothing, reviews nothing, and defines personal knowledge as being confident that someone else has personal knowledge.

The assignments of mortgage in question litter America's land records. These robosigners are employees of Chase Home Finance who, by some legal slight of hand, are attorneys-in-fact for thousands of REMIC trusts. They sign on behalf of now defunct mortgage originators, often via MERS (an electronic mortgage database), from the originator to the foreclosing entity. In doing so, they are transferring property under the guise of being a representative of the grantor when they are employees of the grantee or a shell name of the grantee. The grantee is the foreclosing entity who is creating the evidence upon which they will evict another family from their American home, perhaps the only shelter available to them, and often is the sole proof of the entitlement to foreclose.

To avoid belaboring the point, I will attach several examples for your review after doing so, please see the deposition where "robo-signer" Beth Cottrell denies any "personal knowledge" or even a cursory glance at the facts of the case. The documents provided highlight Beth Cottrell, who is only one of many similarly employed human document processors (aka "robo-signers") at Chase Home Finance, LLC. Please take note that Ms. Cottrell is signing the assignments of mortgage posing as a representative of the grantor, when she is employed by the grantee (or some incarnation of the grantee by a dubious or elusive corporate resolution) who is the foreclosing entity or Attorney-in-Fact-For the foreclosing entity.

This is but one example of one signer's documents filed in one state. Millions of families across America are being evicted from the only homes they know, dispossessed of their storehouse of wealth, based on documents such as these, without any other competent evidence whatsoever.

Also attached is the vociferous objection to the taking of Ms. Cottrell's coworker, Whitney K. Cook, and a small sampling of the documents she has signed.

Will Chase Home Finance start withdrawing these documents as has Ally Financial? They have already started doing so in Florida upon receipt of notices of deposition.

I urge you to open an investigation into Chase Home Finance, LLC and lead the way to stop the madness. Thank you for your time and attention to this matter.

Sincerely,

Lisa Epstein

Attachments: here and here and here and here and here and here

**JP MORGAN CHASE MORATORIUM!!!!!** http://ning.it/aPVddC

Case 3:12-cv-01222   Document 1-1   Filed 11/26/12   Page 147 of 207 PageID #: 152

IN THE CIRCUIT COURT OF THE 15th JUDICIAL CIRCUIT
OF FLORIDA, IN AND FOR PALM BEACH COUNTY

Chase Home Finance, LLC, as Successor-by-
Merger to Chase Manhattan Mortgage
Corporation

        Plaintiff,

-vs.-
Vania Valdes; et al.

        Defendant(s).

## FLA. R. CIV. P. 1.110(b) AFFIRMATION

    I have read the foregoing *Complaint* and affirm that to the best of my knowledge and belief the follow facts are true and correct: (i) Plaintiff is entitled to enforce the note and mortgage; (ii) the attached loan documents are true and accurate; (iii) the allegations regarding default are true and accurate; (iv) any notice(s) required pursuant to the terms of the note and mortgage has/have been sent; and, (v) Plaintiff has retained Shapiro & Fishman, LLP in this action and is obligated to pay its reasonable attorneys fees and costs for services rendered herein.

                                                          Beth Cottrell
                                                          Assistant Secretary

    The foregoing instrument was sworn to and subscribed before me this _21_ day of ___APRIL___, 2010, by _____Beth Cottrell_____ as ____Assistant Secretary____ of ___Chase Home Finance LLC___, who is personally known to me [ ✔ ] or has produced _____ as identification [   ].

                                                    Print Name: _____
                                                    Notary Public, State of ___Ohio___
                                                     My Commission Expires: _____

    This is an attempt to collect a debt and any information obtained will be used for that purpose.

10-171135

6

IN THE CIRCUIT COURT OF THE
15TH JUDICIAL CIRCUIT, IN AND FOR
PALM BEACH COUNTY, FLORIDA
CIVIL DIVISION
CASE NO.

**50 2010 CA 0 11 6 8 7 XXXX MB**

CHASE HOME FINANCE LLC,

          Plaintiff,

vs.

AMY B. WILSON; CHRISTOPHER D.
MANNING A/K/A CHRISTOPHER
DONALD MANNING; UNKNOWN
SPOUSE OF MAMIE A. HAWSE;
UNKNOWN TENANT (S) IN
POSSESSION OF THE SUBJECT
PROPERTY,

          Defendants.

### FLA. R. CIV. P. 1.110(b) AFFIRMATION

I have read the foregoing Complaint and affirm that to the best of my knowledge and belief the

following facts are true and correct: (i) Plaintiff is entitled to enforce the note and mortgage; (ii) the attached

loan documents are true and accurate; (iii) the allegations regarding default are true and accurate; (iv) any

notice(s) required pursuant to the terms of the note and mortgage has/have been sent; and, (v) Plaintiff has

retained The Law Offices of Marshall C. Watson in this action and is obligated to pay its reasonable

attorneys fees and costs for services rendered herein.

_____ Whitney K. Cook          Assistant Se___

The foregoing instrument was sworn to and subscribed before me this ____ day of ____, 2010,

by Whitney K. Cook          as ____ Assistant Secretary of ____ Chase Home Finance LLC, is personally known to

me [ ] or has produced _____ as identification [ ].


TIFFANY BORDER
Notary Public, State of Ohio
My Commission Expires
8-17-2013

Print Name: _____
Notary Public, State of ____ Ohio
My Commission Expires: ____

10-13470

Case 3:12-cv-01222   Document 1-1   Filed 11/26/12   Page 149 of 207 PageID #: 154



January 4, 2007
[Date]

321 N LAKE WAY, PALM BEACH, FL 33480

[Property Address]

**1. BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. $ 1,477,500.00 (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is JPMORGAN CHASE BANK, N.A.

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2. INTEREST**

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 7.000 %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

**3. PAYMENTS**

(A) Time and Place of Payments

I will make a payment every month. This payment will be for interest only for the first 120 months, and then will consist of principal and interest.

I will make my monthly payment on the first day of each month beginning on March 1, 2007 . I will make these payments every month until I have paid all of the Principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date, and if the payment includes both principal and interest it will be applied to interest before Principal. If, on February 1, 2037 , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at P. O. BOX 79046

PHOENIX, AZ 85062-9046 or at a different place if required by the Note Holder.

(B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $ 8,618.75 for the first 120 months of this Note, and thereafter will be in the amount of U.S. $ 11,455.04 . The Note Holder will notify me prior to the date of change in monthly payment.

**4. BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date of my monthly payment

FLORIDA InterestFirst FIXED RATE NOTE-Single Family-Fannie Mae UNIFORM INSTRUMENT

-836N(FL) (0105)    Form 3271.10 1/01
VMP MORTGAGE FORMS - (800)521-7291
Page 1 of 3          Initial: 

Heisel MERS.pdf

CFN 20100207214
OR BK 23884 PG 0314
RECORDED 05/07/2010 08:45:05
Palm Beach County, Florida
Sharon R. Bock, CLERK & COMPTROLLER
Pg 0314; (1pg)

RECORD & RETURN TO:
Law Office of Marshall C. Watson
1800 NW 49th Street, Suite 120
Fort Lauderdale, Florida 33309
Telephone: (954) 453-0365
Facsimile: (954) 771-6052


RECORD AND RETURN TO

## ASSIGNMENT OF MORTGAGE

KNOW ALL MEN BY THESE PRESENTS:

THAT MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. residing or located at 1818 Library Street, Suite 300, Reston, VA 20190 herein designated as the assignor, for and in consideration of the sum of $1.00 Dollar and other good and valuable consideration, the receipt of which is hereby acknowledged, does hereby grant, bargain, sell, assign, transfer and set over unto EMC MORTGAGE CORPORATION residing or located at 2870 LAKE VISTA DR. LEWISVILLE, TX 75067 herein designated as the assignee, the mortgage executed by JOAQUIN MARTINEZ AND MARIA MARTINEZ AND RICARDO MARTINEZ recorded August 7, 2006 in Palm Beach County, Florida in BOOK 20699 and PAGE 0268 encumbering the property more particularly described as follows:

CONDOMINIUM UNIT NO. 1463E, IN BUILDING NO. 11, OF PALM BEACH GRANDE, A CONDOMINIUM, ACCORDING TO THE DECLARATION OF CONDOMINIUM RECORDED ON MAY 18TH, 2006, IN OFFICIAL RECORDS BOOK 20358, AT PAGE 966, OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA, AS AMENDED, TOGETHER WITH AN UNDIVIDED INTEREST IN THE COMMON ELEMENTS APPURTENANT THERETO.

Together with the note and each and every other obligation described in said mortgage and the money due and to become due thereon

TO HAVE AND TO HOLD the same unto the said assignee, its successors and assigns forever, but without recourse on the undersigned.

In Witness Whereof, the said Assignor has hereunto set his hand and seal or caused these presents to be signed by its proper corporate officer and its corporate seal to be hereto affixed this 30th day of April, 2010.

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.

ATTEST: _____
PRINT NAME: _____ Dana Heisel _____ Assistant Secretary

Signed in the presence of:

WITNESS: _____
Print Name: Brenda Sul

WITNESS: _____
Print Name: Carlo Jackson

STATE OF _____ Ohio _____

COUNTY OF _____ Franklin _____

PERSONALLY APPEARED BEFORE ME, the undersigned authority in and for the aforesaid county and state, on this the 30th day of April, 2010, within my jurisdiction, the within named who acknowledged to me that (s)he is and who is personally known to me or has provided _____ Personal Knowledge _____ identification, that for and on behalf of MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC and as its act and deed (s)he executed the above and foregoing instrument, after first having been duly authorized by MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC to do so.

WITNESS my hand and official seal in the County and State last aforesaid this 30th day of April, 2010.

NOTARY PUBLIC

TIFFANY BORDER
Notary Public, State of Ohio
My Commission Expires
8-17-2013

SR 08-30929

Book23884/Page314                    Page 1 of 1

Case 3:12-cv-01222  Document 1-1  Filed 11/26/12  Page 151 of 207 PageID #: 156



ExhiBiT

OFFICE OF
# INSPECTOR GENERAL
U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

FILED
2012 OCT 19 PM 3: 56
CLERK & MASTER
DAVIDSON CO. CHANCERY CT.
DC & M

# JPMorgan Chase Bank N.A.
# Foreclosure and Claims Process Review
# Columbus, OH

MEMORANDUM NO. 2012-CH-1801

MARCH 12, 2012



**U.S. Department of Housing and Urban Development**
Office of Inspector General for Audit, Region V
Ralph H. Metcalfe Federal Building
77 West Jackson Boulevard, Suite 2646
Chicago, IL 60604-3507

Phone (312) 353-7832   Fax (312) 353-8866
Internet http://www.hud.gov/offices/oig/
OIG Fraud Hotline 1-800-347-3735

**MEMORANDUM NO.
2012-CH-1801**

March 12, 2012

**MEMORANDUM**

**FOR:** Charles S. Coulter, Deputy Assistant Secretary for Single Family Housing, HU

　　　//signed//
**FROM:** Kelly Anderson, Regional Inspector General for Audit, 5AGA

**SUBJECT:** JPMorgan Chase Bank, N.A.
　　　　　Foreclosure and Claims Process Review
　　　　　Columbus, OH

**INTRODUCTION AND BACKROUND**

As part of the Office of Inspector General's (OIG) nationwide effort to review the foreclosure practices of the five largest Federal Housing Administration (FHA) servicers (Bank of America, Wells Fargo Bank, CitiMortgage, Ally Financial, Incorporated, and JPMorgan Chase Bank), we reviewed JPMorgan Chase Bank's (Chase) foreclosure and claims processes. In addition to this memorandum, OIG issued separate memorandums for each of the other four reviews.[1] We performed these reviews due to reported allegations made in the fall of 2010 that national mortgage servicing lenders were engaged in widespread questionable foreclosure practices involving the use of foreclosure "mills" and a practice known as "robosigning"[2] of sworn documents in thousands of foreclosures throughout the United States. We initially focused our efforts on examining the foreclosure practices of servicers in the judicial States and jurisdictions in which they do business.[3]

---

[1] 2012-FW-1802, 2012-AT-1801, 2012-KC-1801, and 2012-PH-1801.
[2] We have defined the term "robosigning" as the practice of an employee or agent of the servicer signing documents automatically without performing a due diligence review or verification of the facts.
[3] With respect to foreclosure procedures, there are three variations: those States that require a complete judicial proceeding, which are referred to as "judicial jurisdictions"; those that do not require a judicial proceeding; and those that are a hybrid. For the purposes of this review, we determined that there were 23 judicial States and jurisdictions.

Chase is a supervised FHA direct endorsement lender that can originate, sponsor, and service FHA-insured loans. Chase's foreclosure operations are conducted by its servicing branch, Chase Home Finance, LLC (Chase Home), which is located in Westerville, OH. As of October 1, 2010, Chase Home serviced more than 580,000 FHA-insured loans. In addition, Chase acquired EMC Mortgage Corporation and Washington Mutual Bank in March and September 2008, respectively, and obtained their loan servicing portfolios.

During Federal fiscal years 2009 and 2010, Chase submitted 16,223 FHA insurance claims totaling more than $2 billion.[4] It also submitted 385 FHA insurance claims totaling $46 million using EMC's or Washington Mutual FHA servicing identification numbers during the review period;[5] thus, approximately 2.3 percent of its claims were for loans previously serviced by EMC or Washington Mutual. In September 2010, Chase stated that it had temporarily halted judicial foreclosures while it reviewed its foreclosure process. Because we identified potential False Claims Act[6] violations, we provided the U.S. Department of Justice (DOJ) with our analyses and preliminary conclusions as to whether Chase engaged in the reported foreclosure practices.

DOJ used our review and analysis in negotiating a settlement agreement with Chase. On February 9, 2012, DOJ and 49 State attorneys general announced their proposed settlement of $25 billion with Chase and the four other mortgage servicers for their reported violations of foreclosure requirements. As part of the proposed settlement agreement, each of the five servicers will pay a portion of its settlement to the United States and also must undertake certain consumer relief activities. The proposed settlement agreement described tentative credits that each mortgage servicer would receive for modifying loans, including principal reductions and refinancing, and established a monitoring committee[7] and a monitor to ensure compliance with agreed-upon servicing standards and consumer relief provisions. Once the final settlement agreement has been approved by the courts, OIG will issue a separate summary report detailing each of the five servicers' allocated share of payment due as a result of the settlement agreement.

Our objective was to determine whether Chase complied with applicable foreclosure procedures when processing foreclosures on FHA-insured loans.

## METHODOLOGY AND SCOPE

To accomplish our review objective, we

- Obtained an understanding of relevant legislation, program guidance, and criteria related to FHA single-family mortgage insurance.

---

[4] Properties located in judicial foreclosure states and jurisdictions accounted for $547 million in claims (26 percent of the total loans with claims). Properties located in nonjudicial foreclosure states and jurisdictions accounted for more than $1.55 billion in claims (74 percent of the total loans with claims). These amounts include all categories of FHA claims.
[5] October 1, 2008, through September 30, 2010
[6] 31 U.S.C. § 3729 et. seq.
[7] Comprised of representatives of the State attorneys general, DOJ, and HUD.

2

- Obtained and reviewed relevant Chase written policies and procedures regarding its foreclosure process.
- Obtained and reviewed relevant reviews of Chase's servicing and foreclosure processes.
- Interviewed Chase's management and staff, including those involved in the document execution, notary, foreclosure, and claims processes, along with representatives from the law firm of Debevoise & Plimpton, LLP.[8]
- Coordinated with Chase's legal counsel, our Office of Legal Counsel, and DOJ attorneys.
- Identified a random sample of 108 Chase FHA claims processed by the U.S. Department of Housing and Urban Development (HUD) during the review period. Additionally, we randomly selected 30 FHA-insured loans, the borrowers of which were identified by Chase as currently undergoing foreclosure actions.
- Reviewed FHA claims and related documents, including affidavits, for the 108 claims in our sample and foreclosure documentation for 30 FHA-insured loans, the borrowers of which were identified by Chase as currently undergoing foreclosure actions.
- Obtained and analyzed FHA claims data from both Chase and HUD.
- Obtained and analyzed Chase production records[9] which identified documents that were signed and notarized during the review period. However, as described in the following section, the data were incomplete and did not represent our entire review period.
- Analyzed data for Chase FHA claims in the 23 judicial foreclosure States and jurisdictions and prepared an estimate of False Claims Act liability exposure for its FHA insurance claims.
- Issued an Inspector General administrative subpoena for documents and records.

During the course of our review and the drafting of this memorandum, Chase was actively engaged in negotiations with DOJ in an attempt to resolve potential claims under the False Claims Act or other statutes for the conduct we were reviewing. Accordingly, OIG determined that our work product was privileged and not releasable to Chase for any purpose, including the solicitation of written comments on our findings from Chase. For this same reason, we did not provide Chase with a copy of the draft memorandum. Both DOJ and HUD concurred with our determination that the work product was privileged.

OIG also issued memorandums reporting the results of the reviews of four other servicers. The results reported in the five OIG memorandums differ due to various factors. These factors include (1) the level of information made available to the auditors at the time of the onsite reviews or that was obtained later through subpoenas or civil investigative demands[10], (2) variances between review procedures used, including the analysis of the data, that were governed

---

[8] The law firm retained by Chase to handle regulatory issues and complete a factual review of Chase's foreclosure process.

[9] Chase's production records in a Microsoft Excel format.

[10] Under 31 U.S.C. § 3733, civil investigative demands can be served on a person to give oral testimony whenever the Attorney General has reason to believe that the person may be in control of information relevant to a false claim investigation.

3

in part by the amount and types of information obtained; (3) differences between the foreclosure procedures used by the servicers; and (4) scope limitations imposed by some servicers.

Our review generally covered Chase's foreclosure and claims processes for its FHA claims initially processed by HUD between October 1, 2008, and September 30, 2010, including its procedures for signing and notarizing sworn judgment affidavits. The review focused on FHA-insured loans for properties located primarily in judicial foreclosure States and jurisdictions, because foreclosures in these States would require the filing of some form of sworn affidavit of indebtedness with a court. We expanded the scope as needed to accomplish our objective. We initiated our review on October 15, 2010, and performed our onsite work at Chase's Westerville, OH, office.

## Scope Limitation

Our review was hindered by Chase's reluctance to allow us to interview employees outside the presence or involvement of its management staff or attorneys; therefore, the effectiveness of those interviews was limited. On a number of occasions during the interviews, Chase's management or attorneys clarified statements provided by staff. In addition, Chase did not provide read-only access to its mortgage servicing systems, which would have allowed us to independently verify the amounts on the affidavits and assess the reliability of the data to facilitate a better understanding of Chase's internal controls.

Chase was unable to provide electronic production records for all operations specialists during our review period. Chase's production records, prepared using Microsoft Excel, identified the persons who prepared each foreclosure package and signed the affidavits. However, for the records provided, all of the data fields were not always complete, and Chase did not provide a point of contact, who could explain and clarify the data. Further, Chase provided the production reports nearly 4 months after our initial request. As a result, it was not possible to know whether Chase omitted from the records information that was relevant to our review.

## RESULTS OF REVIEW

Chase did not establish effective control over its foreclosure process. This failure permitted a control environment in which

- Affiants[11] (Chase's operations supervisors) routinely signed foreclosure documents, including affidavits, certifying that they had personal knowledge of the facts when they did not. Specifically, affiants signed foreclosure documents without reviewing the supporting or source documentation referenced in them. They also consistently failed to verify the accuracy of the foreclosure documents they signed.

---

[11] An affiant is a person who signs an affidavit and attests to its truthfulness before a notary public.

4

- Notaries public routinely notarized documents without witnessing affiant signatures.[12] They also failed to maintain required records of the documents they notarized.
- Occasionally, Chase's operations specialists[13] obtained affidavits from foreclosure counsels that already contained the amounts of the borrowers' indebtedness, since foreclosure counsels had read-only access to certain data screens in Chase's mortgage servicing system.

This flawed control environment resulted in Chase filing improper legal documents, thereby misrepresenting its claims to HUD and may have exposed it to liability under the False Claims Act.

## Questionable Affidavit and Foreclosure Document Processes

Chase failed to follow HUD requirements[14] for properties it foreclosed upon in judicial foreclosure States and jurisdictions. These provisions required Chase to obtain and convey to the Secretary of HUD good and marketable title to properties. Chase may have conveyed flawed or improper titles to HUD because it did not establish a control environment which ensured that affiants performed a due diligence review of the facts submitted to courts and that employees properly notarized documents.

Judicial foreclosures were processed through the court system beginning with Chase's filing a complaint or petition regarding a mortgage purportedly in default. The formal legal document stated what the debt was and why the default should allow Chase to foreclose on the property. In many judicial foreclosures, an affidavit was part of the foreclosure documentation. Generally, a representative of Chase swore in a notarized affidavit that it owned or held the mortgage in question and that the borrower's mortgage payments were in arrears. As judicial States and jurisdictions routinely resolved foreclosures through summary judgment,[15] the accuracy and propriety of the documents were essential to ensure the integrity of the foreclosure process. Chase used a flawed process to submit FHA conveyance claims for judicially foreclosed-upon properties during the review period and received FHA claim payments of more than $547 million.[16]

*Affiants Robosigned Foreclosure Documents*[17]

---

[12] This procedure changed in September 2009, when Chase implemented the use of signing tables.

[13] Chase employees who prepared legal documents, including affidavits.

[14] 24 C.F.R. § 203.366(a) and HUD Handbook 4330.4, paragraphs 2-6 and 2-23.

[15] A decision made on the basis of statements and evidence presented for the record without a trial. It is used when there is no dispute as to the facts of the case and one party is entitled to judgment as a matter of law.

[16] Excludes claims for deeds in lieu of foreclosure.

[17] According to Chase's management, affiants' executing foreclosure documentation without knowledge occurred only at Chase Heritage (the prior entity before its merger with JPMorgan & Co). This practice did not occur in its divisions that executed documentation for EMC's and Washington Mutual's servicing loan portfolios. OIG did not validate this statement.

5

Chase provided policies and procedures explaining the foreclosure process; however, the documents did not provide details regarding the preparation and execution of legal documents, including affidavits. Therefore, we relied on interviews with Chase's management and staff and legal representation from the law firm of Debevoise & Plimpton to obtain an understanding of Chase's foreclosure process. During the interviews, Chase's operations supervisors acknowledged that they routinely signed and certified that they had personal knowledge of the contents of documents, including affidavits, without reviewing the source documents referred to in the affidavits. Additionally, they acknowledged that they did not reverify the accuracy of the foreclosure information stated in the affidavits. The operations supervisors reviewed the affidavits only for completeness and to ensure that they had the authority to sign on behalf (power of attorney) of that particular investor. However, they did not reverify the amounts on the affidavits or the accuracy of the borrowers' indebtedness computations.

According to interviews with Chase's management and representatives from the law firm, before September 2009, Chase's document execution process was outsourced to First American.[18] First-level supervisors over operations did not fully review the affidavits before executing them. Chase established its own Foreclosure Document Management Division and hired the First American staff members who were reviewing and executing affidavits on its behalf. However, it continued the policies and procedures that First American had implemented for processing foreclosure documents, with the exception of notarizing affidavits.

Affidavits require an affirmation that the person executing the legal document had personally reviewed borrowers' accounts and applicable records and had personal knowledge of the amounts due on those accounts. Since the operations supervisors did not review the borrowers' account information or reverify the amounts of the borrowers' indebtedness, they did not have personal knowledge. One operations supervisor stated that he was not familiar with the legal documents that he was signing on behalf of Chase and did not receive training on how to execute the affidavits. Therefore, the process that Chase used for processing foreclosures did not ensure that required foreclosure documents were properly executed or that it conveyed good and marketable titles to HUD.

Further, Chase's operations supervisors signed the affidavits as assistant secretary or vice president of Chase Home when these were not their official titles. Moreover, the interviews disclosed that the titles were given by Chase for the sole purpose of allowing the individuals to sign documents and came with no other duties or authority.

In interviews with Chase's specialists, who prepared the affidavits,[19] they stated that Chase's production goal was to manually prepare 40 affidavits daily.[20] However, five of Chase's

---

[18] Chase contractor that prepared and executed legal foreclosure documentation on its behalf. At the time of our review, Chase's management was uncertain about when the contract with First American was initially executed. First American is no longer in business.

[19] To complete the affidavits, specialists obtained from Chase's mortgage servicing system the borrowers' mortgage payment histories, outstanding principal balances, accumulated interest payments, escrow amounts, and other pertinent information and then manually completed the information on the affidavits to determine the total

6

specialists said they prepared 70 or more affidavits per day. According to the specialists, they sometimes would have 100 to 700 affidavits in their in-box for processing daily that were required to be completed and executed within 7 days. Consequently, due to the volume of the affidavits and time constraints, they had to review more affidavits than the required 40 per day. Therefore, one specialist mentioned that she pursued the operations supervisors who would execute the affidavits the "quickest" to meet Chase's production goal and 7-day turnaround requirement.

In 2008, Chase eliminated its Quality Control Division. Therefore, once the specialists manually prepared the legal documents, including affidavits, they were not independently reviewed for accuracy or validity. According to Chase, it reinstituted the division in July 2010. However, one of Chase's quality control supervisors stated that the division's operations had been temporarily discontinued at the time of our review. According to Chase, it was in the process of changing its procedures.

*Notaries Did Not Witness Signatures or Maintain Required Records*

Chase did not establish a control environment which ensured that its notaries[21] met their responsibilities under State laws, which required them to witness affiants' signatures on documents they notarized.[22] When Chase's operations supervisors executed the affidavits, a designated employee would collect the folders containing the affidavits. The specialists or other Chase employees would extract the executed affidavits from the folders and then send them to be notarized. Thus, the affidavits were not always executed in the presence of notary publics. Ohio State law[23] requires that notary publics who certify to the affidavit of a person administer the appropriate oath or affirmation to the person. According to Chase, in September 2009, it implemented a process in which operations supervisors and notaries would sit at a table to execute and notarize affidavits. Therefore, the affidavits were being executed in the "presence" of notary publics.

*Affidavits Were Prepared by Law Firms*

In interviews with Chase's management and staff, they acknowledged that on occasion, the specialists obtained affidavits from their foreclosure counsel that already contained the amounts of the borrowers' indebtedness, since the foreclosure counsel had read-only access to certain data screens in Chase's mortgage servicing system. Additionally, in some cases, before the foreclosure counsel filed the complaints with the court, he or she sometimes added verbiage and

---

amounts of the borrowers' indebtedness.

[20] Chase's production goals were eliminated in September 2010, when Chase ceased foreclosing on properties located in judicial States and jurisdictions.

[21] The notaries had additional job duties and responsibilities.

[22] Every State's notary laws require that the notary personally administer an oath and personally verify the identity of the document signer.

[23] Chapter 147.14

7

clauses to the affidavits regarding borrowers or the subject properties. In these instances, the information on the affidavits was not verified or validated by Chase.

On November 16, 2010, the Congressional Oversight Panel released an indepth report analyzing the robosigning allegations.[24] Its report concluded that "[t]he foreclosure documentation irregularities unquestionably show a system riddled with errors" and emphasized "that mortgage lenders and securitization servicers should not undertake to foreclose on any homeowner unless they are able to do so in full compliance with applicable laws and their contractual agreements."

*Affidavits Contained Inconsistencies and Errors*

We reviewed 36 affidavits for foreclosures in judicial States to determine whether the amounts of borrowers' indebtedness were supported. Chase was unable to provide documentation for the amounts of borrowers' indebtedness listed on the affidavits for all except four.[25] When we reviewed the four affidavits, three were inaccurate. Specifically, the amounts of the borrowers' late charges and accumulated interest did not reconcile with the information in Chase's mortgage servicing system. In discussions with Chase's assistant vice president for default support services, he indicated that he did not know why the amounts did not agree. Further, Chase's vice president and assistant general counsel mentioned that when Chase reverified selected affidavits for the Office of the Comptroller of the Currency, the amounts on the selected affidavits agreed with the information in its system.[26]

## CONCLUSION

Chase did not establish an effective control environment to ensure the integrity of its foreclosure process. Because it failed to establish proper policies and procedures that fostered compliance with laws and regulations, its affiants signed foreclosure documents automatically without performing a due diligence review or verification of the facts, its notaries failed to authenticate signatures, and it used law firms that may have included inaccurate information on foreclosure documents. As a result, Chase engaged in improper practices by not fully complying with applicable foreclosure procedures when processing foreclosures on FHA-insured loans. This flawed control environment resulted in Chase's filing improper legal documents, thereby misrepresenting its claims to HUD.

During the review period, Chase submitted 4,437 conveyance[27] claims totaling more than $547 million in the 23 judicial foreclosure States and jurisdictions. DOJ used our review and analysis in negotiating the proposed settlement agreement.

---

[24] Congressional Oversight Panel, November Oversight Report Examining the Consequences of Mortgage Irregularities for Financial Stability and Foreclosure Mitigation (November 16, 2010), available at http://cop.senate.gov/documents/cop-111610-report.pdf (submitted under section 125(b)(1) of Title 1 of the Emergency Economic Stabilization Act of 2008, Pub. L. No. 110-343).

[25] Chase's foreclosure processing software overrode account histories when applying claim payments which caused the principal and interest records necessary for verifying the affidavits to display as zeros.

[26] The selected affidavits were prepared within the past 6 months of our review.

[27] Excludes deeds in lieu of foreclosure

8

Once the settlement agreements are approved by the court, OIG will issue a separate summary memorandum to HUD containing recommendations to correct weaknesses discussed in this and the other four memorandums. Accordingly, this memorandum contains no recommendations.

**Appendixes:**
Appendix A    Affiant Narratives

# APPENDIX

**Appendix A**

## AFFIANT AND NOTARY NARRATIVES

The affiant narratives in this appendix disclose the number of affidavits the most active staff in our sample signed. We selected excerpts from affidavits and interviews to include in this memorandum from the 16 staff persons interviewed. As Chase did not provide separate records for FHA foreclosures and conventional foreclosures and the completeness of the production sheets could not be verified, we were unable to present figures that would be complete, reliable, or accurate (see Methodology and Scope section).

10

# Operations Supervisor 1 – Affiant

Operations supervisor 1 signed 25 amount due affidavits attesting to her personal knowledge of the facts and matters present in the affidavit and to having reviewed records in our sample of 108 files that were for judicial foreclosure proceedings.

*Interview Excerpts*

Operations supervisor 1 signed multiple documents but was uncertain about the number or amount of documents she had signed. She stated that she did not have personal knowledge of the content of the affidavits or the affidavit process and did not review the affidavits she was signing. However, she signed foreclosure documents, including affidavits certifying that she had personal knowledge of the facts when she did not. She acknowledged that she consistently failed to reverify the accuracy of the amounts or information on the foreclosure documents she executed.

Based on an employee signing authority listing provided by Chase, operations supervisor 1 obtained her signing authority in May of 2007 as vice president of Chase Home, and her job responsibilities included monitoring production, compiling information, and executing documents.

*Affidavit Excerpts*

The typical contents of one of the affidavits this staff member signed included

- "Affiant has the custody of and has personal knowledge of the accounts of said company, and specifically with the account of the borrower, defendant herein."

- "Affiant stated that the account was in default and that plaintiff had elected to call the entire balance of said account due and payable in accordance with the terms of the note and mortgage attached to the complaint. Affiant stated that that principal balance was due on the account. The borrower's principal balance together with interest thereon from the date of default at the rate specified in the note, late charges and advances for taxes, insurance or otherwise expended to protect the property."

11

# Operations Supervisor 2 – Affiant

Operations supervisor 2 signed 17 amount due affidavits attesting to her personal knowledge of the facts and matters present in the affidavit and to having reviewed records in our sample of 108 that were all for judicial foreclosure proceedings.

## Affiant's Deposition

According to a deposition filed in circuit court,[28] operations supervisor 2 was among eight managers who together signed about 18,000 documents per month and did not have personal knowledge of the facts and assertions in the affidavits. She admitted to signing documents without review unless an operations specialist brought them to her with a question, and she stated that her personal knowledge of the affidavits was based on what the operations specialists had entered into the affidavits. She stated that she did not review additional information to verify that there were no issues of material fact.

## Interview Excerpts

Operations supervisor 2 was given the authority to sign as assistant secretary and later as a vice president. Employees were not given training concerning affidavits and signature authority. When employees would sign affidavits, they would not review the document or supporting documents; therefore, the employees had nothing to reference. She signed about three times a day. She stated that supervisors signed the most. She did not know how many documents she signed per day. She stated that signing was not a performance criterion in employee reviews. When operations supervisor 2 received the affidavits, they were usually open to the signature page. She did not complete any procedures apart from checking the signature page, and she did not confirm that each was an actual default. She did not review the book and records for the affidavit or personally confirm that each was a defaulted loan. She also did not receive any training or an explanation that the executed documents were admissible in a court.

## Affidavit Excerpts

- "This affidavit is submitted in support of Plaintiff's Motion for Final Judgment for the purpose of showing: that there is not genuine issue as to any material fact, that plaintiff is entitled to enforce the note and mortgage and plaintiff is entitled to judgment as a matter of law."

---

[28] Fifteenth Judicial Circuit, case number 50-2008-CA-016857

12

Exhibit W

# UNITED STATES OF AMERICA
## DEPARTMENT OF THE TREASURY
## COMPTROLLER OF THE CURRENCY



| | |
|---|---|
| **In the Matter of:** | ) |
| | ) |
| JPMorgan Chase Bank, N.A. | )      AA-EC-11-15 |
| New York, NY | ) |
| | ) |
| | ) |

## CONSENT ORDER

The Comptroller of the Currency of the United States of America ("Comptroller"),

through his national bank examiners and other staff of the Office of the Comptroller of the

Currency ("OCC"), as part of an interagency horizontal review of major residential mortgage

servicers, has conducted an examination of the residential real estate mortgage foreclosure

processes of JPMorgan Chase Bank, N.A., New York, New York ("Bank"). The OCC has

identified certain deficiencies and unsafe or unsound practices in residential mortgage servicing

and in the Bank's initiation and handling of foreclosure proceedings. The OCC has informed the

Bank of the findings resulting from the examination.

The Bank, by and through its duly elected and acting Board of Directors ("Board"), has

executed a "Stipulation and Consent to the Issuance of a Consent Order," dated April 13, 2011

("Stipulation and Consent"), that is accepted by the Comptroller. By this Stipulation and

Consent, which is incorporated by reference, the Bank has consented to the issuance of this

Consent Cease and Desist Order ("Order") by the Comptroller. The Bank has committed to

taking all necessary and appropriate steps to remedy the deficiencies and unsafe or unsound

practices identified by the OCC, and to enhance the Bank's residential mortgage servicing and

foreclosure processes. The Bank has begun implementing procedures to remediate the practices addressed in this Order.

## ARTICLE I

## COMPTROLLER'S FINDINGS

The Comptroller finds, and the Bank neither admits nor denies, the following:

(1) The Bank is among the largest servicers of residential mortgages in the United States, and services a portfolio of 6,300,000 residential mortgage loans. During the recent housing crisis, a substantially large number of residential mortgage loans serviced by the Bank became delinquent and resulted in foreclosure actions. The Bank's foreclosure inventory grew substantially from 2008 through 2010.

(2) In connection with certain foreclosures of loans in its residential mortgage servicing portfolio, the Bank:

(a) filed or caused to be filed in state and federal courts affidavits executed by its employees or employees of third-party service providers making various assertions, such as ownership of the mortgage note and mortgage, the amount of the principal and interest due, and the fees and expenses chargeable to the borrower, in which the affiant represented that the assertions in the affidavit were made based on personal knowledge or based on a review by the affiant of the relevant books and records, when, in many cases, they were not based on such personal knowledge or review of the relevant books and records;

(b) filed or caused to be filed in state and federal courts, or in local land records offices, numerous affidavits or other mortgage-related documents that were not properly notarized, including those not signed or affirmed in the presence of a notary;

2

(c) litigated foreclosure proceedings and initiated non-judicial foreclosure proceedings without always ensuring that either the promissory note or the mortgage document were properly endorsed or assigned and, if necessary, in the possession of the appropriate party at the appropriate time;

(d) failed to devote sufficient financial, staffing and managerial resources to ensure proper administration of its foreclosure processes;

(e) failed to devote to its foreclosure processes adequate oversight, internal controls, policies, and procedures, compliance risk management, internal audit, third party management, and training; and

(f) failed to sufficiently oversee outside counsel and other third-party providers handling foreclosure-related services.

(3) By reason of the conduct set forth above, the Bank engaged in unsafe or unsound banking practices.

Pursuant to the authority vested in him by the Federal Deposit Insurance Act, as amended, 12 U.S.C. §1818(b), the Comptroller hereby ORDERS that:

## ARTICLE II

### COMPLIANCE COMMITTEE

(1) The Board shall maintain a Compliance Committee of at least three (3) directors, of which at least two (2) may not be employees or officers of the Bank or any of its subsidiaries or affiliates. In the event of a change of the membership, the name of any new member shall be submitted to the Examiner-in-Charge for Large Bank Supervision at the Bank ("Examiner-in-Charge"). The Compliance Committee shall be responsible for monitoring and coordinating the

3

Bank's compliance with the provisions of this Order. The Compliance Committee shall meet at least monthly and maintain minutes of its meetings.

(2)  Within ninety (90) days of this Order, and within thirty (30) days after the end of each quarter thereafter, the Compliance Committee shall submit a written progress report to the Board setting forth in detail actions taken to comply with each Article of this order, and the results and status of those actions.

(3)  The Board shall forward a copy of the Compliance Committee's report, with any additional comments by the Board, to the Deputy Comptroller for Large Bank Supervision ("Deputy Comptroller") and the Examiner-in-Charge within ten (10) days of receiving such report.

## ARTICLE III

## COMPREHENSIVE ACTION PLAN

(1)  Within sixty (60) days of this Order, the Bank shall submit to the Deputy Comptroller and the Examiner-in-Charge an acceptable plan containing a complete description of the actions that are necessary and appropriate to achieve compliance with Articles IV through XII of this Order ("Action Plan"). In the event the Deputy Comptroller asks the Bank to revise the Action Plan, the Bank shall promptly make the requested revisions and resubmit the Action Plan to the Deputy Comptroller and the Examiner-in-Charge. Following acceptance of the Action Plan by the Deputy Comptroller, the Bank shall not take any action that would constitute a significant deviation from, or material change to, the requirements of the Action Plan or this Order, unless and until the Bank has received a prior written determination of no supervisory objection from the Deputy Comptroller.

4

(2) The Board shall ensure that the Bank achieves and thereafter maintains compliance with this Order, including, without limitation, successful implementation of the Action Plan. The Board shall further ensure that, upon implementation of the Action Plan, the Bank achieves and maintains effective mortgage servicing, foreclosure, and loss mitigation activities (as used herein, the phrase "loss mitigation" shall include, but not be limited to, activities related to special forbearances, modifications, short refinances, short sales, cash-for-keys, and deeds-in-lieu of foreclosure and be referred to as either "Loss Mitigation" or "Loss Mitigation Activities"), as well as associated risk management, compliance, quality control, audit, training, staffing, and related functions. In order to comply with these requirements, the Board shall:

(a) require the timely reporting by Bank management of such actions directed by the Board to be taken under this Order;

(b) follow-up on any non-compliance with such actions in a timely and appropriate manner; and

(c) require corrective action be taken in a timely manner for any non-compliance with such actions.

(3) The Action Plan shall address, at a minimum:

(a) financial resources to develop and implement an adequate infrastructure to support existing and/or future Loss Mitigation and foreclosure activities and ensure compliance with this Order;

(b) organizational structure, managerial resources, and staffing to support existing and/or future Loss Mitigation and foreclosure activities and ensure compliance with this Order;

5

(c) metrics to measure and ensure the adequacy of staffing levels relative to existing and/or future Loss Mitigation and foreclosure activities, such as limits for the number of loans assigned to a Loss Mitigation employee, including the single point of contact as hereinafter defined, and deadlines to review loan modification documentation, make loan modification decisions, and provide responses to borrowers;

(d) governance and controls to ensure compliance with all applicable federal and state laws (including the U.S. Bankruptcy Code and the Servicemembers Civil Relief Act ("SCRA")), rules, regulations, and court orders and requirements, as well as the Membership Rules of MERSCORP, servicing guides of the Government Sponsored Enterprises ("GSEs") or investors, including those with the Federal Housing Administration and those required by the Home Affordable Modification Program ("HAMP"), and loss share agreements with the Federal Deposit Insurance Corporation (collectively "Legal Requirements"), and the requirements of this Order.

(4) The Action Plan shall specify timelines for completion of each of the requirements of Articles IV through XII of this Order. The timelines in the Action Plan shall be consistent with any deadlines set forth in this Order.

## ARTICLE IV

## COMPLIANCE PROGRAM

(1) Within sixty (60) days of this Order, the Bank shall submit to the Deputy Comptroller and the Examiner-in-Charge an acceptable compliance program to ensure that the mortgage servicing and foreclosure operations, including Loss Mitigation and loan modification, comply with all applicable Legal Requirements, OCC supervisory guidance, and the

6

requirements of this Order and are conducted in a safe and sound manner ("Compliance Program"). The Compliance Program shall be implemented within one hundred twenty (120) days of this Order. Any corrective action timeframe in the Compliance Program that is in excess of one hundred twenty (120) days must be approved by the Examiner-in-Charge. The Compliance Program shall include, at a minimum:

(a) appropriate written policies and procedures to conduct, oversee, and monitor mortgage servicing, Loss Mitigation, and foreclosure operations;

(b) processes to ensure that all factual assertions made in pleadings, declarations, affidavits, or other sworn statements filed by or on behalf of the Bank are accurate, complete, and reliable; and that affidavits and declarations are based on personal knowledge or a review of the Bank's books and records when the affidavit or declaration so states;

(c) processes to ensure that affidavits filed in foreclosure proceedings are executed and notarized in accordance with state legal requirements and applicable guidelines, including jurat requirements;

(d) processes to review and approve standardized affidavits and declarations for each jurisdiction in which the Bank files foreclosure actions to ensure compliance with applicable laws, rules and court procedures;

(e) processes to ensure that the Bank has properly documented ownership of the promissory note and mortgage (or deed of trust) under applicable state law, or is otherwise a proper party to the action (as a result of agency or other similar status) at all stages of foreclosure and bankruptcy litigation, including appropriate transfer and delivery of endorsed notes and assigned mortgages or deeds of trust at the formation of a residential mortgage-backed security,

7

and lawful and verifiable endorsement and successive assignment of the note and mortgage or deed of trust to reflect all changes of ownership;

(f) processes to ensure that a clear and auditable trail exists for all factual information contained in each affidavit or declaration, in support of each of the charges that are listed, including whether the amount is chargeable to the borrower and/or claimable by the investor;

(g) processes to ensure that foreclosure sales (including the calculation of the default period, the amounts due, and compliance with notice requirements) and post-sale confirmations are in accordance with the terms of the mortgage loan and applicable state and federal law requirements;

(h) processes to ensure that all fees, expenses, and other charges imposed on the borrower are assessed in accordance with the terms of the underlying mortgage note, mortgage, or other customer authorization with respect to the imposition of fees, charges, and expenses, and in compliance with all applicable Legal Requirements and OCC supervisory guidance;

(i) processes to ensure that the Bank has the ability to locate and secure all documents, including the original promissory notes if required, necessary to perform mortgage servicing, foreclosure and Loss Mitigation, or loan modification functions;

(j) ongoing testing for compliance with applicable Legal Requirements and OCC supervisory guidance that is completed by qualified persons with requisite knowledge and ability (which may include internal audit) who are independent of the Bank's business lines;

(k) measures to ensure that policies, procedures, and processes are updated on an ongoing basis as necessary to incorporate any changes in applicable Legal Requirements and OCC supervisory guidance;

8

(l)  processes to ensure the qualifications of current management and supervisory personnel responsible for mortgage servicing and foreclosure processes and operations, including collections, Loss Mitigation and loan modification, are appropriate and a determination of whether any staffing changes or additions are needed;

(m)  processes to ensure that staffing levels devoted to mortgage servicing and foreclosure processes and operations, including collections, Loss Mitigation, and loan modification, are adequate to meet current and expected workload demands;

(n)  processes to ensure that workloads of mortgage servicing, foreclosure and Loss Mitigation, and loan modification personnel, including single point of contact personnel as hereinafter defined, are reviewed and managed. Such processes, at a minimum, shall assess whether the workload levels are appropriate to ensure compliance with the requirements of Article IX of this Order, and necessary adjustments to workloads shall promptly follow the completion of the reviews. An initial review shall be completed within ninety (90) days of this Order, and subsequent reviews shall be conducted semi-annually;

(o)  processes to ensure that the risk management, quality control, audit, and compliance programs have the requisite authority and status within the organization so that appropriate reviews of the Bank's mortgage servicing, Loss Mitigation, and foreclosure activities and operations may occur and deficiencies are identified and promptly remedied;

(p)  appropriate training programs for personnel involved in mortgage servicing and foreclosure processes and operations, including collections, Loss Mitigation, and loan modification, to ensure compliance with applicable Legal Requirements and supervisory guidance; and

9

(q)  appropriate procedures for customers in bankruptcy, including a prohibition on collection of fees in violation of bankruptcy's automatic stay (11 U.S.C. § 362), the discharge injunction (11 U.S.C. § 524), or any applicable court order.

## ARTICLE V

## THIRD PARTY MANAGEMENT

(1)  Within sixty (60) days of this Order, the Bank shall submit to the Deputy Comptroller and the Examiner-in-Charge acceptable policies and procedures for outsourcing foreclosure or related functions, including Loss Mitigation and loan modification, and property management functions for residential real estate acquired through or in lieu of foreclosure, to any agent, independent contractor, consulting firm, law firm (including local counsel in foreclosure or bankruptcy proceedings retained to represent the interests of the owners of mortgages), property management firm, or other third-party (including any affiliate of the Bank) ("Third-Party Providers").  Third-party management policies and procedures shall be implemented within one hundred twenty (120) days of this Order.  Any corrective action timetable that is in excess of one hundred twenty (120) days must be approved by the Examiner-in-Charge.  The policies and procedures shall include, at a minimum:

(a)  appropriate oversight to ensure that Third-Party Providers comply with all applicable Legal Requirements, OCC supervisory guidance (including applicable portions of OCC Bulletin 2001-47), and the Bank's policies and procedures;

(b)  measures to ensure that all original records transferred from the Bank to Third-Party Providers (including the originals of promissory notes and mortgage documents) remain within the custody and control of the Third-Party Provider (unless filed with the

10

appropriate court or the loan is otherwise transferred to another party), and are returned to the Bank or designated custodians at the conclusion of the performed service, along with all other documents necessary for the Bank's files, and that the Bank retains imaged copies of significant documents sent to Third-Party Providers;

(c) measures to ensure the accuracy of all documents filed or otherwise utilized on behalf of the Bank or the owners of mortgages in any judicial or non-judicial foreclosure proceeding, related bankruptcy proceeding, or in other foreclosure-related litigation, including, but not limited to, documentation sufficient to establish ownership of the promissory note and/or right to foreclose at the time the foreclosure action is commenced;

(d) processes to perform appropriate due diligence on potential and current Third-Party Provider qualifications, expertise, capacity, reputation, complaints, information security, document custody practices, business continuity, and financial viability, and to ensure adequacy of Third-Party Provider staffing levels, training, work quality, and workload balance;

(e) processes to ensure that contracts provide for adequate oversight, including requiring Third-Party Provider adherence to Bank foreclosure processing standards, measures to enforce Third-Party Provider contractual obligations, and processes to ensure timely action with respect to Third-Party Provider performance failures;

(f) processes to ensure periodic reviews of Third-Party Provider work for timeliness, competence, completeness, and compliance with all applicable Legal Requirements and supervisory guidance, and to ensure that foreclosures are conducted in a safe and sound manner;

(g) processes to review customer complaints about Third-Party Provider services;

11

(h) processes to prepare contingency and business continuity plans that ensure the continuing availability of critical third-party services and business continuity of the Bank, consistent with federal banking agency guidance, both to address short-term and long-term service disruptions and to ensure an orderly transition to new service providers should that become necessary;

(i) a review of fee structures for Third-Party Providers to ensure that the method of compensation considers the accuracy, completeness, and legal compliance of foreclosure filings and is not based solely on increased foreclosure volume and/or meeting processing timelines; and

(j) a certification process for law firms (and recertification of existing law firm providers) that provide residential mortgage foreclosure and bankruptcy services for the Bank, on a periodic basis, as qualified to serve as Third-Party Providers to the Bank including that attorneys are licensed to practice in the relevant jurisdiction and have the experience and competence necessary to perform the services requested.

ARTICLE VI

MORTGAGE ELECTRONIC REGISTRATION SYSTEM

(1) Within sixty (60) days of this Order, the Bank shall submit to the Deputy Comptroller and the Examiner-in-Charge an acceptable plan to ensure appropriate controls and oversight of the Bank's activities with respect to the Mortgage Electronic Registration System ("MERS") and compliance with MERSCORP's membership rules, terms, and conditions ("MERS Requirements") ("MERS Plan"). The MERS Plan shall be implemented within one hundred twenty (120) days of this Order. Any corrective action timetable that is in excess of one

12

hundred twenty (120) days must be approved by the Examiner-in-Charge. The MERS Plan shall include, at a minimum:

(a) processes to ensure that all mortgage assignments and endorsements with respect to mortgage loans serviced or owned by the Bank out of MERS' name are executed only by a certifying officer authorized by MERS and approved by the Bank;

(b) processes to ensure that all other actions that may be taken by MERS certifying officers (with respect to mortgage loans serviced or owned by the Bank) are executed by a certifying officer authorized by MERS and approved by the Bank;

(c) processes to ensure that the Bank maintains up-to-date corporate resolutions from MERS for all Bank employees and third-parties who are certifying officers authorized by MERS, and up-to-date lists of MERS certifying officers;

(d) processes to ensure compliance with all MERS Requirements and with the requirements of the MERS Corporate Resolution Management System ("CRMS");

(e) processes to ensure the accuracy and reliability of data reported to MERSCORP, including monthly system-to-system reconciliations for all MERS mandatory reporting fields, and daily capture of all rejects/warnings reports associated with registrations, transfers, and status updates on open-item aging reports. Unresolved items must be maintained on open-item aging reports and tracked until resolution. The Bank shall determine and report whether the foreclosures for loans serviced by the Bank that are currently pending in MERS' name are accurate and how many are listed in error, and describe how and by when the data on the MERSCORP system will be corrected; and

(f) an appropriate MERS quality assurance workplan, which clearly describes all tests, test frequency, sampling methods, responsible parties, and the expected process for open-

13

item follow-up, and includes an annual independent test of the control structure of the system-to-system reconciliation process, the reject/warning error correction process, and adherence to the Bank's MERS Plan.

(2) The Bank shall include MERS and MERSCORP in its third-party vendor management process, which shall include a detailed analysis of potential vulnerabilities, including information security, business continuity, and vendor viability assessments.

## ARTICLE VII

### FORECLOSURE REVIEW

(1) Within forty-five (45) days of this Order, the Bank shall retain an independent consultant acceptable to the Deputy Comptroller and the Examiner-in-Charge to conduct an independent review of certain residential foreclosure actions regarding individual borrowers with respect to the Bank's mortgage servicing portfolio. The review shall include residential foreclosure actions or proceedings (including foreclosures that were in process or completed) for loans serviced by the Bank, whether brought in the name of the Bank, the investor, the mortgage note holder, or any agent for the mortgage note holder (including MERS), that have been pending at any time from January 1, 2009 to December 31, 2010, as well as residential foreclosure sales that occurred during this time period ("Foreclosure Review").

(2) Within fifteen (15) days of the engagement of the independent consultant described in this Article, but prior to the commencement of the Foreclosure Review, the Bank shall submit to the Deputy Comptroller and the Examiner-in-Charge for approval an engagement letter that sets forth:

14

(a) the methodology for conducting the Foreclosure Review, including: (i) a description of the information systems and documents to be reviewed, including the selection of criteria for cases to be reviewed; (ii) the criteria for evaluating the reasonableness of fees and penalties; (iii) other procedures necessary to make the required determinations (such as through interviews of employees and third parties and a process for submission and review of borrower claims and complaints); and (iv) any proposed sampling techniques. In setting the scope and review methodology under clause (i) of this sub-paragraph, the independent consultant may consider any work already done by the Bank or other third-parties on behalf of the Bank. The engagement letter shall contain a full description of the statistical basis for the sampling methods chosen, as well as procedures to increase the size of the sample depending on results of the initial sampling;

(b) expertise and resources to be dedicated to the Foreclosure Review;

(c) completion of the Foreclosure Review within one hundred twenty (120) days from approval of the engagement letter; and

(d) a written commitment that any workpapers associated with the Foreclosure Review shall be made available to the OCC immediately upon request.

(3) The purpose of the Foreclosure Review shall be to determine, at a minimum:

(a) whether at the time the foreclosure action was initiated or the pleading or affidavit filed (including in bankruptcy proceedings and in defending suits brought by borrowers), the foreclosing party or agent of the party had properly documented ownership of the promissory note and mortgage (or deed of trust) under relevant state law, or was otherwise a proper party to the action as a result of agency or similar status;

15

(b) whether the foreclosure was in accordance with applicable state and federal law, including but not limited to the SCRA and the U.S. Bankruptcy Code;

(c) whether a foreclosure sale occurred when an application for a loan modification or other Loss Mitigation was under consideration; when the loan was performing in accordance with a trial or permanent loan modification; or when the loan had not been in default for a sufficient period of time to authorize foreclosure pursuant to the terms of the mortgage loan documents and related agreements;

(d) whether, with respect to non-judicial foreclosures, the procedures followed with respect to the foreclosure sale (including the calculation of the default period, the amounts due, and compliance with notice periods) and post-sale confirmations were in accordance with the terms of the mortgage loan and state law requirements;

(e) whether a delinquent borrower's account was only charged fees and/or penalties that were permissible under the terms of the borrower's loan documents, applicable state and federal law, and were reasonable and customary;

(f) whether the frequency that fees were assessed to any delinquent borrower's account (including broker price opinions) was excessive under the terms of the borrower's loan documents, and applicable state and federal law;

(g) whether Loss Mitigation Activities with respect to foreclosed loans were handled in accordance with the requirements of the HAMP, and consistent with the policies and procedures applicable to the Bank's proprietary loan modifications or other loss mitigation programs, such that each borrower had an adequate opportunity to apply for a Loss Mitigation option or program, any such application was handled properly, a final decision was made on a reasonable basis, and was communicated to the borrower before the foreclosure sale; and

16

(h)  whether any errors, misrepresentations, or other deficiencies identified in the Foreclosure Review resulted in financial injury to the borrower or the mortgagee.

(4)  The independent consultant shall prepare a written report detailing the findings of the Foreclosure Review ("Foreclosure Report"), which shall be completed within thirty (30) days of completion of the Foreclosure Review.  Immediately upon completion, the Foreclosure Report shall be submitted to the Deputy Comptroller, Examiner-in-Charge, and the Board.

(5)  Within forty-five (45) days of submission of the Foreclosure Report to the Deputy Comptroller, Examiner-in-Charge, and the Board, the Bank shall submit to the Deputy Comptroller and the Examiner-in-Charge a plan, acceptable to the OCC, to remediate all financial injury to borrowers caused by any errors, misrepresentations, or other deficiencies identified in the Foreclosure Report, by:

(a)  reimbursing or otherwise appropriately remediating borrowers for impermissible or excessive penalties, fees, or expenses, or for other financial injury identified in accordance with this Article; and

(b)  taking appropriate steps to remediate any foreclosure sale where the foreclosure was not authorized as described in this Article.

(6)  Within sixty (60) days after the OCC provides supervisory non-objection to the plan set forth in paragraph (5) above, the Bank shall make all reimbursement and remediation payments and provide all credits required by such plan, and provide the OCC with a report detailing such payments and credits.

17

## ARTICLE VIII

## MANAGEMENT INFORMATION SYSTEMS

(1) Within sixty (60) days of this Order, the Bank shall submit to the Deputy Comptroller and the Examiner-in-Charge an acceptable plan for operation of its management information systems ("MIS") for foreclosure and Loss Mitigation or loan modification activities to ensure the timely delivery of complete and accurate information to permit effective decision-making. The MIS plan shall be implemented within one hundred twenty (120) days of this Order. Any corrective action timeframe that is in excess of one hundred twenty (120) days must be approved by the Examiner-in-Charge. The plan shall include, at a minimum:

(a) a description of the various components of MIS used by the Bank for foreclosure and Loss Mitigation or loan modification activities;

(b) a description of and timetable for any needed changes or upgrades to:

(i) monitor compliance with all applicable Legal Requirements and supervisory guidance, and the requirements of this Order;

(ii) ensure the ongoing accuracy of records for all serviced mortgages, including, but not limited to, records necessary to establish ownership and the right to foreclose by the appropriate party for all serviced mortgages, outstanding balances, and fees assessed to the borrower; and

(iii) measures to ensure that Loss Mitigation, loan foreclosure, and modification staffs have sufficient and timely access to information provided by the borrower regarding loan foreclosure and modification activities;

18

(c) testing the integrity and accuracy of the new or enhanced MIS to ensure that reports generated by the system provide necessary information for adequate monitoring and quality controls.

# ARTICLE IX

## MORTGAGE SERVICING

(1)  Within sixty (60) days of this Order, the Bank shall submit to the Deputy Comptroller and the Examiner-in-Charge an acceptable plan, along with a timeline for ensuring effective coordination of communications with borrowers, both oral and written, related to Loss Mitigation or loan modification and foreclosure activities:  (i) to ensure that communications are timely and effective and are designed to avoid confusion to borrowers; (ii) to ensure continuity in the handling of borrowers' loan files during the Loss Mitigation, loan modification, and foreclosure process by personnel knowledgeable about a specific borrower's situation; (iii) to ensure reasonable and good faith efforts, consistent with applicable Legal Requirements, are engaged in Loss Mitigation and foreclosure prevention for delinquent loans, where appropriate; and (iv) to ensure that decisions concerning Loss Mitigation or loan modifications continue to be made and communicated in a timely fashion.  Prior to submitting the plan, the Bank shall conduct a review to determine whether processes involving past due mortgage loans or foreclosures overlap in such a way that they may impair or impede a borrower's efforts to effectively pursue a loan modification, and whether Bank employee compensation practices discourage Loss Mitigation or loan modifications.  The plan shall be implemented within one hundred twenty (120) days of this Order.  Any corrective action timeframe that is in excess of

19

one hundred twenty (120) days must be approved by the Examiner-in-Charge. The plan shall include, at a minimum:

(a) measures to ensure that staff handling Loss Mitigation and loan modification requests routinely communicate and coordinate with staff processing the foreclosure on the borrower's property;

(b) appropriate deadlines for responses to borrower communications and requests for consideration of Loss Mitigation, including deadlines for decision-making on Loss Mitigation Activities, with the metrics established not being less responsive than the timelines in the HAMP program;

(c) establishment of an easily accessible and reliable single point of contact for each borrower so that the borrower has access to an employee of the Bank to obtain information throughout the Loss Mitigation, loan modification, and foreclosure processes;

(d) a requirement that written communications with the borrower identify such single point of contact along with one or more direct means of communication with the contact;

(e) measures to ensure that the single point of contact has access to current information and personnel (in-house or third-party) sufficient to timely, accurately, and adequately inform the borrower of the current status of the Loss Mitigation, loan modification, and foreclosure activities;

(f) measures to ensure that staff are trained specifically in handling mortgage delinquencies, Loss Mitigation, and loan modifications;

(g) procedures and controls to ensure that a final decision regarding a borrower's loan modification request (whether on a trial or permanent basis) is made and communicated to the borrower in writing, including the reason(s) why the borrower did not qualify for the trial or

permanent modification (including the net present value calculations utilized by the Bank, if applicable) by the single point of contact within a reasonable period of time before any foreclosure sale occurs;

(h) procedures and controls to ensure that when the borrower's loan has been approved for modification on a trial or permanent basis that: (i) no foreclosure or further legal action predicate to foreclosure occurs, unless the borrower is deemed in default on the terms of the trial or permanent modification; and (ii) the single point of contact remains available to the borrower and continues to be referenced on all written communications with the borrower;

(i) policies and procedures to enable borrowers to make complaints regarding the Loss Mitigation or modification process, denial of modification requests, the foreclosure process, or foreclosure activities which prevent a borrower from pursuing Loss Mitigation or modification options, and a process for making borrowers aware of the complaint procedures;

(j) procedures for the prompt review, escalation, and resolution of borrower complaints, including a process to communicate the results of the review to the borrower on a timely basis;

(k) policies and procedures to ensure that payments are credited in a prompt and timely manner; that payments, including partial payments to the extent permissible under the terms of applicable legal instruments, are applied to scheduled principal, interest, and/or escrow before fees, and that any misapplication of borrower funds is corrected in a prompt and timely manner;

(l) policies and procedures to ensure that timely information about Loss Mitigation options is sent to the borrower in the event of a delinquency or default, including plain language notices about loan modification and the pendency of foreclosure proceedings;

21

(m)  policies and procedures to ensure that foreclosure, Loss Mitigation, and loan modification documents provided to borrowers and third parties are appropriately maintained and tracked, and that borrowers generally will not be required to resubmit the same documented information that has already been provided, and that borrowers are notified promptly of the need for additional information; and

(n)  policies and procedures to consider loan modifications or other Loss Mitigation Activities with respect to junior lien loans owned by the Bank, and to factor the risks associated with such junior lien loans into loan loss reserving practices, where the Bank services the associated first lien mortgage and becomes aware that such first lien mortgage is delinquent or has been modified.  Such policies and procedures shall require the ongoing maintenance of appropriate loss reserves for junior lien mortgages owned by the Bank and the charge-off of such junior lien loans in accordance with FFIEC retail credit classification guidelines.


ARTICLE X

RISK ASSESSMENT AND RISK MANAGEMENT PLAN

(1)  Within ninety (90) days of this Order, the Bank shall conduct a written, comprehensive assessment of the Bank's risks in mortgage servicing operations, particularly in the areas of Loss Mitigation, foreclosure, and the administration and disposition of other real estate owned, including, but not limited to, operational, compliance, transaction, legal, and reputational risks.

(2)  The Bank shall develop an acceptable plan to effectively manage or mitigate identified risks on an ongoing basis, with oversight by the Bank's senior risk managers, senior

22

management, and the Board. The assessment and plan shall be provided to the Deputy Comptroller and the Examiner-in-Charge within one hundred twenty (120) days of this Order.

## ARTICLE XI

## APPROVAL, IMPLEMENTATION AND REPORTS

(1) The Bank shall submit the written plans, programs, policies, and procedures required by this Order for review and determination of no supervisory objection to the Deputy Comptroller and the Examiner-in-Charge within the applicable time periods set forth in Articles II through X. The Bank shall adopt the plans, programs, policies, and procedures required by this Order upon submission to the OCC, and shall immediately make any revisions requested by the Deputy Comptroller or the Examiner-in-Charge. Upon adoption, the Bank shall immediately implement the plans, programs, policies, and procedures required by this Order and thereafter fully comply with them.

(2) During the term of this Order, the required plans, programs, policies, and procedures shall not be amended or rescinded in any material respect without the prior written approval of the Deputy Comptroller or the Examiner-in-Charge (except as otherwise provided in this Order).

(3) During the term of this Order, the Bank shall revise the required plans, programs, policies, and procedures as necessary to incorporate new or changes to applicable Legal Requirements and supervisory guidelines.

(4) The Board shall ensure that the Bank has processes, personnel, and control systems to ensure implementation of and adherence to the plans, programs, policies, and procedures required by this Order.

23

(5) Within thirty (30) days after the end of each calendar quarter following the date of this Order, the Bank shall submit to the OCC a written progress report detailing the form and manner of all actions taken to secure compliance with the provisions of this Order and the results thereof. The progress report shall include information sufficient to validate compliance with this Order, based on a testing program acceptable to the OCC that includes, if required by the OCC, validation by third-party independent consultants acceptable to the OCC. The OCC may, in writing, discontinue the requirement for progress reports or modify the reporting schedule.

(6) All communication regarding this Order shall be sent to:

    (a) Sally G. Belshaw
        Deputy Comptroller
        Large Bank Supervision
        Office of the Comptroller of the Currency
        250 E Street, SW
        Washington, DC 20219

    (b) Scott N. Waterhouse
        Examiner-in-Charge
        National Bank Examiners
        1166 Avenue of the Americas, 21st Floor
        New York, NY 10036

## ARTICLE XII

## COMPLIANCE AND EXTENSIONS OF TIME

(1) If the Bank contends that compliance with any provision of this Order would not be feasible or legally permissible for the Bank, or requires an extension of any timeframe within this Order, the Board shall submit a written request to the Deputy Comptroller asking for relief. Any written requests submitted pursuant to this Article shall include a statement setting forth in detail the special circumstances that prevent the Bank from complying with a provision, that require

24

the Deputy Comptroller to exempt the Bank from a provision, or that require an extension of a timeframe within this Order.

(2) All such requests shall be accompanied by relevant supporting documentation, and to the extent requested by the Deputy Comptroller, a sworn affidavit or affidavits setting forth any other facts upon which the Bank relies. The Deputy Comptroller's decision concerning a request is final and not subject to further review.

## ARTICLE XIII

### OTHER PROVISIONS

(1) Although this Order requires the Bank to submit certain actions, plans, programs, policies, and procedures for the review or prior written determination of no supervisory objection by the Deputy Comptroller or the Examiner-in-Charge, the Board has the ultimate responsibility for proper and sound management of the Bank.

(2) In each instance in this Order in which the Board is required to ensure adherence to, and undertake to perform certain obligations of the Bank, it is intended to mean that the Board shall:

(a) authorize and adopt such actions on behalf of the Bank as may be necessary for the Bank to perform its obligations and undertakings under the terms of this Order;

(b) require the timely reporting by Bank management of such actions directed by the Board to be taken under the terms of this Order;

(c) follow-up on any material non-compliance with such actions in a timely and appropriate manner; and

25



# UNITED STATES OF AMERICA
## DEPARTMENT OF THE TREASURY
## COMPTROLLER OF THE CURRENCY

|  |  |  |
|---|---|---|
| **In the Matter of:** | ) | |
| JPMorgan Chase Bank, National Association | ) | AA-EC-11-15 |
| New York, NY | ) | |
|  | ) | |

## STIPULATION AND CONSENT TO THE ISSUANCE
## OF A CONSENT ORDER

The Comptroller of the Currency of the United States of America ("Comptroller") intends to impose a cease and desist order on JPMorgan Chase Bank, National Association ("Bank") pursuant to 12 U.S.C. § 1818(b), for unsafe or unsound banking practices relating to mortgage servicing and the initiation and handling of foreclosure proceedings.

The Bank, in the interest of compliance and cooperation, enters into this Stipulation and Consent to the Issuance of a Consent Order ("Stipulation") and consents to the issuance of a Consent Order, dated April 13, 2011 ("Consent Order");

In consideration of the above premises, the Comptroller, through his authorized representative, and the Bank, through its duly elected and acting Board of Directors, stipulate and agree to the following:

## ARTICLE I
## JURISDICTION

(1)     The Bank is a national banking association chartered and examined by the Comptroller pursuant to the National Bank Act of 1864, as amended, 12 U.S.C. § 1 *et seq.*

(2)     The Comptroller is "the appropriate Federal banking agency" regarding the Bank pursuant to 12 U.S.C. §§ 1813(q) and 1818(b).

(3)     The Bank is an "insured depository institution" within the meaning of 12 U.S.C. § 1818(b)(1).

(4)     For the purposes of, and within the meaning of 12 C.F.R. §§ 5.3(g)(4), 5.51(c)(6), and 24.2(e)(4), this Consent Order shall not be construed to be a "cease and desist order" or "consent order", unless the OCC informs the Bank otherwise.

## ARTICLE II
## AGREEMENT

(1)     The Bank, without admitting or denying any wrongdoing, consents and agrees to issuance of the Consent Order by the Comptroller.

(2)     The Bank consents and agrees that the Consent Order shall (a) be deemed an "order issued with the consent of the depository institution" pursuant to 12 U.S.C. § 1818(h)(2), (b) become effective upon its execution by the Comptroller through his authorized representative, and (c) be fully enforceable by the Comptroller pursuant to 12 U.S.C. § 1818(i).

(3)     Notwithstanding the absence of mutuality of obligation, or of consideration, or of a contract, the Comptroller may enforce any of the commitments or obligations herein undertaken by the Bank under his supervisory powers, including 12 U.S.C. § 1818(i), and not as a matter of contract law.  The Bank expressly acknowledges that neither the Bank nor the Comptroller has any intention to enter into a contract.

2

(4)     The Bank declares that no separate promise or inducement of any kind has been made by the Comptroller, or by his agents or employees, to cause or induce the Bank to consent to the issuance of the Consent Order and/or execute the Consent Order.

(5)     The Bank expressly acknowledges that no officer or employee of the Comptroller has statutory or other authority to bind the United States, the United States Treasury Department, the Comptroller, or any other federal bank regulatory agency or entity, or any officer or employee of any of those entities to a contract affecting the Comptroller's exercise of his supervisory responsibilities.

(6)     The OCC releases and discharges the Bank from all potential liability for a cease and desist order that has been or might have been asserted by the OCC based on the banking practices described in the Comptroller's Findings set forth in Article I of the Consent Order, to the extent known to the OCC as of the effective date of the Consent Order. However, the banking practices alleged in Article I of the Consent Order may be utilized by the OCC in other future enforcement actions against the Bank or its institution-affiliated parties, including, without limitation, to assess civil money penalties or to establish a pattern or practice of violations or the continuation of a pattern or practice of violations. This release shall not preclude or affect any right of the OCC to determine and ensure compliance with the terms and provisions of this Stipulation or the Consent Order.

(7)     The terms and provisions of the Stipulation and the Consent Order shall be binding upon, and inure to the benefit of, the parties hereto and their successors in interest. Nothing in this Stipulation or the Consent Order, express or implied, shall give to any person or entity, other than the parties hereto, and their successors hereunder, any

3

benefit or any legal or equitable right, remedy or claim under this Stipulation or the Consent Order.

## ARTICLE III
## WAIVERS

(1)     The Bank, by consenting to this Stipulation, waives:

(a)     the issuance of a Notice of Charges pursuant to 12 U.S.C. § 1818(b);

(b)     any and all procedural rights available in connection with the issuance of the Consent Order;

(c)     all rights to a hearing and a final agency decision pursuant to 12 U.S.C. §§ 1818(b) and (h), 12 C.F.R. Part 19;

(d)     all rights to seek any type of administrative or judicial review of the Consent Order;

(e)     any and all claims for fees, costs or expenses against the Comptroller, or any of his agents or employees, related in any way to this enforcement matter or this Consent Order, whether arising under common law or under the terms of any statute, including, but not limited to, the Equal Access to Justice Act, 5 U.S.C. § 504 and 28 U.S.C. § 2412; and

(f)     any and all rights to challenge or contest the validity of the Consent Order.

4

## ARTICLE IV
## OTHER PROVISIONS

(1)     The provisions of this Stipulation shall not inhibit, estop, bar, or otherwise prevent the Comptroller from taking any other action affecting the Bank if, at any time, it deems it appropriate to do so to fulfill the responsibilities placed upon it by the several laws of the United States of America.

(2)     Nothing in this Stipulation shall preclude any proceedings brought by the Comptroller to enforce the terms of this Consent Order, and nothing in this Stipulation constitutes, nor shall the Bank contend that it constitutes, a waiver of any right, power, or authority of any other representative of the United States or an agency thereof, including, without limitation, the United States Department of Justice, to bring other actions deemed appropriate.

(3)     The terms of the Stipulation and the Consent Order are not subject to amendment or modification by any extraneous expression, prior agreements or prior arrangements between the parties, whether oral or written.


IN TESTIMONY WHEREOF, the undersigned, authorized by the Comptroller as his representative, has hereunto set her hand on behalf of the Comptroller.


/s/

Sally G. Belshaw
Deputy Comptroller
Large Bank Supervision

April 13, 2011

Date

5

IN TESTIMONY WHEREOF, the undersigned, as the duly elected and acting

Board of Directors of the Bank, have hereunto set their hands on behalf of the Bank.


| | |
|---|---|
| /s/ | 3/30/2011 |
| James Dimon | Date |

| | |
|---|---|
| /s/ | 4/4/2011 |
| Douglas Braunstein | Date |

| | |
|---|---|
| /s/ | 3/30/2011 |
| Barry Zubrow | Date |

| | |
|---|---|
| /s/ | 3/30/2011 |
| Frank Bisignano | Date |

| | |
|---|---|
| /s/ | 3/30/2011 |
| Laban Jackson | Date |

| | |
|---|---|
| /s/ | 3/31/2011 |
| James Crown | Date |

6

# ORIGINAL

| STATE OF TENNESSEE 20TH JUDICIAL DISTRICT CHANCERY COURT | **SUMMONS** | CASE FILE NUMBER  *12-1502-I* |
|---|---|---|

| PLAINTIFF  *SHERi JONES AKA BAKER Baker*  *DERYL BAKER* | DEFENDANT  *SHellie WAllAce* |
|---|---|

TO: (NAME AND ADDRESS OF DEFENDANT)

*SHellie WAllAce*
*1521 MERRill DRive Suite D-220*
*LiTTle Rock, AR 72211*

Method of Service:

- ☑ Certified Mail
- G Davidson Co. Sheriff
- G *Comm. Of Insurance
- G *Secretary of State
- G *Out of County Sheriff
- G Private Process Server
- G Other
  *Attach Required Fees

List each defendant on a separate summons.

YOU ARE SUMMONED TO DEFEND A CIVIL ACTION FILED AGAINST YOU IN CHANCERY COURT, DAVIDSON COUNTY, TENNESSEE. YOUR DEFENSE MUST BE MADE WITHIN THIRTY (30) DAYS FROM THE DATE THIS SUMMONS IS SERVED UPON YOU. YOU MUST FILE YOUR DEFENSE WITH THE CLERK OF THE COURT AND SEND A COPY TO THE PLAINTIFF'S ATTORNEY AT THE ADDRESS LISTED BELOW. IF YOU FAIL TO DEFEND THIS ACTION BY THE ABOVE DATE, JUDGMENT BY DEFAULT CAN BE RENDERED AGAINST YOU FOR THE RELIEF SOUGHT IN THE COMPLAINT.

| Attorney for plaintiff or plaintiff if filing Pro Se: (Name, address & telephone number) | FILED, ISSUED & ATTESTED  OCT 1 9 2012  CRISTI SCOTT, Clerk and Master By: 1 Public Square Suite 308 Nashville, TN 37201  *Deputy Clerk & Master* |
|---|---|

## NOTICE OF DISPOSITION DATE

The disposition date of this case is twelve months from date of filing. The case must be resolved or set for trial by this date or it will be dismissed by the Court for failure to prosecute pursuant to T.R.C.P. 41.02 and Local Rule 18.

If you think the case will require more than one year to resolve or set for trial, you must send a letter to the Clerk and Master at the earliest practicable date asking for an extension of the disposition date and stating your reasons. Extensions will be granted only when exceptional circumstances exist.

| TO THE SHERIFF: | DATE RECEIVED |
|---|---|
| | Sheriff |

***Submit one original plus one copy for each defendant to be served.

*ADA Coordinator, Cristi Scott (862-5710)

# RETURN ON SERVICE OF SUMMONS

I hereby return this summons as follows: (Name of Party Served) _____

☐ Served _____
☐ Not Served _____
☐ Not Found _____
☐ Other _____

DATE OF RETURN: _____ 

By: _____

Sheriff or other authorized person to serve process

## RETURN ON SERVICE OF SUMMONS BY MAIL

I hereby certify and return that on the _____ day of _____, 20___, I sent, postage prepaid, by registered return receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in case _____ to the defendant _____. On the _____ day of _____, 20___, I received the return receipt, which had been signed by _____ on the _____ day of _____, 20___.

The return receipt is attached to this original summons to be filed by the Chancery Court Clerk & Master.

Sworn to and subscribed before me on this _____ day of _____
_____, 20___.

Signature of _____ Notary Public or _____ Deputy Clerk

My Commission Expires: _____

Signature of plaintiff, plaintiff's attorney or other person authorized by statute to serve process.

## NOTICE OF PERSONAL PROPERTY EXEMPTION

TO THE DEFENDANT(S):

Tennessee law provides that a ten thousand dollar ($10,000.00) debtor's equity interest personal property exemption from execution or seizure to satisfy a judgment. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for yourself and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer.

Mail list to:  Clerk & Master
1 Public Square
Suite 308
Nashville TN 37201

Please state file number on list.

## CERTIFICATION (IF

I, Cristi Scott, Clerk & Master of the Chancery Court in the State of Tennessee, Davidson County, do certify this to be a true and correct copy of the original summons issued in this case.

PS Form 3811, February 2004        Domestic Return Receipt

SENDER: COMPLETE THIS SECTION

■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

SHERRI WALLACE
152 1 MEREDITH DRIVE
Little Rock, AR
72211

2. Article Number (Transfer from service label)
7011 3500 0003 0204 6116

COMPLETE THIS SECTION ON DELIVERY

A. Signature
X _____ ☐ Agent  ☐ Addressee

B. Received by ( Printed Name )   C. Date of Delivery
Sheri Lucas      10/29

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type
☐ Certified Mail   ☐ Express Mail
☐ Registered   ☐ Return Receipt for Merchandise
☐ Insured Mail   ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

# ORIGINAL

| STATE OF TENNESSEE<br>20TH JUDICIAL DISTRICT<br>CHANCERY COURT | **SUMMONS** | CASE FILE NUMBER<br>*12-1502-I* |
|---|---|---|

| PLAINTIFF<br>SHeri BAKer (AKA Jones)<br>DERYL BAKer | DEFENDANT<br>MERS |
|---|---|

**TO: (NAME AND ADDRESS OF DEFENDANT)**

MORTGAGE Electronic Registration System inc,
PO Box 2026
FLint, Michigan 48501-2026

**Method of Service:**
G Certified Mail
G Davidson Co. Sheriff
G *Comm. Of Insurance
G *Secretary of State
G *Out of County Sheriff
G Private Process Server
G Other____
    *Attach Required Fees

List each defendant on a separate summons.

YOU ARE SUMMONED TO DEFEND A CIVIL ACTION FILED AGAINST YOU IN CHANCERY COURT, DAVIDSON COUNTY, TENNESSEE. YOUR DEFENSE MUST BE MADE WITHIN THIRTY (30) DAYS FROM THE DATE THIS SUMMONS IS SERVED UPON YOU. YOU MUST FILE YOUR DEFENSE WITH THE CLERK OF THE COURT AND SEND A COPY TO THE PLAINTIFF'S ATTORNEY AT THE ADDRESS LISTED BELOW. IF YOU FAIL TO DEFEND THIS ACTION BY THE ABOVE DATE, JUDGMENT BY DEFAULT CAN BE RENDERED AGAINST YOU FOR THE RELIEF SOUGHT IN THE COMPLAINT.

| Attorney for plaintiff or plaintiff if filing Pro Se:<br>(Name, address & telephone number) | FILED, ISSUED & ATTESTED<br><br>OCT 19 2012<br><br>CRISTI SCOTT, Clerk and Master<br>By:            1 Public Square<br>                   Suite 308<br>                   Nashville, TN 37201<br><br>Deputy Clerk & Master |
|---|---|

## NOTICE OF DISPOSITION DATE

The disposition date of this case is twelve months from date of filing. The case must be resolved or set for trial by this date or it will be dismissed by the Court for failure to prosecute pursuant to T.R.C.P. 41.02 and Local Rule 18.

If you think the case will require more than one year to resolve or set for trial, you must send a letter to the Clerk and Master at the earliest practicable date asking for an extension of the disposition date and stating your reasons. Extensions will be granted only when exceptional circumstances exist.

| TO THE SHERIFF: | DATE RECEIVED |
|---|---|
| | **Sheriff** |

\*\*\*Submit one original plus one copy for each defendant to be served.

ADA Coordinator, Cristi Scott (862-5710)

2012 OCT 30 PM 3:00 CLERK & MASTER DAVIDSON CO. CHANCERY CT. D.C. & M. FILED

## RETURN ON SERVICE OF SUMMONS

I hereby return this summons as follows: (Name of Party Served) _____

☐ Served _____     ☐ Not Found _____
☐ Not Served _____     ☐ Other _____

| DATE OF RETURN: | By: |
|---|---|
| | Sheriff/or other authorized person to serve process |

## RETURN ON SERVICE OF SUMMONS BY MAIL

I hereby certify and return that on the _____ day of _____, 20___, I sent, postage prepaid, by registered return receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in case _____ to the defendant _____. On the _____ day of _____, 20___, I received the return receipt, which had been signed by _____ on the _____ day of _____, 20___.

The return receipt is attached to this original summons to be filed by the Chancery Court Clerk & Master.

Sworn to and subscribed before me on this _____ day of _____
_____, 20___.

Signature of _____ Notary Public or _____ Deputy Clerk

Signature of plaintiff, plaintiff's attorney or other person

My Commission Expires:

### NOTICE OF PERSONAL PROPERTY EXEMPTION

**TO THE DEFENDANT(S):**

Tennessee law provides a ten thousand dollar ($10,000.00) debtor's equity interest personal property exemption from execution or seizure to satisfy a judgment. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for yourself and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer.

Mail list to:  Clerk & Master
1 Public Square
Suite 308
Nashville TN 37201

Please state file number on list.

### CERTIFICATION (1

I, Cristi Scott, Clerk & Master of the Chancery Court in the State of Tennessee, Davidson County, do certify this to be a true and correct copy of the original summons issued in this case.

SENDER: COMPLETE THIS SECTION

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

MORTGAGE Electronic System
MERS
P.O. Box 2026
FLINT MICH 48501-2026

COMPLETE THIS SECTION ON DELIVERY

A. Signature
X _____  ☐ Agent  ☐ Addressee

B. Received by (Printed Name)  C. Date of Delivery
Katie Richardson

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type
☑ Certified Mail  ☐ Express Mail
☐ Registered  ☐ Return Receipt for Merchandise
☐ Insured Mail  ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)  ☐ Yes

2. Article Number
(Transfer from service label)
7011 3500 0003 0284 6093

PS Form 3811, February 2004    Domestic Return Receipt

D.C. & M.

# ORIGINAL

| STATE OF TENNESSEE<br>20TH JUDICIAL DISTRICT<br>CHANCERY COURT | **SUMMONS** | CASE FILE NUMBER<br>*12-1502-I* |
|---|---|---|

| PLAINTIFF<br>*SHERi BAKER (AKA Jones)*<br>*DERYL BAKER* | DEFENDANT<br>*Chase Home Finance* |
|---|---|

TO: (NAME AND ADDRESS OF DEFENDANT)

*CHASE Home FiNANCE LLC*
*3415 Vision DRive*
*Columbus, OH 43219*

Method of Service:

- ✓ Certified Mail
- G Davidson Co. Sheriff
- G *Comm. Of Insurance
- G *Secretary of State
- G *Out of County Sheriff
- G Private Process Server
- G Other
  *Attach Required Fees

List each defendant on a separate summons.

YOU ARE SUMMONED TO DEFEND A CIVIL ACTION FILED AGAINST YOU IN CHANCERY COURT, DAVIDSON COUNTY, TENNESSEE. YOUR DEFENSE MUST BE MADE WITHIN THIRTY (30) DAYS FROM THE DATE THIS SUMMONS IS SERVED UPON YOU. YOU MUST FILE YOUR DEFENSE WITH THE CLERK OF THE COURT AND SEND A COPY TO THE PLAINTIFF'S ATTORNEY AT THE ADDRESS LISTED BELOW. IF YOU FAIL TO DEFEND THIS ACTION BY THE ABOVE DATE, JUDGMENT BY DEFAULT CAN BE RENDERED AGAINST YOU FOR THE RELIEF SOUGHT IN THE COMPLAINT.

| Attorney for plaintiff or plaintiff if filing Pro Se:<br>(Name, address & telephone number) | FILED, ISSUED & ATTESTED<br>OCT 19 2012<br><br>CRISTI SCOTT, Clerk and Master<br>By:       1 Public Square<br>          Suite 308<br>          Nashville, TN 37201<br><br>Deputy Clerk & Master |
|---|---|

## NOTICE OF DISPOSITION DATE

The disposition date of this case is twelve months from date of filing. The case must be resolved or set for trial by this date or it will be dismissed by the Court for failure to prosecute pursuant to T.R.C.P. 41.02 and Local Rule 18.

If you think the case will require more than one year to resolve or set for trial, you must send a letter to the Clerk and Master at the earliest practicable date asking for an extension of the disposition date and stating your reasons. Extensions will be granted only when exceptional circumstances exist.

| TO THE SHERIFF: | DATE RECEIVED |
|---|---|
| | **Sheriff** |

***Submit one original plus one copy for each defendant to be served.

ADA Coordinator, Cristi Scott (862-5710)

## RETURN ON SERVICE OF SUMMONS

I hereby return this summons as follows:  (Name of Party Served) _____

□ Served _____     □ Not Found _____
□ Not Served _____     □ Other _____

| DATE OF RETURN: | By: |
| | Sheriff/or other authorized person to serve process |

## RETURN ON SERVICE OF SUMMONS BY MAIL

I hereby certify and return that on the _____ day of _____, 20___, I sent, postage prepaid, by registered return

receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in case _____ to

the defendant _____. On the _____ day of _____, 20___, I received the return

receipt, which had been signed by _____ on the _____ day of _____, 20___.

The return receipt is attached to this original summons to be filed by the Chancery Court Clerk & Master.

Sworn to and subscribed before me on this _____ day of _____     Signature of plaintiff, plaintiff's attorney or other person
_____, 20___.                                                     authorized by statute to serve process.
Signature of _____ Notary Public or _____ Deputy Clerk

My Commission Expires: _____

### NOTICE OF PERSONAL PROPERTY EXEMPTION

TO THE DEFENDANT(S):

  Tennessee law provides a ten thousand dollar ($10,000.00) debtor's equity interest personal property exemption from execution or seizure to satisfy a judgment.  If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court.  The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list.  Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for yourself and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them.  If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer.

  Mail list to:  Clerk & Master
                 1 Public Square
                 Suite 308
                 Nashville TN 37201

Please state file number on list.

### CERTIFICATION (IF

I, Cristi Scott, Clerk & Master of the Chancery Court in the State of Tennessee, Davidson County, do certify this to be a true and correct copy of the original summons issued in this case.

PS Form 3811, February 2004          Domestic Return Receipt          102595-02-M-1540

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Chase Home Finance LLC
3415 Vision Drive
Columbus, OH 43219

2. Article Number
   (Transfer from service label)

7011 3500 0003 0284 6130

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature  Joe Cowans

X _____   □ Agent
                            □ Addressee

B. Received by (Printed Name)    C. Date of Delivery

D. Is delivery address different from item 1?  □ Yes
   If YES, enter delivery address below:       □ No

3. Service Type
   ☒ Certified Mail    □ Express Mail
   □ Registered        □ Return Receipt for Merchandise
   □ Insured Mail      □ C.O.D.

4. Restricted Delivery? (Extra Fee)    □ Yes

# ORIGINAL

## SUMMONS

| STATE OF TENNESSEE 20TH JUDICIAL DISTRICT CHANCERY COURT | CASE FILE NUMBER 12-1502-I |

**PLAINTIFF**
DERYL L. BAKER
SHERI L. JONES

**DEFENDANT**
JP MORGAN CHASE

TO: (NAME AND ADDRESS OF DEFENDANT)
J.P. MORGAN CHASE BANK NA.
3415 VISION DRIVE
COLUMBUS, OHIO

Method of Service:
☑ Certified Mail
G  Davidson Co. Sheriff
G  *Comm. Of Insurance
G  *Secretary of State
G  *Out of County Sheriff
G  Private Process Server
G  Other
    *Attach Required Fees

List each defendant on a separate summons.

YOU ARE SUMMONED TO DEFEND A CIVIL ACTION FILED AGAINST YOU IN CHANCERY COURT, DAVIDSON COUNTY, TENNESSEE. YOUR DEFENSE MUST BE MADE WITHIN THIRTY (30) DAYS FROM THE DATE THIS SUMMONS IS SERVED UPON YOU. YOU MUST FILE YOUR DEFENSE WITH THE CLERK OF THE COURT AND SEND A COPY TO THE PLAINTIFF'S ATTORNEY AT THE ADDRESS LISTED BELOW. IF YOU FAIL TO DEFEND THIS ACTION BY THE ABOVE DATE, JUDGMENT BY DEFAULT CAN BE RENDERED AGAINST YOU FOR THE RELIEF SOUGHT IN THE COMPLAINT.

| Attorney for plaintiff or plaintiff if filing Pro Se: (Name, address & telephone number) | FILED, ISSUED & ATTESTED  OCT 19 2012 |
| | CRISTI SCOTT, Clerk and Master By:  1 Public Square  Suite 308  Nashville, TN 37201  Deputy Clerk & Master |

### NOTICE OF DISPOSITION DATE

The disposition date of this case is twelve months from date of filing. The case must be resolved or set for trial by this date or it will be dismissed by the Court for failure to prosecute pursuant to T.R.C.P. 41.02 and Local Rule 18.

If you think the case will require more than one year to resolve or set for trial, you must send a letter to the Clerk and Master at the earliest practicable date asking for an extension of the disposition date and stating your reasons. Extensions will be granted only when exceptional circumstances exist.

| TO THE SHERIFF: | DATE RECEIVED |
| | Sheriff |

CLERK & MASTER
DAVIDSON CO. CHANCERY CT
2012 OCT 30 PH 3:00
FILED

***Submit one original plus one copy for each defendant to be served.

♿ADA Coordinator, Cristi Scott (862-5710)

## RETURN ON SERVICE OF SUMMONS

I hereby return this summons as follows: (Name of Party Served) _____

☐ Served _____          ☐ Not Found _____
☐ Not Served _____          ☐ Other _____

DATE OF RETURN: _____ | By: _____

Sheriff/or other authorized person to serve process

## RETURN ON SERVICE OF SUMMONS BY MAIL

I hereby certify and return that on the _____ day of _____, 20___, I sent, postage prepaid, by registered return

receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in case _____ to

the defendant _____. On the _____ day of _____, 20___, I received the return

receipt, which had been signed by _____ on the _____ day of _____, 20___.

The return receipt is attached to this original summons to be filed by the Chancery Court Clerk & Master.

Sworn to and subscribed before me on this _____ day of _____
_____, 20___.
Signature of _____ Notary Public or _____ Deputy Clerk

My Commission Expires:

Signature of plaintiff, plaintiff's attorney or other person
authorized by statute to serve process.

### NOTICE OF PERSONAL PROPERTY EXEMPTION

**TO THE DEFENDANT(S):**

Tennessee law provides a ten thousand dollar ($10,000.00) debtor's equity interest personal property exemption from execution or seizure to satisfy a judgment. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for yourself and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer.

Mail list to:  Clerk & Master
1 Public Square
Suite 308
Nashville TN 37201

Please state file number on list.

### CERTIFICATION (I

I, Cristi Scott, Clerk & Master of the Chancery Court in the State of Tennessee, Davidson County, do certify this to be a true and correct copy of the original summons issued in this case.

SENDER: COMPLETE THIS SECTION

■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

JP Morgan Chase Bank
3415 Vision Dr
Columbus, OH 43219

PS Form 3811, February 2004    Domestic Return Receipt    102595-02-M-1540

2. Article Number
(Transfer from service label)

7011 3500 0003 0284 6109

COMPLETE THIS SECTION ON DELIVERY

A. Signature
X                    Joe Cowan    ☐ Agent
                                  ☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:       ☐ No

3. Service Type
   ☑ Certified Mail   ☐ Express Mail
   ☐ Registered       ☐ Return Receipt for Merchandise
   ☐ Insured Mail     ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

# ORIGINAL

| STATE OF TENNESSEE 20TH JUDICIAL DISTRICT CHANCERY COURT | SUMMONS | CASE FILE NUMBER 12-1502-I |
|---|---|---|

| PLAINTIFF | DEFENDANT |
|---|---|
| SHERi L BAKER (Jones) AKA DERYL L BAKER | Wilson & Associates |

**TO: (NAME AND ADDRESS OF DEFENDANT)**

Wilson & Associates
1521 ~~Wilson Rd~~ Merrill Drive Suite D-220
Little Rock AR 72211

Method of Service:

- C̶ Certified Mail
- G Davidson Co. Sheriff
- G *Comm. Of Insurance
- G *Secretary of State
- G *Out of County Sheriff
- G Private Process Server
- G Other
  *Attach Required Fees

List each defendant on a separate summons.

YOU ARE SUMMONED TO DEFEND A CIVIL ACTION FILED AGAINST YOU IN CHANCERY COURT, DAVIDSON COUNTY, TENNESSEE. YOUR DEFENSE MUST BE MADE WITHIN THIRTY (30) DAYS FROM THE DATE THIS SUMMONS IS SERVED UPON YOU. YOU MUST FILE YOUR DEFENSE WITH THE CLERK OF THE COURT AND SEND A COPY TO THE PLAINTIFF'S ATTORNEY AT THE ADDRESS LISTED BELOW. IF YOU FAIL TO DEFEND THIS ACTION BY THE ABOVE DATE, JUDGMENT BY DEFAULT CAN BE RENDERED AGAINST YOU FOR THE RELIEF SOUGHT IN THE COMPLAINT.

| Attorney for plaintiff or plaintiff if filing Pro Se: (Name, address & telephone number) | FILED, ISSUED & ATTESTED |
|---|---|
| | OCT 19 2012 |
| | CRISTI SCOTT, Clerk and Master By: 1 Public Square Suite 308 Nashville, TN 37201 |
| | Deputy Clerk & Master |

## NOTICE OF DISPOSITION DATE

The disposition date of this case is twelve months from date of filing. The case must be resolved or set for trial by this date or it will be dismissed by the Court for failure to prosecute pursuant to T.R.C.P. 41.02 and Local Rule 18.

If you think the case will require more than one year to resolve or set for trial, you must send a letter to the Clerk and Master at the earliest practicable date asking for an extension of the disposition date and stating your reasons. Extensions will be granted only when exceptional circumstances exist.

| TO THE SHERIFF: | DATE RECEIVED |
|---|---|
| | |
| | Sheriff |

***Submit one original plus one copy for each defendant to be served.

ADA Coordinator, Cristi Scott (862-5710)

## RETURN ON SERVICE OF SUMMONS

I hereby return this summons as follows: (Name of Party Served) _____

☐ Served _____  ☐ Not Found _____
☐ Not Served _____  ☐ Other _____

| DATE OF RETURN: | By: |
| | Sheriff/or other authorized person to serve process |

## RETURN ON SERVICE OF SUMMONS BY MAIL

I hereby certify and return that on the _____ day of _____, 20___, I sent, postage prepaid, by registered return

receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in case _____ to

the defendant _____. On the _____ day of _____, 20___, I received the return

receipt, which had been signed by _____ on the _____ day of _____, 20___.

The return receipt is attached to this original summons to be filed by the Chancery Court Clerk & Master.

Sworn to and subscribed before me on this _____ day of _____ , 20___.

Signature of _____ Notary Public or _____ Deputy Clerk

My Commission Expires:

Signature of plaintiff, plaintiff's attorney or other person authorized by statute to serve process.

### NOTICE OF PERSONAL PROPERTY EXEMPTION

TO THE DEFENDANT(S):

Tennessee law provides a ten thousand dollar ($10,000.00) debtor's equity interest personal property exemption from execution or seizure to satisfy a judgment. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for yourself and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer.

Mail list to: Clerk & Master
1 Public Square
Suite 308
Nashville TN 37201

Please state file number on list.

ATTACH
RETURN
RECEIPT
HERE
(IF APPLICABLE)

## CERTIFICATION (IF APPLICABLE)

| I, Cristi Scott, Clerk & Master of the Chancery Court in the State of Tennessee, Davidson County, do certify this to be a true and correct copy of the original summons issued in this case. | CRISTI SCOTT, Clerk & Master |
| | By: |
| | D.C. & M. |



## Track/Confirm - Intranet Item Inquiry - Domestic

**Tracking Label: 7011 3500 0003 0284 6123**

| | | | |
|---|---|---|---|
| **Destination** | **ZIP Code:** 72211 | **City:** LITTLE ROCK | **State:** AR |
| **Origin** | **ZIP Code:** 37027-9998 | **City:** BRENTWOOD | **State:** TN |

**Class/Service:** Priority Mail Certified Mail

Service Calculation Information

**Service Performance Date**
Scheduled Delivery Date: 10/24/2012

**Weight: 2 lb(s) 3 oz(s)**

**Postage:** $8.05

**Zone:** 04

**Delivery Option Indicator:** Normal Delivery

**PO Box?:** N

**Rate Indicator:** Single-Piece Rate

| Special Services | Associated Labels | Amount |
|---|---|---|
| Certified Mail | 7011 3500 0003 0284 6123 | $2.95 |
| Return Receipt | 7011 3500 0003 0284 6123 | $2.35 |

| Event | Date/Time | Location | Scanner ID |
|---|---|---|---|
| DELIVERED | 10/24/2012 10:59 | LITTLE ROCK, AR 72211 | 030SHCX697 |
| | **Input Method:** Scanned | | |
| | **Finance Number:** 045144 | | |
| | Request Delivery Record | | |
| | View Delivery Signature and Address | | |
| ARRIVAL AT UNIT | 10/24/2012 08:21 | LITTLE ROCK, AR 72211 | 030SHAB102 |
| | **Input Method:** Scanned | | |
| DISPATCHED TO SORT FACILITY | 10/22/2012 17:27 | BRENTWOOD, TN 37027 | |
| | **Input Method:** System Generated | | |
| | **Closeout Label ID:** CT144427900012102217462 6 | | |
| ACCEPT OR PICKUP | 10/22/2012 17:15 | BRENTWOOD, TN 37027 | |
| | **Input Method:** Scanned | | |
| | **Finance Number:** 471020 | | |

**Enter Request Type and Item Number:**

Quick Search ⦿    Extensive Search ○

Explanation of Quick and Extensive Searches

Submit

*Version 1.0*

Inquire on multiple items.

FILED
2012 OCT 30 PM 3:01
DAVIDSON CO. CHANCERY CT.
CLERK & MASTER



## UNITED STATES
## POSTAL SERVICE

**Track/Confirm – Intranet Item Inquiry**
**Item Number: 7011 3500 0003 0284 6123**

2012 OCT 30 PM 3:01
CLERK & MASTER
DAVIDSON CO. CHANCERY CT.
D.C. & M.
FILED

**This item was delivered on 10/24/2012 at 10:59**



| | |
|---|---|
| **Signature:** | |
| **Address:** | |

**Enter Request Type and Item Number:**

**Quick Search** ◉          **Extensive Search** ○

Explanation of Quick and Extensive Searches

Submit

*Version 1.0*

Inquire on multiple items.

Go to the Product Tracking System Home Page.